**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ARCO CAPITAL CORPORATION LTD, <br><br>             Plaintiff, <br><br>    v. <br><br>DEUTSCHE BANK AG, <br><br>          Defendant. | 1:12-cv-7270-RWS <br><br> **ECF Case** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT DEUTSCHE BANK AG'S MOTION TO DISMISS</u>**

JONES DAY
Jayant W. Tambe
Kelly A. Carrero
222 East 41st Street
New York, New York 10017
Tel: (212) 326-3939

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................... 2

    A.    Arco's Investment in the Craft EM CLO .............................................. 2

    B.    Representations and Warranties by Note Purchasers ............................. 3

    C.    Swap Agreements Between the Issuer and Deutsche Bank ..................... 5

    D.    Arco's Allegations and Claims ............................................................... 8

ARGUMENT .................................................................................................. 10

    I.    PLAINTIFF'S FEDERAL SECURITIES LAWS CLAIM FAILS ON
        MULTIPLE GROUNDS ........................................................................ 10

    A.    The Section 10(b) Claim Fails Under Morrison ..................................... 10

    B.    The Section 10(b) Claim Is Time-Barred ............................................... 13

    C.    The Section 10(b) Claim Fails To State a Claim .................................... 14

        1.    The Complaint Fails to Plead Any Fraudulent Conduct ............. 15

        2.    The Complaint Fails to Plead *Scienter* ....................................... 20

        3.    The Complaint Fails to Plead Reliance ........................................ 22

    II.    ARCO LACKS STANDING FOR ITS BREACH OF CONTRACT
        CLAIM ................................................................................................... 24

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
 677 F.3d 60 (2d Cir. 2012)..............................................................................11, 2

*Anwar v. Fairfield Greenwich Ltd.*,
 728 F. Supp. 2d 372 (S.D.N.Y. 2010).....................................................................14

*Arnold v. KPMG LLP*,
 334 F.App'x 349 (2d Cir. 2009) .............................................................................14

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)................................................................................................16

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007).................................................................................15, 20

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*,
 No. 03 Civ. 1537(MBM), 2003 WL 23018888 (S.D.N.Y. 2003)...........................25

*Bay Harbour Mgmt. LLC v. Carothers*,
 Nos. 07-1124-cv, 07-1157-cv, 2008 WL 2566557 (2d Cir. June 24, 2008)...........17

*Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.*,
 Civil Action No. 08–cv–01381–MSK–CBS, 2011 WL 1211511 (D. Colo. Mar. 31,
 2011) .....................................................................................................................12

*Catton v. Defense Tech. Sys., Inc.*,
 No. 05 Civ. 6954(SAS), 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006)........................20

*Cent. Bank of Denver v. First Interstate Bank of Denver*,
 511 U.S. 164 (1994)................................................................................................22

*Chill v. Gen. Elec. Co.*,
 101 F.3d 263 (2d Cir. 1996)....................................................................................20

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
 343 F.3d 189 (2d Cir. 2003)....................................................................................23

*Epirus Capital Mgmt., LLC v. Citigroup Inc.*,
 No. 09 Civ. 2594(SHS), 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)............17, 20

*Field v. Trump*,
 850 F.2d 938 (2d Cir. 1988)....................................................................................18

*Gurary v. Winehouse,*
    190 F.3d 37 (2d Cir. 1999).................................................................................19

*Harsco Corp. v. Segui,*
    91 F.3d 337 (2d Cir. 1996)................................................................................23

*In re AstraZeneca Secs. Litig.,*
    559 F. Supp. 2d 453 (S.D.N.Y. 2008)................................................................20

*In re Citigroup Auction Rate Secs. Litig.,*
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)................................................................21

*In re Merrill Lynch Auction Rate Secs. Litig.,*
    765 F. Supp. 2d 375 (S.D.N.Y. 2011)................................................................22

*In re Refco Capital Mkts., Ltd. Brokerage Customer Secs. Litig.,*
    No. 06 Civ. 643(GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007), *aff'd sub nom,*
    *Capital Mgmt. Select Fund v. Bennett* , 670 F.3d 194 (2d Cir. 2012) ........................15, 16, 19

*In re Smith Barney Transfer Agent Litig.,*
    No. 05 Civ. 7583(WHP), 2012 WL 3339098 (S.D.N.Y. 2012)........................15, 22

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
    501 U.S. 350 (1991)...........................................................................................13

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005)...............................................................................18

*Leykin v. AT&T,*
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)................................................................15

*Meridian Horizon Fund, LP v. KPMG (Cayman),*
    Nos. 11-3311-cv, 11-3725-cv, 2012 WL 2754933 (2d Cir. July 12, 2012)............17

*Mills v. Polar Molecular Corp.,*
    12 F.3d 1170 (2d Cir. 1993)...............................................................................19

*Morrison v. National Australia Bank,*
    130 S. Ct. 2869 (2010) ............................................................................... *passim*

*MVP Asset Mgmt. (USA) LLC v. Vestbirk,*
    No. 2:10-cv-02483-GEB-CKD, 2012 WL 2873371 (E.D. Cal. July 12, 2012)......12

*O'Brien v. Nat'l Prop. Analysts Partners,*
    936 F.2d 674 (2d Cir. 1991)...............................................................................21

*P. Stolz Family P'ship, L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004).................................................................................14

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
    603 F.3d 144 (2d Cir. 2010)...........................................................................15

*Pope Invs. II LLC v. Deheng Law Firm*,
    No. 10 Civ. 6608, 2012 WL 3526621 (S.D.N.Y. Aug. 15, 2012) ..........................12

*Premium Mortg. Corp. v. Equifax, Inc.*,
    583 F.3d 103 (2d Cir. 2009)...........................................................................24

*PT. Bank Negara Indonesia (Persero) Tbk v. Barclays Bank PLC*,
    2011 WL 4717360 (S.D.N.Y. Sept. 28, 2011)....................................................21

*S.E.C. v. Tourre*,
    No. 10 Civ. 3229, 2012 WL 5838794 (S.D.N.Y. Nov. 19, 2012) ..........................11

*Schnell v. Conseco, Inc.*,
    43 F. Supp. 2d 438 (S.D.N.Y. 1999).................................................................20

*SEC v. Kelly*,
    817 F.Supp.2d 340 (S.D.N.Y. 2011).................................................................19

*SEC v. PIMCO Advisors Fund Mgmt.*,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)...............................................................18

*Stoneridge Inv. Partners, LLC v. Scientific Atlanta Inc.*,
    552 U.S. 148 (2008)......................................................................................22

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
    425 F.3d 119 (2d Cir. 2005)...........................................................................25

*TCS Capital Mgmt, LLC v. Apax Partners, L.P.*,
    No. 06–CV–13447 (CM), 2008 WL 650385 (March 7, S.D.N.Y. 2008)..................18

*Underdog Trucking, LLC v. Verizon Servs. Corp.*,
    No. 09 Civ. 8918(DLC), 2010 WL 2900048 (S.D.N.Y. July 20, 2010)...................24

**STATUTES**

15 U.S.C. § 78j(b) ..................................................................................................13

17 CFR § 230.901 ..................................................................................................11

17 C.F.R. § 240.10b-5 ......................................................................................*passim*

28 U.S.C. § 1658(b) .........................................................................................2, 14

Fed. R. Civ. P. 8 ....................................................................................................16

Fed. R. Civ. P. 9(b) .......................................................................................1, 15, 21

Fed. R. Civ. P. 12(b)(6).............................................................................................................1

Deutsche Bank AG ("Deutsche Bank" or "Defendant") respectfully submits this memorandum of law in support of its motion to dismiss the Complaint (the "Complaint" or "Compl.") of Plaintiff Arco Capital Corporation Ltd ("Arco" or "Plaintiff") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").[1]

## PRELIMINARY STATEMENT

Arco is a sophisticated Cayman Islands hedge fund that purchased debt securities from a Cayman Islands issuer in an offshore transaction more than five years ago.  The debt securities that Arco elected to purchase were the riskiest classes of notes issued by a Collateralized Loan Obligation ("CLO"), CRAFT EM CLO 2006-1, an offshore company that invested exclusively in emerging market companies and derivatives.  This lawsuit is an ill-conceived effort by Arco to recoup losses it suffered when, in the midst of the global economic crisis, some of those emerging market companies and derivative counterparties suffered defaults and other financial distress, resulting in losses on Arco's notes.

Arco's first cause of action, for securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934, fails because:

    i.    Arco purchased its notes offshore and not on a U.S. exchange or in a domestic transaction.  Under the transactional test adopted by the Supreme Court in *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010), Plaintiff cannot avail itself of the U.S. securities fraud laws to bring a claim for alleged securities violations in connection with its offshore transactions.

---

[1] The Complaint is attached as Exhibit 1 to the accompanying Declaration of Jayant W. Tambe, dated December 3, 2012.  Relevant pages of documents incorporated by reference in the Complaint and cited in Defendant's brief are included as exhibits and referenced herein as "Ex. __."

      ii.     The claim is time-barred because Arco filed this action more than five years after

its last note purchase, when the applicable statute of repose had run.  28 U.S.C. §

1658(b).  The five year repose period is a fixed cut-off that begins to run from the

date of purchase and is not subject to equitable tolling.

In any event, the securities fraud claim suffers from a myriad of pleading deficiencies.  Arco has

done little more than allege fraud-by-hindsight based on alleged misrepresentations arising out of

the same operative facts as Arco's alleged breach of contract claim and then attempted to dress

up those allegations as a "scheme liability" claim.  The complaint not only fails to allege any

fraudulent conduct with the requisite particularity, but also fails to plead at least two other

essential elements, *scienter* and reliance.

      Arco's only other claim, a state law claim for breach of contract, also fails.  Arco was not

a party to the contracts it seeks to enforce; nor does Arco have any basis to assert third party

beneficiary standing.  The sole provision on which Plaintiff relies does not support any inference

that the contractual parties intended to confer third party beneficiary status.  In fact, the provision

does precisely the opposite.  It is a representation and warranty by a purchaser of notes in a

subscription agreement expressly disclaiming reliance on Deutsche Bank, its affiliates and any

person acting on its behalf in connection with its purchase.

      For these and other reasons, the Court should dismiss the Complaint in its entirety, with

prejudice.

## STATEMENT OF FACTS

### A.     Arco's Investment in the Craft EM CLO

The CRAFT EM CLO 2006-1, Ltd., a Cayman Islands company (the "CRAFT EM CLO"

or "Issuer"), is a CLO that issued Notes linked to a portfolio of loans with companies in

emerging markets and derivative transactions.  (Compl. ¶¶ 2-4, 30, 77.)  Arco, a sophisticated

hedge fund organized under Cayman Islands law and headquartered in Puerto Rico, concedes

that it purchased no CRAFT EM CLO notes directly from the Issuer.  (*Id.* ¶¶ 14, 81-84, 166.)

Nor does Arco claim to have purchased any notes directly from Deutsche Bank, at any time.

Instead, Arco alleges that non-party Gramercy Emerging Markets Fund ("Gramercy"), "a

company associated with Arco," in some manner not described in the Complaint, purchased

notes on Arco's behalf (the "Notes").  (*Id.* ¶¶ 81-84, 166.)  In June 2006 (the "First Offering")

and January 2007 (the "Second Offering"), Gramercy purportedly purchased on Arco's behalf a

total of $56,250,000 of the Class F and Class G Notes—the riskiest bottom two classes of notes

issued by the CLO.  (*Id.*)[2]  Arco alleges that, in May 2007, more than five years before this

lawsuit was filed, Gramercy "transferred" the Notes to Arco in a "pass-through" transaction.  (*Id.*

¶ 84.)

## B.    Representations and Warranties by Note Purchasers

In connection with each purchase of Notes, Gramercy executed a separate Note

Subscription Agreement.  (Compl. ¶ 61; Exs. 8-11 [Note Subscription Agreements].)  The

subscription under each Note Subscription Agreement became an irrevocable agreement between

Gramercy and the CLO only upon acceptance by the CLO in the Cayman Islands:

> This subscription by the Purchaser is irrevocable; provided,
> however, that the execution and delivery by the Purchaser of this
> Subscription Agreement will not constitute an agreement between
> the Company and the Purchaser until this Subscription Agreement

---

[2] The CLO issued three classes of notes, the Class E, the Class F, and the Class G Notes, in two offshore transactions.  (Compl. ¶ 4; *see also* Exs. 2-5 at § 2.3 [Indentures]; Ex. 6 [Indenture Ex. A (Form of Note)]; Ex. 7 [Indenture Ex. B (Deemed Representations of Noteholders)].)  The Class E-1, F-1, and G-1 Notes were issued in the First Offering in June 2006, and the Class E-2, F-2, and G-2 Notes were issued in the Second Offering in January 2007.  (Compl. ¶¶ 1, 5, 31, 34, 77, 81.)  All Classes of Notes were scheduled to mature on July 15, 2012.  (*Id.* ¶ 10.) The CLO issued each class of securities pursuant to an indenture agreement between the CRAFT EM CLO, as Issuer, and HSBC Bank USA, National Association, as Trustee.  (Compl. ¶¶ 5; Exs. 2-5 [Indentures].)  The Indentures were amended in January 2007, requiring Noteholder consent.  (Compl. ¶ 78; Exs. 2-5 at § 8.2 [Indentures].)  Deutsche Bank is an express third party beneficiary to the Indentures.  (Exs. 2-5 at § 13.8 [Indentures].)

> is accepted on behalf of the Company and, if not so accepted (as
> described below), this subscription and the obligations of the
> Purchaser hereunder will terminate.

(Exs. 8-11 at § 1(b) [Note Subscription Agreements].)

On or before the closing date of each issuance, the Note Subscription Agreements were

agreed to and accepted in the Cayman Islands by a director of the CLO employed by the CLO's

"Administrator," Maples & Calder, a Cayman Islands law firm.  (Exs. 8-11 at Signature Pages

[Note Subscription Agreements]; Ex. 12 at § 2.4 [Administration Agreement]; Ex. 13 [Registers

of Directors and Officers].)  Indeed, the Administration Agreement required them to "perform all

services and take all actions in connection with [the transaction] in or from within the Cayman

Islands."  (Ex. 12 at § 2.9 [Administration Agreement].)  Deutsche Bank was not a party to any

of the Note Subscription Agreements, but was expressly identified as a third party beneficiary.

(Exs. 8-11 at § 17 [Note Subscription Agreements].)

In Section 4 of each Note Subscription Agreement, Gramercy—and by extension Arco,

as Arco contends Gramercy was acting on its behalf —made several representations and

warranties, including that:

- It "received the Indenture and the other Transaction Documents and has not relied on any information . . . other than information that is contained in, and the terms and provisions of, the Indenture and the other Transaction Documents or is otherwise available."

- It "has made its own investment decisions based upon its review of the Indenture and the other Transaction Documents, its own judgment and upon any advice from such advisers as it has deemed necessary . . . ."

- It acknowledged that the Notes had been sold pursuant to Regulation S ("Reg S") of the Securities Act of 1933 (the "1933 Act"), an exemption from the registration requirements of Section 5 of the 1933 Act for offshore securities offerings.

(Exs. 8-11 at § 4(e) - (i) [Note Subscription Agreements].)

By virtue of its acceptance of the Notes, Arco is subject to the terms, provisions and conditions of the Indentures.  (Exs. 2-5 at § 10.5(d) (Reminder to Owner of Notes) [Indentures]; Ex. 6 [Indenture Ex. A (Note)]; Ex. 7 [Indenture Ex. B (Deemed Representations of Noteholders)].)  In the Indentures and in certain exhibits thereto, Arco is deemed to have made similar representations to those in the Note Subscription Agreements, including disclaimers of reliance and acknowledgements that the Notes were offered pursuant to Reg S in an offshore transaction to non-U.S.-persons.  (Exs. 2-5 at §2.6 [Indentures]; Ex. 7 at ¶ 1, 6, 7, 9, 10 [Indenture Ex. B (Deemed Representations of Noteholders)].)

### C.    Swap Agreements Between the Issuer and Deutsche Bank

The Craft EM CLO was a so-called "synthetic" CLO.  (Compl. ¶¶ 2-3, 31-43.)  What that means is that the CLO did not go out and purchase outright whole loans or other direct exposures to the emerging market companies or derivatives counterparties; instead, it gained exposure synthetically through credit default swap transactions the Issuer entered into with Deutsche Bank AG, Frankfurt (the "Swap Agreements").  (Compl. ¶¶ 2-3, 31-43; Exs. 14-17 [Swap Confirmations].)[3]  Not one of the CLO's Noteholders, including Arco, were parties to any of the Swap Agreements.  (Compl. ¶ 2.)  Nor was Arco, or any other Noteholder, an express third party beneficiary of any Swap Agreements.  (Exs. 14-17 [Swap Confirmations].)

***The Reference Portfolio***.  The Swap Agreements referenced a portfolio of Deutsche-Bank originated loans with emerging market companies and derivative transactions (each a

---

[3] The Swap transactions are governed by separate confirmations (each, a "Swap Confirmation") under an ISDA Master Agreement and Schedule between the Issuer and Deutsche Bank AG, Frankfurt.  (Exs. 14-17 [Swap Confirmations].)  In June 2006, the Issuer and Deutsche Bank entered into two Swap transactions the terms of which are reflected by the two Swap Confirmations dated in or around June 2006 (the "2006 Swap Confirmations").  (Exs. 14-15 [2006 Swap Confirmations].)  In January 2007, the Issuer and Deutsche Bank amended the terms of their Swap Agreements as reflected by the two Swap Confirmations dated in or around January 2007 (the "2007 Amended Swap Confirmations").  (Exs. 16-17 [2007 Amended Swap Confirmations].)

"Reference Obligation," and together, the "Reference Portfolio"). (Compl. ¶¶ 2-3, 31-43, 77.) The Reference Portfolio started as $500 million in size. (*Id*. ¶¶ 2, 34.) In January 2007, the Swap Confirmations were amended and the Reference Portfolio's size was increased to $1 billion. (*Id*. ¶¶ 10, 75.) At that time, the definition of "Reference Obligation" was expanded to include "Specified Payment Obligations," which in turn was defined to include certain derivative transactions and "a senior secured or unsecured note of the Reference Entity issued pursuant to an indenture or equivalent instrument." (*Id*. ¶ 77; *compare* Exs. 14-15 at § 1 [2006 Swap Confirmations], *with* Exs. 16-17 at §§ 1 and 3 [2007 Amended Swap Confirmations].)

**Eligibility Criteria**. Deutsche Bank had sole discretion to select the Reference Obligations to add to the Reference Portfolio. (Compl. ¶¶ 7, 36, 178(d).) Each Reference Obligation was required to meet the following qualifications (the "Eligibility Criteria") on the date it was first included in the Reference Portfolio, and on the date of any Replenishment that increased the notional amount of the Reference Obligation (the "Relevant Date"): (1) the underlying company (the "Reference Entity") satisfied credit rating thresholds (e.g., Moody's Equivalent Rating of "B3" or better); (2) the Reference Obligation could meet origination requirements (e.g., an eligible asset type and originated by Deutsche Bank "in accordance with its standard credit policies and guidelines"); (3) there was no known event that with notice or lapse of time would become a Credit Event in relation to the Reference Obligation; (4) the Reference Obligation was legally valid and enforceable in accordance with its terms and applicable provisions of law; and (5) the Reference Obligation was held by or for the benefit of a Deutsche Bank entity. (Compl. ¶¶ 37, 44-56; Exs. 14-17 at ¶1, C [Swap Confirmations].)

**Creditworthiness**. Under the first Eligibility Criteria, a Reference Entity had to meet certain minimum credit rating thresholds, including holding a Moody's Equivalent Rating of "B3"

or better.  (Exs. 14-17 at C [Swap Confirmations].)[4]  For unrated Reference Entities, Deutsche

Bank would ascribe an internal rating to the Reference Entity.  (Compl. ¶¶ 21, 47-48.)  The

rating agencies provided "mapping tables" to determine the corresponding Moody's or S&P

rating to Deutsche Bank's internal ratings, which would be used to determine the "Moody's

Equivalent Rating" and "S&P Equivalent Rating," as defined in the Swap Agreements.  (Compl.

¶¶ 22, 49, 60, 97; Exs. 14-17 at E [Swap Confirmations].)

   ***Independent Accountant Certifications***.  As "Calculation Agent" under the Swap

Confirmations, Deutsche Bank was required to cause the Independent Accountant, Ernst &

Young LLP ("E&Y"), to deliver an irrevocable notice to the Issuer containing a certification—

not an audit— if there was a Credit Event.  (Compl. ¶¶ 41-42, 89-96; Exs. 14-17 at ¶ 4 [Swap

Confirmations].)  The certification was to include: (a) that the defaulted Reference Obligation

satisfied the Eligibility Criteria and Replenishment Conditions;[5] (b) verifying that the related

Credit Event occurred; and (c) verifying the computation of the relevant "Loss Determination

Amount" (each, an "E&Y Certification").  (Exs. 14-17 at ¶ 4 [Swap Confirmations].)  The E&Y

Certifications were drafted by E&Y in accordance with "agreed upon procedures" and expressly

provided they were "in accordance with attestation standards established by the American

Institute of Certified Public Accountants [("AICPA")]."  (Compl. at Ex. B.)

---

[4] Under Moody's rating scale, any rating "Ba1" and below is considered speculative, and "B3," which is five levels lower, is at ***the lowest end of the speculative scale***.  (Ex. 19 [Moody's Investor Services, Ratings and Definitions, November 2012, http://www.moodys.com/researchdocumentcontentpage.aspx?docid =PBC_79004].)

[5] The Replenishment Conditions are a set of five guidelines provided in the Swap Confirmations which place limitations on Deutsche Bank's ability to add to or otherwise alter the contents of the Reference Portfolio during the life of the transaction.  (Compl. ¶¶ 57-60; Exs. 14-17 at D [Swap Confirmations].)  These guidelines are comprised of a series of tests and formulas designed to ensure that the  Reference Portfolio maintains a consistent credit profile following any replenishment.  (*Id.*)

### D.    Arco's Allegations and Claims

Arco's allegations are predicated on seventeen Reference Obligations that Deutsche Bank designated after the Second Offering in January 2007 and that later suffered Credit Events. (Compl. ¶¶ 11, 80.)  Upon default of each Reference Obligation, as provided for under the Swap Agreements, the Issuer was required to make a "Credit Event Payment" to Deutsche Bank.  (*Id*. ¶¶ 3-4, 69-70.)  Each Credit Event Payment correspondingly reduced the amount of funds available to repay the principal balance due on the Notes at maturity.  (*Id*. ¶ 6.)  Notwithstanding that these processes occurred precisely as designed and disclosed in the Indentures and Swap Confirmations, Arco now cries securities fraud and breach of contract seeking to shift to Deutsche Bank the very risk that Arco willingly and knowingly assumed in investing in the most junior Notes of an emerging markets CLO.  (*Id*. ¶¶ 163-180.)

In January 2007, when Arco elected to participate in a foreign transaction pursuant to Reg S to more than double its position in the Notes (*id*. ¶¶ 83-84), Arco represented and warranted repeatedly through the Note Subscription Agreements and Indentures and their exhibits, as discussed *supra*, (SOF p. 3-5): (i) it was eligible to purchase in a Reg S transaction, (ii) it had made its own investment decision, and (iii) it had received the Indenture and Transaction Documents and thus knew (a) the size of the Reference Portfolio had increased, (b) the definition of eligible Reference Obligations had been expanded, (c) what the Eligibility Criteria were, including that the assets were originated by and held by Deutsche Bank, (d) the information it was entitled to receive in quarterly Information Reports,[6] and (e) there would be an accountant certification—not audit—in the event any Reference Obligation suffered a Credit

---

[6] Noteholders were to receive periodic quarterly reports known as "Information Reports" containing the requisite information Noteholders bargained for in the Indentures. (Exs. 2-5 at §10.5 [Indentures].)

Event.[7]  Notwithstanding all of the above and the fact that Arco is not a party or express third-party beneficiary to the Swap Agreements (Exs. 14-17 [Swap Confirmations]), Arco contends one of the *purchaser* representations made in the Notes Subscription Agreement somehow supports that the *parties* to the Swap Agreements intended to confer third party beneficiary status on Noteholders.  (Compl. ¶¶ 13, 177.)  Specifically, Arco contends Section 4(e) of the Note Subscription Agreements, a disclaimer of reliance provision, incorporates the Swap Agreements, which contain terms "vital to the protection of the Noteholders in the Transaction."  (Compl. ¶ 177.)

Arco's securities fraud claim under section 10(b), and Rule 10b-5(a) and (c), for "scheme liability" arises out of the same operative facts as the contract claim and seeks to recoup the $37 million in losses Arco allegedly suffered:

- *First*, as a basis for its fraud and contract claims, Arco contends that assets that suffered Credit Events were ineligible under the Eligibility Criteria in the Swap Agreements.  (Compl. ¶¶ 106-162, 168-169, 178(c).)

- *Second*, as a basis for its fraud and contract claims, Arco takes issue with the E&Y Certifications notwithstanding that those certifications were provided by independent accountant E&Y for each of the seventeen defaulted assets, and were identified as certifications performed in accordance with attestation standards established by the AICPA.  (*Id*. ¶¶ 89-96, 170, 178(a), Ex. B.)  Plaintiff complains about the quality of the E&Y Certifications, but does not claim Deutsche Bank failed to deliver the required E&Y Certifications for any of the seventeen defaulted Reference Obligations.  (*Id*.)

- *Third*, as a basis for its fraud and contract claims, Arco contends Deutsche Bank falsely reported Moody's Equivalent Ratings based on its use of an outdated Moody's mapping table.  (*Id*. ¶¶ 97-105, 171, 178(b).)  Plaintiff has not identified a single asset that fell under the minimum credit threshold set by the Eligibility Criteria, even if the table had in fact been updated, which it was not.  To support its contention that the Moody's mapping table was updated, Plaintiff relies on a press release, which says no such thing.  (*Id*. ¶¶ 98-99; Ex. 18 [Press Release].)

---

[7] Furthermore, under the express terms of the Indentures, to modify an Indenture, any Noteholder adversely affected thereby had to consent to the substance of any proposed supplemental indenture.  (Exs. 2-5 at § 8.2 [Indentures].)

- *Fourth*, as a basis for its fraud and contract claims, Plaintiff contends Defendant took Credit Event Payments it should not have.  (Compl. ¶¶ 172, 178(e).)

As detailed below, no matter how Arco attempts to manipulate the relevant facts and the law, under well-settled legal precedent and Arco's own representations and warranties and its acknowledgement of extensive disclosures and disclaimers, Arco's litigation gambit fails and its Complaint must be dismissed in its entirety.

## ARGUMENT

### I.     PLAINTIFF'S FEDERAL SECURITIES LAW CLAIM FAILS ON MULTIPLE GROUNDS

#### A.     The Section 10(b) Claim Fails Under *Morrison*

Pursuant to *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), section 10(b) and Rule 10b-5 do not apply to Notes purchased by a Cayman Islands plaintiff from a Cayman Islands entity in an offshore transaction.  In *Morrison*, the Supreme Court repudiated the "conduct and effects test," adopting instead a "transaction test" expressly limiting the benefits and protections of the U.S. federal securities laws to two types of transactions: "transactions in securities listed on domestic exchanges and domestic transactions in other securities."  130 S. Ct. at 2884.  There is no contention that Arco's Notes were traded on a domestic exchange.  Nor can Arco credibly contend that its Notes purchases were a domestic transaction.

As the *Morrison* Court noted, "with regard to securities *not* registered on domestic exchanges, the exclusive focus on *domestic* purchases and sales is strongly confirmed by §§ 30(a) and (b). . . ."  *Id.* at 2885.  Under sections 30(a) and (b) of the Securities and Exchange Act of 1934, the Court explained,  it is the "foreign location of the transaction that establishes . . . the Act's inapplicability, absent regulations by the Commission."  *Id*.  The Court then elaborated on how a determination could be made whether a transaction was a domestic one.  It referred expressly to the definition of  domestic transactions as set forth in the Securities Act of 1933, and

the regulations enacted thereunder, as instructive to that question.  *Id*.  Thus, the Supreme Court observed that "[t]he same focus on domestic transactions is evident in the Securities Act of 1933, 48 Stat. 74, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading."  *Id*.  The Court cited specifically to 17 CFR § 230.901 – commonly known as Rule 901 under Regulation S of the 1933 Act – as an example of a regulatory determination "not to include . . . sales that occur outside the United States."  *Id*.  As discussed above, Arco as a purchaser of the CLO notes repeatedly has acknowledged that the Notes and all purchases and transfers of the Notes are offshore transactions pursuant to Regulation S and the related Rules under the 1933 Act.

Following *Morrison*, the Second Circuit has made clear a plaintiff must allege facts giving rise to a plausible inference that the location of the purchase and sale was in the United States, *i.e.*, that "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).  And, more recently, courts in this District have underlined that it is the *Plaintiff's* own securities transaction that is the relevant transaction for determining whether a section 10(b) claim may be pursued. *S.E.C. v. Tourre*, No. 10 Civ. 3229, 2012 WL 5838794, at *5 (S.D.N.Y. Nov. 19, 2012) (Section 10(b) and Rule 10b-5 on their plain terms prohibit fraud "in connection with the purchase or sale of any security," and "[w]ith *Morrison*, the Supreme Court made clear that the 'purchase or sale of [a] security' that provides the basis for a section 10(b) and Rule 10b-5 claim must be a domestic one").  Thus, to pursue a claim under section 10(b), Arco must plead – which it has not and cannot – that the Notes that *it* purchased were purchased in a domestic transaction.  No other transactions or activities related to the Craft EM CLO, whether or not touching upon the United States, can be used as a basis for Arco to seek redress under section 10(b).

The Complaint fails to plead Arco's purchase of the CLO Notes was a domestic transaction. To the extent Arco seeks to establish some "nexus" to the United States because Deutsche Bank employees involved in the transactions were located in New York (Compl. ¶ 166), or Gramercy purportedly transmitted funds following the execution of the Note Subscription Agreements to the Trustee in New York (*id*.), that is simply not enough as a matter of law to satisfy *Morrison*. *See, e.g.*, *Pope Invs. II LLC v. Deheng Law Firm*, No. 10 Civ. 6608, 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012) (if it were enough to plead that "acts that ultimately result in the execution of the transaction abroad take place in the United States [it] amounts to nothing more than the reinstatement of the conduct test.") (citations and quotations omitted); *MVP Asset Mgmt. (USA) LLC v. Vestbirk*, No. 2:10-cv-02483-GEB-CKD, 2012 WL 2873371, at *7 (E.D. Cal. July 12, 2012) ("Plaintiff's allegations concerning the transactions, that certain funds were transferred in between New York-based banking institutions, are insufficient to establish the existence of a domestic transaction, as required under Section 10(b)."); *Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.*, Civil Action No. 08–cv–01381–MSK–CBS, 2011 WL 1211511, at *7 (D. Colo. Mar. 31, 2011) ("[T]hat the funds to complete the transaction were wired (at least initially) to New York . . . does not amount to a conclusion that the transaction was completed in New York. . . . The Subscription Agreement makes clear that simply sending money to New York was not sufficient to complete the transaction.").

Assuming as true Plaintiff's allegation that Gramercy purchased on its behalf, by the plain terms of the Note Subscription Agreements between Gramercy and the Issuer, irrevocable liability attached to the transaction outside the U.S. when the Issuer in the Cayman Islands accepted each of the Note Subscription Agreements executed by Gramercy. *Absolute*, 677 F.3d at 68 (a buyer becomes committed, bound to effectuate the transaction, and incurs irrevocable

liability when it agrees "to deliver a security").  That purchase, by a Cayman Islands purchaser

from a Cayman Islands issuer, completed only upon acceptance of the purchase order by the

Issuer in the Cayman Islands is not a domestic transaction.  Moreover, that transaction and any

subsequent transfer of Notes from Gramercy to Arco were subject to the conditions and express

representations of both Gramercy and Arco that the transactions were offshore and conducted

pursuant to Regulation S.[8]  As accepted by the Supreme Court in *Morrison* itself, the execution

of a transaction pursuant to Regulation S and the 1933 Act should be dispositive that the

transaction cannot be considered a domestic transaction for purposes of the 1934 Act, "enacted

by the same Congress . . .  and forming part of the same comprehensive regulation of securities

trading."  *Morrison*, 130 S. Ct. 2885.

The section 10(b) claim should therefore be dismissed.

**B.      The Section 10(b) Claim Is Time-Barred**

Even if the federal securities laws somehow are deemed to extend to Arco's offshore

transaction, any claim for the violation of the federal securities laws should still be dismissed

because that claim is time-barred under the applicable statute of repose.  *See* 28 U.S.C. § 1658(b)

(A claim "may be brought not later than the earlier of– (1) 2 years after the discovery of the facts

constituting the violation; or (2) 5 year after such violation.")  The five-year statue of repose

period is a fixed statutory cut-off independent of a plaintiff's awareness of a violation and is an

absolute bar, not subject to equitable tolling.  *See, e.g., Lampf, Pleva, Lipkind, Prupis &*

*Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991) ("The purpose of the [statute of repose] . . . is

---

[8] Furthermore, Plaintiff concedes Gramercy did not transfer the Notes to Arco, and Arco did not pay for
them, until May 2007.  (Compl. ¶ 84.)  Plaintiff does not contend this May 2007 transfer was a domestic transaction,
as it cannot.  Indeed, if it were domestic, it would be in direct contravention of the representations and warranties
both Gramercy and Arco made.  (Exs. 8-11 at § 4(m) and (n) [Note Subscription Agreements]; Exs. 2-5 at §10.5(d)
(Reminder to Owner of Notes) [Indentures]; Ex. 6 [Indenture Ex. A (Form of Note)]; Ex. 7 [Indenture Ex. B
(Deemed Representations of Noteholders)].)

clearly to serve as a cutoff . . . [equitable] tolling principles do not apply to that period."); *P. Stolz Family P'ship, L.P. v. Daum*, 355 F.3d 92, 102-03 (2d Cir. 2004) ("[A] statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling . . . .").

To give rise to a section 10(b) claim, an alleged violation must be "in connection with the purchase or sale of [a] security," 15 U.S.C. § 78j(b), and thus it is well-established that the repose and limitations period "starts to run on the date the parties have committed themselves to complete the purchase or sale transaction." *See Arnold v. KPMG LLP*, 334 F.App'x 349, 351 (2d Cir. 2009) (holding in connection with statue of repose applicable at that time that "Plaintiff's contention that the period of repose begins to run at the time of the last alleged misrepresentation (even when made after the final purchase or sale of the securities) ignores the applicable limitations period, and thus, is devoid of merit"); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010) (dismissing section 10(b) claims as time-barred because investments were made more than five years before the complaint was filed) (citing *Arnold*, 334 F. App'x at 351).

Plaintiff Arco contends it purchased Notes in June 2006 and January 2007 when Gramercy purchased on its behalf.  (Compl. ¶¶ 81-83.)  At the very latest, Arco acquired its securities in May 2007 when Gramercy allegedly transferred the Notes to Arco.  (Compl. ¶ 84.) Plaintiff filed its Complaint in September 2012, more than five years after the latest purchase date.  Therefore, Plaintiff's section 10(b) claim is time-barred and must be dismissed.

### C.     The Section 10(b) Claim Fails To State a Claim

It is well-established in misrepresentation and omission cases under section 10(b) and Rule 10b-5(b), a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation." *See, e.g.*, *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d

144, 151 (2d Cir. 2010).  In the context of claims under 10b-5(a) and (c), courts in this District

have applied a similar pleading standard, except the conduct at issue under the first element is

instead the use of a "device, scheme, or artifice to defraud" or "any act, practice, or course of

business which operates or would operate as a fraud or deceit."  17 C.F.R. § 240.10b-5(a),(c); *In*

*re Refco Capital Mkts., Ltd. Brokerage Customer Secs. Litig.*, No. 06 Civ. 643(GEL), 2007 WL

2694469, at *8 (S.D.N.Y. Sept. 13, 2007) (dismissing 10b-5(a) and (c) claim for failure to plead

deceptive conduct), *aff'd sub nom*, *Capital Mgmt. Select Fund v. Bennett* , 670 F.3d 194, 234 (2d

Cir. 2012); *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 103 (2d Cir. 2007)

(dismissing 10b-5(a) and (c) claim for failure to adequately plead scienter); *Leykin v. AT&T*, 423

F. Supp. 2d 229, 242 (S.D.N.Y. 2006) (dismissing 10b-5(a) and (c) claim for failure to

adequately plead loss causation and a fraud "in connection with" the purchase of sale of a

security); *In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583(WHP), 2012 WL 3339098,

at *9 (S.D.N.Y. 2012) (dismissing 10b-5(a) and (c) claim for failure to adequately plead reliance).

The Complaint fails to plead facts sufficient to state a claim under the applicable pleading

standards.

### 1.    The Complaint Fails to Plead Any Fraudulent Conduct

Plaintiff fails to allege with particularity how Deutsche Bank's alleged mismanagement

of the transaction constituted a "scheme" in violation of Rule 10b-5(a) and (c).

*First*, each element of Plaintiff's section 10(b) claim must be pled with particularity

pursuant to Rule 9(b) and thus "'must specify what deceptive or manipulative acts were

performed, which defendants performed them, when the acts were performed, and the effect the

scheme had on investors in the securities at issue.'"  *See, e.g., In re Refco*, 2007 WL 2694469, at

*7-8 (dismissing plaintiff's 10b-5(a) and (c) claim upon finding plaintiffs failed to "identify (1) the source of the understanding falsely created by defendants (that is, a fiduciary duty, a prior representation, or some other reason they believed defendants would act otherwise than they did), and (2) conduct that violated that understanding") (citations omitted).  From the overall allegations contained in the Complaint, Plaintiff purports to meet such requirements through four theories, discussed *supra* (SOF p. 9-10), none of which are supported by a plausible set of facts pleaded with sufficient particularity to support a "reasonable inference" that Deutsche Bank is "liable for the misconduct alleged" under Rule 8, let alone under the heightened standards of Rule 9.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (a claim has facial plausibility only "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Significantly, in Plaintiff's poorly asserted Complaint, Plaintiff does not even identify the seventeen defaulted Reference Obligations, let alone plead facts to support why each was purportedly ineligible to be included in the Reference Portfolio or why Deutsche Bank's inclusion of each of the seventeen credits was the result of *fraud* and not mere inadvertence, error, or oversight.[9]  With respect to the E&Y Certifications, Plaintiff complains about the quality, but does not claim Deutsche Bank failed to deliver the required E&Y Certifications for any of the seventeen defaulted Reference Obligations, why Plaintiff was entitled to anything more than what was delivered, or how what was delivered amounts to fraud.  Plaintiff does nothing more than make conclusory allegations based on information and belief.  (Compl. ¶¶ 93, 95, 124, 136, 148.)  Similarly, Plaintiff's allegation that Deutsche Bank used the wrong Moody's

---

[9] For the seven Reference Obligations Plaintiff identifies, it offers little more than generic conclusory allegations that they were "recklessly originated to borrowers engaging in accounting fraud, were subject to legal challenge due to Deutsche Bank's misleading or fraudulent lending practices, and/or were ineligible for other reasons."  (Compl. ¶ 169; *see also* ¶¶ 106-162.)

Mapping Table is based upon nothing more than information and belief (*id.* ¶¶ 99, 102, 104, 178(b)), and a misguided reading of a press release.  (*Id.* ¶ 98-99; Ex. 18 [Press Release].)  Even if it were true, Plaintiff does not allege how this would amount to fraud.[10]  Likewise, Plaintiff pleads no facts to support how payment of Credit Event Payments to Deutsche Bank under the Swap Agreements amounts to fraud, and Plaintiff's bald accusation based on information and belief are not enough.  (Compl. ¶¶ 117, 125, 137, 150, 152, 154, 161.)

*Second*, Plaintiff's claim is little more than a classic, and impermissible, fraud-by-hindsight.  *Meridian Horizon Fund, LP v. KPMG (Cayman)*, Nos. 11-3311-cv, 11-3725-cv, 2012 WL 2754933, at *3 (2d Cir. July 12, 2012) (dismissing 10b-5 claim based on "impermissible allegations of fraud by hindsight"); *Bay Harbour Mgmt. LLC v. Carothers*, Nos. 07-1124-cv, 07-1157-cv, 2008 WL 2566557, at *2 (2d Cir. June 24, 2008) (dismissing 10b-5 claim as "fraud by hindsight" where plaintiff alleged that offering documents contained inaccurate valuations because later financial reports contained lower valuations); *Epirus Capital Mgmt., LLC v. Citigroup Inc.*, No. 09 Civ. 2594(SHS), 2010 WL 1779348, at *5 (S.D.N.Y. Apr. 29, 2010) (dismissing 10b-5 claim as fraud by hindsight where plaintiff failed to allege any facts to suggest that the "performance or selection process for the allegedly worthless assets for [the CDO] was materially different from the performance or selection process for the other assets in [the CDO]"; "[w]hile great clairvoyance may have predicted the upcoming market difficulties, failure to make such predictions does not constitute fraud") (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).  Plaintiff's claims are predicated on defaults suffered by seventeen different emerging market companies or derivative counterparties, in most cases years after exposure to those

---

[10] Indeed, the Complaint alleges the internal Deutsche Bank credit ratings for only three of the seventeen Reference Obligations, all three of which have a Moody's Equivalent Rating at least three levels above the minimum "B3" rating permitted under the Eligibility Criteria using the Moody's Mapping Tables in the Swap Confirmations. (Compl. ¶¶ 108, 119, 128; Exs. 14-17 at C and E [Swap Confirmations].)

companies was underwritten by Deutsche Bank or those companies were added to the Reference

Portfolio.  Plaintiff's allegations say nothing about the eligibility of the assets at the time that the

credit was underwritten or when those names were added to the Reference Portfolio; nor does

Plaintiff allege what Deutsche Bank allegedly knew during each relevant point in time.

*Third*, Plaintiff's theory of scheme liability is rooted in a purported breach of fiduciary

duty, a claim Plaintiff does not have standing to bring, cannot bring derivatively, and a claim that

could not support scheme liability in any regard.  *See TCS Capital Mgmt, LLC v. Apax Partners,*

*L.P.*,  No. 06–CV–13447 (CM), 2008 WL 650385, at *24 (March 7, S.D.N.Y. 2008) (dismissing

10b-5(a) and (c) claims that were "essentially breach of fiduciary claims, not securities fraud

claims"); *Field v. Trump*, 850 F.2d 938, 947-48 (2d Cir. 1988) (fiduciary duty breach allegations

do not themselves give rise to a 10b-5 claim); *SEC v. PIMCO Advisors Fund Mgmt.*, 341 F.

Supp. 2d. 454, 469 (S.D.N.Y. 2004) (an alleged fiduciary breach by an investment adviser is not

a "scheme" liability claim).  If alleged fiduciary breaches could be used to state a "scheme"

liability claim, it would transform every alleged fiduciary duty breach into a securities law

violation.

*Fourth*, Plaintiff has alleged no inherently deceptive act that is distinct from an alleged

misstatement and cannot transform its claim from a garden variety misrepresentation claim into

one for alleged "scheme" liability merely by affixing a label on it.  *See, e.g., Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (rejecting scheme liability where "the sole basis

for such claims is alleged misrepresentations or omissions"); *SEC v. Kelly*, 817 F.Supp.2d 340,

344 (S.D.N.Y. 2011) ("Although conduct can itself be deceptive, . . . this case is not about

conduct that is itself deceptive—it is about conduct that *became* deceptive only through . . .

misstatements . . . .").  The Complaint alleges nothing more than that Defendant misrepresented

how it would perform its obligations under the Swap Agreements in selecting and monitoring assets for the Reference Portfolio linked to the CLO and how the Notes would perform. Plaintiff's allegations of purported misrepresentations do not even support a 10b-5(b) claim, let alone a scheme liability claim under 10b-5(a) and (c).

*Fifth*, Plaintiff's allegations of misrepresentation arise out of the same operative facts as its breach of contract claim.  To bring a fraud claim duplicative of breach of contract, Plaintiff must establish that Defendant secretly intended not to perform under the contract (here, the Swap Agreements) at the time of execution.  *See, e.g.*, *Gurary v. Winehouse*, 190 F.3d 37, 44 (2d Cir. 1999) (dismissing claim because plaintiff failed to allege that defendant did not intend to perform at time of promise); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (dismissing 10b-5 claim where plaintiff alleged no fact probative of defendant's intent not to perform promises made in contracts executed in connection with sale of securities at issue). Plaintiff has not alleged any facts to support an inference that Defendant had a secret intent not to perform its obligations and promises under the relevant contracts.  *Capital Mgmt Select Fund*, 670 F.3d 194, 226 ("[T]he promise . . . must encompass particular actions and be more than a generalized promise to act as a faithful fiduciary . . . a simple disagreement over the meaning of an ambiguous contract combined with a conclusory allegation of intent to breach at the time of execution will not do.") (citations and internal quotations omitted).

## 2.    The Complaint Fails to Plead *Scienter*

To plead a strong inference of *scienter*, a plaintiff must allege particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitut[e] strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns Inc.*, 493 F.3d 87, 99.  Plaintiff has not pleaded particularized facts to establish *scienter* under either approach.

*First*, Plaintiff has offered no evidence of motive other than profit.  The Second Circuit has held that a "generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor," is not enough.  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996); *In re AstraZeneca Secs. Litig.*, 559 F. Supp. 2d 453, 468 (S.D.N.Y. 2008) ("Thus, arguing that the motive for defrauding investors was to increase the company's profits or to increase officer compensation is not sufficient."); *Epirus*, 2010 WL 1779348, at *6 ("Plaintiffs have not alleged motive that is different from the motives that all corporate officers and directors have—that is, a desire for the company to remain profitable and to profit personally as a result of the company's profitability.").

*Second*, Plaintiff has pleaded no facts to support any conscious misbehavior or recklessness by Defendant.  There are no allegations that Defendant knew specific information concerning the true risk or value of any particular asset at the time it was added to the Reference Portfolio.  Plaintiff relies almost exclusively on information and belief pleadings, which are not alleged with the requisite particularity and thus fail to establish *scienter*.  *Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954(SAS), 2006 WL 27470, at *8 (S.D.N.Y. Jan. 3, 2006) (dismissing 10b-5(a) and (c) claim for failure to state with particularity the facts supporting its "information and belief" allegations); *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999) (dismissing 10b-5(a) and (c) claim pled on information and belief where plaintiff's allegations were general and lacked specificity as to facts underlying their belief).[11]  The types of conclusory allegations made by Plaintiffs – standing alone – have been rejected as insufficient.  *See, e.g.,*

---

[11] Plaintiff has alleged "upon information and belief," without the requisite particularity, Deutsche Bank's (i) alleged motivation for the Second Offering in January 2007(Compl. ¶ 75-76), (ii) alleged knowledge about underwriting issues with the Reference Obligations and any financial problems the Reference Entities were allegedly experiencing at the time (*id.* ¶ 76, 113, 134, 169), (iii) alleged knowledge that the assumptions provided to E&Y were false as Plaintiff claims (*id.* ¶ 93), and (iv) alleged knowledge that Deutsche Bank was not entitled to receive Credit Event Payments. (*Id.* ¶¶ 96, 117, 125, 137, 150, 152, 154, 161.)

*O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) ("[W]hile Rule 9(b) permits *scienter* to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'") (citations omitted); *PT. Bank Negara Indonesia (Persero) Tbk v. Barclays Bank PLC*, 2011 WL 4717360, at *2, 4 (S.D.N.Y. Sept. 28, 2011) (Rule 9(b) prohibits "speculation and conclusory allegations" and requires the plaintiff to "adduce specific facts supporting a strong inference of fraud.") (internal quotations and citations omitted).

If anything, Arco's allegations compel an inference against *scienter*, because Defendant did nothing more than it was supposed to do by contract.  *See In re Merrill Lynch Auction Rate Secs. Litig.*, 765 F. Supp. 2d 375, 387 (S.D.N.Y. 2011) (where defendants disclosed "the very practices that [plaintiff] now claims were fraudulently and intentionally omitted," plaintiff failed to "allege a 'compelling' inference of scienter"); *see also In re Citigroup Auction Rate Secs. Litig.*, 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009) (dismissing 10b-5(a) and (c) claim where "defendants disclosed the practices of which Plaintiff now complains").  It was fully known to Plaintiff (i) that Defendant was the swap counterparty, (ii) that Defendant had sole discretion to select the assets to be included in the Reference Portfolio, (iii) that the assets to be included in the Reference Portfolio were loan transactions underwritten by Defendant with emerging market companies or derivative transactions and carried on Defendant's books, (iv) that the assets were not without risk as they could carry Moody's Equivalent Ratings as low as "B3," (v) that in the event of a Credit Default E&Y would provide the Issuer with a Certification (not an audit), and (vi) as the holder of Class F and Class G Notes, Plaintiff held riskier subordinated classes that would suffer losses first.

In sum, Plaintiff has failed to plead facts demonstrating that Defendant knowingly or recklessly "dumped" any ineligible assets into the Reference Portfolio as part of a fraudulent scheme.

### 3.      The Complaint Fails to Plead Reliance

To establish reliance for purposes of a "scheme liability" claim under Rule 10b-5(a) and (c), a plaintiff must allege reliance on allegedly deceptive acts.  *Stoneridge Inv. Partners, LLC v. Scientific Atlanta Inc.*, 552 U.S. 148, 161, 171 (2008) (holding "deceptive acts, which were not disclosed to the investing public are too remote to satisfy the requirement of reliance," because a plaintiff cannot rely on acts of which it is unaware); *see also Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 180 (1994) ("Allowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b-5 recovery mandated by our earlier cases."); *In re Smith Barney*, 2012 WL 3339098, at *7-9 (dismissing 10b-5(a) and (c) scheme liability claim for failure to allege reliance on specific deceptive misconduct).

In support of reliance, Plaintiff's sole allegation is that it relied on its assumption that Defendant would honor its contractual duties in good faith.  (Compl. ¶ 167.)  Plaintiff's disclosure-based claim does not allege reliance on a deceptive act.  *In re Smith Barney*, 2012 WL 3339098, at *9 (a plaintiff must allege reliance on a specific deceptive act of which it was aware; reliance on an assumption that a defendant would honor its duties is not enough).  Therefore, Plaintiff's securities fraud claim must be dismissed for the reason that Plaintiff fails to allege it actually relied on the supposed fraud.

In any event, Plaintiff is foreclosed from establishing reasonable reliance.  In considering whether the alleged reliance is reasonable, courts look to "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp.,*

*Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).  In the Note Subscription Agreements, Gramercy

expressly represented and warranted it would rely only on "the Indenture and the other

Transaction Documents" and disclaimed reliance "for any additional information that has

otherwise been made available."  (Exs. 8-11 at § 4(e) [Note Subscription Agreements].)  And, as

the Indentures made clear, each subsequent purchaser of the Notes was bound by nearly identical

undertakings.  (Exs. 2-5 at § 2.6 [Indentures]; Ex. 7.)  This renders Arco's purported reliance on

the Investor Presentations or information from any person acting on behalf of Deutsche Bank

unreasonable as a matter of law.  *Emergent Capital Inv. Mgmt.*, 343 F.3d at 195 (10b-5

plaintiff's reliance on misrepresentations must be reasonable, otherwise claim must be

dismissed); *Harsco Corp. v. Segui*, 91 F.3d 337, 345-348 (2d Cir. 1996) (dismissing plaintiff's

10b-5 claim because reliance on defendant's extracontractual representations was not reasonable

where plaintiff was a sophisticated investor who expressly disclaimed reliance on representations

made outside of the contract).

## II.    ARCO LACKS STANDING FOR ITS BREACH OF CONTRACT CLAIM

Because Arco has alleged no plausible set of facts to support it has standing to sue for

breach of the Swap Agreements between the Issuer and Deutsche Bank, its breach of contract

claim should be dismissed.  It is well-established that "[a] non-party to a contract governed by

New York law lacks standing to enforce the agreement in the absence of terms ***that clearly***

***evidences an intent*** to permit enforcement by the third party in question."  *Premium Mortg.*

*Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (emphasis added) (dismissing breach of

contract claim where complaint presented only conclusory allegations that plaintiff had standing

to sue under the contract, and finding them facially implausible) (internal quotations and

citations omitted); *see also Underdog Trucking, LLC  v. Verizon Servs. Corp.*, No. 09 Civ.

8918(DLC), 2010 WL 2900048, at *5 (S.D.N.Y. July 20, 2010) (dismissing breach of contract

claim where plaintiff was not a party to the contract and the contract did "not evince any intent by the parties to benefit" the plaintiff).

Plaintiff's sole allegation in support of its purported third party beneficiary status is based on Section 4(e) of the Note Subscription Agreements executed by Gramercy, who purportedly was acting on Plaintiff Arco's behalf.  (Compl. ¶ 177.)  The Complaint contends that through Section 4(e) the parties incorporate the Indentures and other "Transaction Documents," including the Swap Agreements.  (*Id.*)  That section of the Note Subscription Agreements, however, is a *disclaimer* of reliance and does not support the inference that parties to the Swap Agreements intended to confer third party beneficiary status on Plaintiff.  *See, e.g., Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) ("[D]ismissal of a third-party-beneficiary claim is appropriate where . . . the complaint relies on language in the contract . . . that will not support the inference that the parties intended to confer a benefit on the claimant."); *Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537(MBM), 2003 WL 23018888, at *9 (S.D.N.Y. 2003) (finding CDO investor was not an intended beneficiary of a contract between CDO Issuer and defendant Citibank where the intent of a contractual provision cited by plaintiff "was to limit duties rather than to generate an additional duty").

Plaintiff's breach of contract claim must, therefore, be dismissed.

## CONCLUSION

For the foregoing reasons, the Defendant respectfully submits that Plaintiff's Complaint should be dismissed in its entirety, with prejudice.

Dated:  December 3, 2012                        Respectfully Submitted
       New York, New York

                                                      */s/ Jayant W. Tambe*
                                              Jayant W. Tambe (JT-0118)
                                              Kelly A. Carrero (KC-5218)
                                              JONES DAY

222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
jtambe@jonesday.com
kacarrero@jonesday.com

*Attorneys for Defendant Deutsche Bank AG*

## CERTIFICATE OF SERVICE

I certify that on December 3, 2012, I caused the foregoing to be served to the counsel of record through electronically filing the foregoing with the Clerk of Court using the CM/ECF system.

 /s/ *Jayant Tambe*