UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCO CAPITAL CORPORATION LTD,

                    Plaintiff,

          -against-

DEUTSCHE BANK AG,

                    Defendant.

Case No. 12-CV-7270 (RWS)

ECF Case

**PLAINTIFF ARCO CAPITAL CORPORATION LTD'S
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT DEUTSCHE BANK AG'S MOTION TO DISMISS**

MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500
*Attorneys for Plaintiff
Arco Capital Corporation Ltd.*

Dated: New York, New York
          December 17, 2012

## TABLE OF CONTENTS

**Page**

Table of Authorities ..................................................................................................................ii

Preliminary Statement................................................................................................................ 1

Statement of Facts...................................................................................................................... 4

Argument .................................................................................................................................... 6

I.      THE COMPLAINT STATES A SECTION 10(b) AND RULE 10b-5 CLAIM ............... 6

        A.      Arco's Investment in the Notes Was a Domestic Transaction ...............................6

                1.      Irrevocable Liability Arose in New York ...................................................6

                2.      Deutsche Bank's References to Citizenship Are Irrelevant.......................8

                3.      Deutsche Bank Ignores the Complaint and the NSA..................................9

                4.      Deutsche Bank's Reg S and 1933 Act Argument Fails ............................11

        B.      Arco's Section 10(b) and Rule 10b-5 Claim Is Timely ........................................12

        C.      The Complaint States a Claim under Rule 10b-5(a) and (c)................................15

                1.      The Complaint Alleges Deceptive Acts....................................................15

                2.      The Complaint Alleges Scienter ...............................................................19

                3.      The Complaint Alleges Reliance ..............................................................21

II.     ARCO HAS STATED A CLAIM FOR BREACH OF CONTRACT
        AS THIRD-PARTY BENEFICIARY ............................................................................ 22

Conclusion ............................................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  672 F.3d 143 (2d Cir. 2012)............................................................................. passim

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................................................. 14

*Arnold v. KPMG LLP*,
  334 F. App'x 349 (2d Cir. 2009) ......................................................................... 14

*Banco Espirito Santo de Investimento v. Citibank NA*,
  No. 03-1537, 2003 U.S. Dist. LEXIS 23062 (S.D.N.Y. Dec. 29, 2003) .............. 24

*Bayerische Landesbank v. Aladdin Capital Management, LLC*,
  692 F.3d 42 (2d Cir. 2012)................................................................................... 22

*Borden, Inc. v. Spoor Behrins Campbell & Young*,
  778 F. Supp. 695 (S.D.N.Y. 1991) ..................................................................... 14

*Bovee v. Coopers & Lybrand*,
  216 F.R.D. 596 (S.D. Ohio 2003) ....................................................................... 13

*Freudenberg v. E*Trade Financial Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................... 19

*Goldin Assocs., L.L.C. ex rel. SmarTalk Teleservices, Inc. v. Donaldson, Lufkin &
  Jenrette Sec. Corp.*,
  No. 00 Civ. 8688, 2003 U.S. Dist. LEXIS 16798 (S.D.N.Y. Sept. 24, 2003) ....... 18

*Grondahl v. Merritt & Harris, Inc.*,
  964 F.2d 1290 (2d Cir. N.Y. 1992)....................................................................... 14

*In re Beacon Associates Litig.*,
  282 F.R.D. 315 (S.D.N.Y. 2012) ......................................................................... 13

*In re NYSE Specialists Sec. Litig.*,
  405 F. Supp. 2d 281 (S.D.N.Y. 2005)................................................................... 20

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005)............................................................. 15, 21

*In re Tower Automotive Secs. Litig.*,
  483 F. Supp. 2d 327 (S.D.N.Y. 2007).............................................................. passim

*Jacquemyns v. Spartan Mullen Et Cie, S.A.*,
  No. 10 Civ. 1586, 2011 U.S. Dist. LEXIS 136579 (S.D.N.Y. Nov. 23, 2011) ....... 20

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991).................................................................................. 14

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)............................................................. 15, 16, 21

*Morrison v. Nat'l Aust. Bank Ltd.*,
    130 U.S. 2869 (2010)........................................................................ passim

*MVP Asset Management (USA) LLC v. Vestbirk*,
    No. 2:10-cv-02483, 2012 U.S. Dist. LEXIS 97104, (E.D. Cal. July 12, 2012)..................... 10

*Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)................................................................. 8

*Plymouth County Ret. Ass'n v. Schroeder*,
    576 F. Supp. 2d 360 (E.D.N.Y. 2008) ............................................................... 13

*Pope Investments II, LLC v. Deheng Law Firm*,
    No. 10 Civ. 6608, 2012 U.S. Dist. LEXIS 115282 (S.D.N.Y. Aug. 15, 2012) ............. 8, 9, 10

*Radiation Dynamics, Inc. v. Goldmuntz*,
    464 F.2d 876 (2d Cir. 1972)........................................................................ 14

*Securities and Exchange Commission v. Zanford*,
    535 U.S. 813 (2002).............................................................................. 21

*Stern v. Leucadia Nat'l Corp.*,
    844 F.2d 997 (2d Cir. 1988)....................................................................... 18

*Subaru Dists. Corp. v. Subaru of America, Inc.*,
    425 F.3d 119 (2d Cir. 2005)....................................................................... 24

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    No. 05 Civ. 1898, 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005) ...................... 13

*The Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings, Ltd.*,
    No. 08-cv-01381, 2011 U.S. Dist. LEXIS 34748 (D. Colo. 2011)...................................... 9

*The Wharf (Holdings) Ltd. v. United International Holdings, Inc.*,
    532 U.S. 588 (2001)........................................................................... 15, 21

*VanCook v. SEC*,
    653 F.3d 130 (2d Cir. 2011)....................................................................... 15

*Wafra Leasing Corp.1999-A-1 v. Prime Capital Corp.*,
    192 F. Supp.2d 852 (N.D. Ill. 2002) ............................................................... 13

**Statutes and Regulations**

Regulation S of the Securities Act of 1933.............................................................. 3, 11

Securities and Exchange Commission Rule 10b-5 ....................................................... passim

Securities Act of 1933.................................................................................................. 4, 11

Securities Exchange Act of 1934.............................................................................. 3, 4, 11

28 U.S.C. § 1658(b) ............................................................................................. 4, 12, 13

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................. 1

Fed. R. Civ. P. 9(b) ............................................................................................ 1, 15, 18

Plaintiff Arco Capital Corporation Ltd. ("Arco") respectfully submits this memorandum of law in opposition to the motion of defendant Deutsche Bank AG ("Deutsche Bank") to dismiss the Complaint ("Cplt.") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).

## Preliminary Statement

In June 2006, Deutsche Bank effected a collateralized loan obligation transaction (the "Transaction"), in which it offered investors the opportunity to acquire debt securities ("Notes") tied to a portfolio (the "Reference Portfolio") of Deutsche Bank-originated emerging markets investments ("Reference Obligations"), by means of a credit default swap agreement (the "CDS Agreement"). Cplt. ¶ 2. The CDS Agreement was essentially an insurance policy covering the Reference Portfolio. In exchange for the interest payments on the Notes, investors agreed to risk the principal due on the Notes based on the performance of the Reference Portfolio. If a Reference Obligation defaulted in a way covered by the CDS Agreement (a "Credit Event"), Deutsche Bank received a payment (a "Credit Event Payment"), which directly reduced the principal due on the Notes at the end of the Transaction in June 2012. *Id.* ¶ 3.

In the CDS Agreement, Deutsche Bank promised that (1) the Reference Obligations it selected would meet specified criteria ("Eligibility Criteria"); (2) it would not make any changes to the Reference Portfolio unless specified conditions were met ("Replenishment Conditions"); and (3) it would engage an "independent accountant," Ernst & Young ("E&Y") to provide an "irrevocable" "certification," as a "condition precedent" to Deutsche Bank's entitlement to any claimed Credit Event Payment, that, *inter alia*, Deutsche Bank had complied with the Eligibility Criteria and Replenishment Conditions (an "E&Y Certification"). *Id.* ¶¶ 31-60. Deutsche Bank's promises in the CDS Agreement were critical to

investors, because they defined the risk that the Reference Obligations would suffer Credit Events.

The Transaction was effected through a Cayman Islands special-purpose entity ("SPE") created by Deutsche Bank, CRAFT EM CLO 2006-1 (the "Issuer"), which issued the Notes and entered into the CDS Agreement with Deutsche Bank.  However, immediately upon closing, the Issuer assigned its interest in the Transaction to a trust (the "Trust") in New York, with HSBC Bank, N.A. ("HSBC") as Trustee.  All funds went to and from HSBC, and investors purchased Notes by delivering funds to HSBC.  Deutsche Bank controlled the Transaction from its offices in New York.  *Id.* ¶¶ 7, 27-28, 66-71

Arco invested in Notes in June 2006.  *Id.* ¶ 81.  Less than a year later, in January 2007, Deutsche Bank doubled the maximum size of the Reference Portfolio from $500 million to $1 billion (the "Upsize"), and included derivatives in the definition of Reference Obligation.  All other requirements of the original CDS Agreement remained the same.  *Id.* ¶¶ 10, 77.  Arco purchased new Notes in the Upsize, which replaced its original Notes and also represented an additional investment by Arco, in reliance on the CDS Agreement signed by Deutsche Bank in the Upsize.  *Id.* ¶¶ 83, 167.

At the time of the Upsize, Deutsche Bank faced more stringent regulatory capital requirements and had poorly-underwritten and toxic investments on its books, particularly its derivative investments.  *Id.* ¶ 76.  It knew that such investments did not meet the Eligibility Criteria, and secretly intended to use the Upsize to rid itself of such assets and shift the losses to Arco.  *Id.*  Deutsche Bank had the means to do this because it controlled the Transaction, including the contents of E&Y Certifications and instructions to HSBC to make Credit Event Payments, and was required to provide little information to Noteholders such as Arco.  *Id.* ¶ 7.

2

Immediately after the Upsize closed, and continuing until the end of the Transaction in June 2012, Deutsche Bank knowingly designated Reference Obligations that violated the Eligibility Criteria, procured false E&Y Certifications (*id.* ¶¶ 89-96 & Exs. B-C), and instructed HSBC to make Credit Event Payments to which it knew it was not entitled.  *Id.* ¶¶ 106-162.  By the end of the Transaction, Deutsche Bank had claimed so many Credit Events – all of which with respect to Reference Obligations designated *after* the Upsize – that the principal due on Arco's Notes was reduced to a small fraction of Arco's original investment.  Arco lost more than $37 million, taken directly by Deutsche Bank.  *Id.* ¶¶ 86-87.

In its moving brief ("Br."),[1] Deutsche Bank portrays Arco as a "sophisticated investor" seeking to "shift to Deutsche Bank the very risk that Arco willingly and knowingly assumed."  Br. 1, 8.  The only accurate part of this description is that Arco is a sophisticated investor.  Arco does not allege that it misunderstood the Transaction.  Arco brings this action because when Deutsche Bank induced Arco to invest in the Notes in the Upsize, it intended to abandon the CDS Agreement, and it thereafter committed fraudulent acts to accomplish its scheme.  Arco asserts claims for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5(a) and (c), and for breach of the CDS Agreement as a third-party beneficiary.

Deutsche Bank seeks dismissal of Arco's Section 10(b) and Rule 10b-5 on the grounds that Arco fails to allege a domestic transaction as required by *Morrison v. Nat'l Aust. Bank Ltd.*, 130 U.S. 2869 (2010).  Br. 10-13.  To the contrary, the Complaint and the documents incorporated by reference therein amply allege a domestic transaction, because the Transaction,

---

[1] Memorandum of Law in Support of Defendant Deutsche Bank AG's Motion to Dismiss [Doc. No. 13].

including Arco's investment in the Notes, was made through the Trust in New York.  That the Notes were sold pursuant to Regulation S ("Reg S") under the Securities Act of 1933 (the "1933 Act") does not alter the reality that Arco's investment in the Notes was a domestic transaction for purposes of the 1934 Act.  *See* Point I(A).

Deutsche Bank next argues that the Section 10(b) and Rule 10b-5 claim is time-barred under 28 U.S.C. § 1658(b).  Br. 13-14.  This argument is contrary to the plain language of the statute, which provides that the period of repose runs from the "violation."  The violation is Deutsche Bank's scheme to use the Transaction to defraud Arco, which occurred from January 2007 through June 2012.  Arco's claim is thus timely.  *See* Point I(B).

Deutsche Bank also conclusorily argues that the Complaint fails to state a Section 10(b) and Rule 10b-5 claim.  Br. 14-23.  Deutsche Bank mischaracterizes the Complaint and ignores the allegations therein, and its arguments are meritless.  *See* Point I(C).

Finally, Deutsche Bank argues that Arco's breach of contract claim fails because Arco was not a third-party beneficiary of the CDS Agreement.  Br. 23-24.  To the contrary, the Transaction documents and the fundamental nature of the Transaction demonstrate that the CDS Agreement was intended for the benefit of Noteholders such as Arco.  *See* Point II.

## Statement of Facts

The full allegations in the Complaint are incorporated by reference herein. Additional allegations are recited where relevant in the Argument section, *supra*.

Arco invested in the Notes through an agent, Gramercy Emerging Markets Fund ("Gramercy").  Cplt. ¶ 81.  Although in its motion Deutsche Bank purports to question Gramercy's agency (Br. 3), Deutsche Bank "knew and agreed" that Gramercy was acquiring the Notes for Arco.  Cplt. ¶ 82.

4

The CDS Agreement is comprised of three documents, the most important of which is the "Confirmation," which contained the Eligibility Criteria, the Replenishment Conditions, and the E&Y Certification requirement.  A copy of a Confirmation from the Upsize is attached to the Declaration of Claire L. Huene ("Huene Decl.") as Exhibit A.[2]  Under the CDS Agreement, Deutsche Bank made premium-like payments ("CDS Fee Payments"), generating a stream  of income used to make interest payments on the Notes.  The purchase price paid by investors to acquire the Notes was held as collateral (the "Note Collateral") and used to make Credit Default Payments to Deutsche Bank under the CDS Agreement.  The Note Collateral also represented the only funds in the Transaction available to repay the principal on the Notes when due in June 2012.  Cplt. ¶¶ 69-71.  As the Note Collateral was depleted by Credit Event Payments, the principal on the Notes was reduced, in reverse order of seniority.  *Id.* ¶ 71.

Investors subscribed to purchase Notes by entering into a Note Subscription Agreement ("NSA") with the Issuer.  A copy of an NSA from the Upsize is attached to the Huene Decl. as Exhibit B.

The New York Trust was created under an indenture (the "Indenture") between the Issuer and HSBC.  A copy of an Indenture from the Upsize is attached to the Huene Decl. as Exhibit C.

As demonstrated *infra*, Arco alleges that at the time of the Upsize, Deutsche Bank intended to abandon the CDS Agreement and use the Transaction to commit fraud on Arco, and that it thereafter did so.  *See* Point I(C).

---

[2] The same set of Transaction documents was executed for each series of Notes, and were in all material respects the same.  For ease of reference, the Huene Decl. attaches one of each relevant Transaction document from the Upsize.

## Argument

## I.

## THE COMPLAINT STATES A SECTION 10(b) AND RULE 10b-5 CLAIM

### A.   Arco's Investment in the Notes Was a Domestic Transaction

Under *Morrison*, the 1934 Act applies to a purchase or sale of securities in a "domestic transaction." *Morrison*, 130 S. Ct. at 2884.[3]  The Second Circuit has defined a domestic transaction as one in which: (1) "the parties incurred irrevocable liability within the United States: that is, that the purchaser incurred irrevocable liability within the United States to take and pay for a security, or that the seller incurred irrevocable liability within the United States to deliver a security;" or (2) "title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 672 F.3d 143, 151 (2d Cir. 2012).  At the pleading stage, it is sufficient for the plaintiff "to allege facts leading to the plausible inference" of a domestic transaction. *Id.*

### 1.   Irrevocable Liability Arose in New York

The Complaint and the Transaction documents give rise to a plausible inference that "irrevocable liability" arose in New York.

On the closing date of the Upsize (the "Closing Date"), the Issuer granted its interest in the Transaction, including "all" its "rights" under the CDS Agreement, to the New York Trust.  Cplt. ¶ 66; Indenture at 1 (First Granting Clause).  HSBC maintained the bank accounts for the Transaction, and all funds in the Transaction went to and from HSBC in New York, not the Issuer.  Cplt. ¶¶ 67-71; Indenture,§§ 10.2, 11.1.  Deutsche Bank made the CDS Fee Payments to HSBC, the Note Collateral was held at HSBC, and HSBC made Credit Event

---

[3] The other *Morrison* category, securities listed on a domestic exchange, does not apply.

Payments to Deutsche Bank and payments due on the Notes to Noteholders.  The Trust was for

the "for the benefit and security of" Noteholders and Deutsche Bank, except as to the Issuer's

rights under the CDS Agreement, which was only for the benefit of Noteholders.  Indenture, at 1

("First Granting Clause").  Both Deutsche Bank and the Noteholders were express third-party

beneficiaries of the Indenture "to the extent of the rights granted thereto" therein.  *Id.* § 13.8.

Under the NSA: (1) Arco was required to deliver the purchase price to HSBC in

New York on the Closing Date, *see* NSA, § 2 (delivery of payment to be by "immediately

available funds on the Closing Date to the account to be advised to the Purchaser by the Trustee

[HSBC]"); (2) the Notes were not "valid and binding" until, *inter alia*, "paid for by the Purchaser

pursuant to Section 2 hereof," *see id.* § 3(i); (3) receipt of payment "in accordance with Section

2" (*i.e.* delivery to HSBC) was a condition precedent to the Issuer's obligation to "sell" the

Notes, *see id.* § 7(c); (4) the Issuer could revoke the NSA in "its sole discretion at any time prior

to the Closing Date," *i.e.* prior to Arco's delivery of payment; *id.* § 9(a); and (5) Arco's delivery

of funds to HSBC completed the NSA, which automatically terminated with "the payment of the

[purchase price] in accordance with Section 2 hereof."  *Id.* § 9(b).

Thus, the NSA and the sale of Notes were expressly *not* binding until the

purchase price was received by HSBC in New York.  *See Ficeto*, 672 F.3d at 153 (allegations

concerning the "exchange of money" are suggestive of where parties became irrevocably bound).

The Issuer in the Cayman Islands did not even have an interest in Arco's

investment in the Notes.  It is an SPE with no employees, and it assigned any interest to the Trust

in New York.  Cplt. ¶¶ 30, 66; Indenture, at 1 (First Granting Clause).

In addition, under *Ficeto*, "facts concerning the formation of the contracts" as

relevant to determining where "irrevocable liability" was incurred.  *Ficeto*, 672 F.3d at 153

Contract formation occurs upon a "meeting of the minds." *Id.* at 151 (citation omitted); *see also Pope Investments II, LLC v. Deheng Law Firm*, No. 10 Civ. 6608, 2012 U.S. Dist. LEXIS 115282, at *20 (S.D.N.Y. Aug. 15, 2012) (not only "where the agreement was signed" but also "where that agreement was negotiated" is relevant to "where a 'commitment' or 'meeting of the minds' occurred."). Deutsche Bank controlled the Transaction from its offices in New York. Cplt. ¶¶ 27-28. This allegation is plausible because Arco identified the Deutsche Bank employees in New York (*id.* ¶ 27), Deutsche Bank structured the Transaction as a Trust in New York, selected a New York trustee (HSBC), the NSA, Indenture and CDS Agreement are all governed by New York law (*id.* ¶ 32; Indenture § 13.10; NSA § 18), the Issuer is an SPE with no employees. Cplt. ¶ 30. Thus, it is plausible that decisions concerning the Transaction, including the decision to sell Notes to Arco, were made by Deutsche Bank in New York, and thus that the "meeting of the minds" on the Issuer's side occurred in New York.[4]

For all these reasons, Arco's investment in the Notes was clearly a domestic transaction.

### 2.   Deutsche Bank's References to Citizenship Are Irrelevant

Deutsche Bank's references to Arco and the Issuer being Cayman Islands entities (Br. 1, 10, 13) are irrelevant under *Morrison*. *See Ficeto*, 672 F.3d at 152 ("a purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase in the United States") (citing *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010)); *Pope Investments II, LLC*, 2012 U.S.

---

[4] Deutsche Bank refers to the transfer of the Notes from Gramercy to Arco in April 2007 as not a "domestic transaction." Br. 13 n. 8. This is irrelevant. That transfer was from an agent to a principal in a "pass-through transaction" in which Arco "reimbursed" Gramercy for purchasing the Notes as agent on Arco's behalf. Cplt. ¶ 84.

Dist. LEXIS 115282, at *20 ("residency or citizenship is irrelevant to the location of a given transaction.") (*citing Ficeto*).

### 3.    <u>Deutsche Bank Ignores the Complaint and the NSA</u>

Deutsche Bank ignores most of the relevant allegations in the Complaint, and only mentions two: that Deutsche Bank controlled the Transaction in New York and that Arco (through Gramercy) transmitted the purchase price to HSBC in New York.  Based on these two allegations, Deutsche Bank claims that Arco seeks a "nexus" test.  Br. 12.  To the contrary, *Morrison* governs and plainly establishes a transactional test, which *Ficeto* further developed.  As demonstrated in Point I(A)(1), both the allegations cited by Deutsche Bank are relevant to "irrevocable liability" and "contract formation" under *Ficeto*.

Deutsche Bank also asserts that the two allegations it cherry-picked are "not enough as a matter of law to satisfy *Morrison*."  Br. 12.  As Deutsche Bank ignored many relevant allegations and provisions of the NSA (*see* Point I(A)(1)), this assertion is meaningless.

Deutsche Bank's reliance on *The Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings, Ltd.*, No. 08-cv-01381, 2011 U.S. Dist. LEXIS 34748 (D. Colo. 2011), is misplaced, as it involves very different facts.  In *Cascade Fund*, the investor's delivery of money was "one step" in the process of "*applying* to invest in the funds" (*id.*, * 22) (emphasis added), and the fund manager reserved the right to reject an application even after payment was received.  *Id.* Under those circumstances, the delivery of funds in New York "did not amount to a conclusion that the transaction was *completed* in New York."  *Id.* (emphasis added).

Here, nothing in the NSA suggests that Arco's delivery of its purchase funds in New York was merely "one step" in "applying" for the investment.  To the contrary, the NSA provides that the delivery of funds to HSBC terminated (*i.e.* "completed") the transaction,

because it was the act that made the transaction irrevocably binding.  NSA § 7 (receipt of funds a "condition" of "obligation" to "sell" Notes); § 9 (NSA terminates upon "payment").  *Cf. Ficeto*, 672 F.3d at 153 (noting that the complaint "alleges that investors subscribed to the Funds by wiring money to a bank located in New York," and finding such allegation insufficient only because it was not the investment on which the plaintiffs' claims were based).  Moreover, here the Cayman Islands entity was an SPE with no purpose other than the Transaction, which assigned its interests to the Trust in New York, and decisions were made by Deutsche Bank in New York.[5]

Deutsche Bank cites a single provision in the NSA (Br. 4), which it mischaracterizes as a "purchase order" (*id.* 13), which provides that the NSA "will not constitute an agreement between" the Issuer and the purchaser until it is "accepted on behalf of the [Issuer]."  NSA § 1(b).  Based on this provision, Deutsche Bank argues that the Issuer's "acceptance" of the NSA was the act that rendered the transaction "irrevocable," that the Issuer accepted by signing the NSA in the Cayman Islands, and therefore the transaction became irrevocable in the Cayman Islands.  Br. 4, 12.

This argument is refuted by Section 9(a) of the NSA, which provides: "the [Issuer] may *revoke in whole or in part any prior acceptance at its sole discretion* at any time prior to the Closing Date."  NSA § 9(a) (emphasis added).  Thus, the Issuer's "acceptance" did not "irrevocably" bind the Issuer.  Because the Issuer had "sole discretion" to determine whether

---

[5] Deutsche Bank also cites (Br. 12) *MVP Asset Management (USA) LLC v. Vestbirk*, No. 2:10-cv-02483, 2012 U.S. Dist. LEXIS 97104, *18 (E.D. Cal. July 12, 2012), which held, without explanation, that the plaintiff had failed to allege a domestic transaction, citing only *Cascade Fund*.  The *MVP* Court recited, but did not analyze, the alleged facts before it, and did not address the unique facts in *Cascade*.  Nor is *Pope Investments II*, 2012 U.S. Dist. LEXIS 115282, at *22-23 relevant, because in that case the plaintiffs, notwithstanding *Morrison*, were seeking an "effects" test or a "conduct" test.  *Id.*

a contract existed, its acceptance was *illusory* and could not create a contract.  *See* Restatement (Second) of Contracts, § 77, cmt. a ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.").  Notably, the date beyond which the Issuer no longer had the discretion to revoke acceptance was the "Closing Date," when the purchaser was to transmit the funds to HSBC in New York (*id.* § 2).  Clearly, it was the parties' *performance* on the Closing Date that made the sale of Notes "irrevocable."  On the Closing Date, Arco (through Gramercy) delivered the funds to HSBC in New York and the Issuer assigned its interest to the Trust in New York.  The sale of Notes was clearly a New York, and hence a domestic, transaction.

### 4.    Deutsche Bank's Reg S and 1933 Act Argument Fails

Deutsche Bank's final argument is that because the Notes were sold pursuant to Reg S, Arco is estopped from claiming that its investment in the Notes was a domestic transaction under *Morrison*.  This argument is specious.

Deutsche Bank mischaracterizes *Morrison*.  It claims that the *Morrison* Court "accepted" that "the execution of a transaction pursuant to [Reg S] should be dispositive that the transaction cannot be considered a domestic transaction for purposes of the 1934 Act."  Br. 13.  This is not even colorable.  *Morrison* referred to the 1933 Act and other securities laws to demonstrate that they were not intended to have extraterritorial effect.  Nothing in *Morrison* could be reasonably read to mean that selling securities under Reg S of the 1933 Act now also automatically exempts parties from the antifraud provisions of the 1934 Act.

Moreover, Reg S expressly provides that it relates only to the 1933 Act, and "not to *antifraud* or other provisions of the federal securities laws."  17 C.F.R. § 230 (Preliminary Note ¶ 1) (emphasis added).  The definition of "offshore transaction" under Reg S is not

reconcilable with *Morrison* and *Ficeto*, because Reg S serves an entirely different purpose (determining whether 1933 Act registration is required).  17 C.F.R 230.902(h).

Deutsche Bank also mischaracterizes the Transaction documents in an effort to claim that Arco "represented" or "warranted" that the transaction was "offshore."  Br. 5, 8. Rather, Arco represented that it was not a "U.S. Person" within the meaning of Reg S (Cplt ¶ 14), and acknowledged that the Notes were not registered under the 1933 Act pursuant to Reg S. Such statements have no relevance to *Morrison*.  In addition, Deutsche Bank's reliance on contractual provisions to evade liability under the 1934 Act is contrary to Section 29 of the 1934 Act, 15 U.S.C. § 78cc.

**B.      Arco's Section 10(b) and Rule 10b-5 Claim Is Timely**

Under 28 U.S.C. § 1658(b), a Section 10(b) claim is timely if brought within five years of the "violation."  Under Rule 10b-5(a) and (c), the violation is the deceptive "device, scheme or artifice to defraud" or the acts, practices or "course of business" that operates as a fraud, and claims are timely if brought within five years of such conduct.  *In re Tower Automotive Secs. Litig.*, 483 F. Supp. 2d 327, 349 (S.D.N.Y. 2007) (Rule 10b-5(a) and (c) claims not time-barred because "the deceptive scheme continued into late in the class period, well within the minimum five year" period).

Here, Arco asserts claims under Rule 10b-5(a) and (c), and alleges that Deutsche Bank's deceptive course of conduct in furtherance of its scheme continued from January 2007 through 2012.  *See* Point I(C), *infra*.  This course of conduct directly reduced the outstanding principal value of Arco's Notes throughout the period.  Arco commenced this action within a few months of the end of the Transaction in June 2012.  Arco's claim is timely.  *In re Tower Automotive Secs. Litig.*, 483 F. Supp. 2d at  349.

Deutsche Bank argues that the repose period begins to run on the date the securities were purchased or sold.  Br. 14 ("because Section 10(b) requires that the fraud be "in connection with the purchase or sale of a security," the five-year statute of repose in 28 U.S.C. § 1658(b) begins to run upon the "purchase or sale.").  Deutsche Bank claims this is "well-established."  *Id.*

To the contrary, the majority position adheres to the plain language of the statute, and measures the repose period from the "violation," which is not the same thing as the date of "purchase or sale."  *See In re Tower Automotive*, 483 F. Supp. 2d at 349 (Rule 10b-5(a) and (c)). Where the violation is a misrepresentation or omission under Rule 10b-5(b), the repose period runs from the date of misrepresentation or omission, or, if the conduct is ongoing, from the date of the last such violation.  *See, e.g.*, *In re Beacon Associates Litig*., 282 F.R.D. 315, 324 (S.D.N.Y. 2012) ("the rule, adopted by the majority of courts in this Circuit, is that the statute of repose 'first runs from the date of the last misrepresentation regarding related subject matter.'"); *Plymouth County Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 376-377 (E.D.N.Y. 2008) ("In accordance with Section 1658(b)'s focus on the particular statutory 'violation' at issue, . . . the period begins to run on the date of" the misleading disclosures); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898, 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005); *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 604 (S.D. Ohio 2003) ("The better authority is that the statute of limitations is triggered by the misrepresentation that constitutes the securities violation."); *Wafra Leasing Corp.1999-A-1 v. Prime Capital Corp.*, 192 F. Supp.2d 852, 864 (N.D. Ill. 2002) ("It is the misrepresentation 'in connection with the purchase or sale,' not the sale itself, that violates Rule 10b-5;" the statute of repose is measured from the misrepresentation); *Borden, Inc. v. Spoor Behrins Campbell & Young*, 778 F. Supp.

695, 699 (S.D.N.Y. 1991) (plaintiff required to commence an action within three years [under the prior repose statute] "after the occurrence of the conduct alleged to have violated the statute.").

The two decisions on which Deutsche Bank relies (Br. 14) first refer to the repose period running from the "fraud" or the "violation," and then to the transaction date as if synonymous with the violation, without explanation. *See Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d. 372 (S.D.N.Y. 2010). Notably, although it ultimately refers to the "transaction" date, *Arnold* actually uses a violation concept, because it held that in a series of transactions, the repose period for all commenced with the date of the final transaction. In addition, *Arnold* and *Anwar* are based on a small number of decisions that stem from a case that did not involve the statute of repose. *Anwar* relies on *Arnold*. *Arnold* relies on *Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290, 1294 (2d Cir. N.Y. 1992), which relies on *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972). *Radiation Dynamics* held, in an insider trading case, that a "purchase or sale" had occurred when the parties committed themselves to the transaction. It did not involve the statute of repose. *Id.* For all these reasons, this line of decisions does not establish that "violation" in 28 U.S.C. § 1658(b) should be interpreted to mean "transaction date," particularly where the violation is an ongoing course of conduct carried out after the transaction date, as here.[6]

---

[6] Indeed, "violation" must mean the defendant's wrongful conduct if the statute of repose is to serve its purpose of providing a "fixed statutory cut-off" for the defendant. Br. 13 (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991)). A publicly-traded company can know with certainty when five years has passed from the date it released allegedly misleading financial statements, but it cannot know with certainty when five years has passed from the last date an investor purchased or sold securities in reliance on such misleading financial statements.

**C.**     **The Complaint States a Claim under Rule 10b-5(a) and (c)**

"The Supreme Court has directed lower courts to interpret Section 10(b) and Rule 10b-5 flexibly and broadly, rather than technically or restrictively,"  because Section 10(b) was "designed as a catch-all clause to prevent fraudulent practices, including not just garden type varieties of fraud, but also unique forms of deception involving novel or atypical methods." *VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011) (quotations and citations omitted).

To "state a claim based on conduct that violates *Rule 10b-5(a)* and *(c)*, the plaintiff must allege that a defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries."  *In re Tower Automotive*, 483 F. Supp. 2d at 349 (citing *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005)).

Arco alleges each of these elements with the level of particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

**1.**     **The Complaint Alleges Deceptive Acts**

It is well-established that a "secret" intention not to honor the terms of a security is fraudulent conduct under Rule 10b-5.  *See The Wharf (Holdings) Ltd. v. United International Holdings, Inc.*, 532 U.S. 588, 596-597 (2001) (selling an option to purchase stock with a secret intention not to honor the option constitutes securities fraud); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) ("making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of the consideration for the transfer of securities.").  Deutsche Bank admits as much.  Br. 19 ("Plaintiff must establish that Defendant secretly intended not to perform under the contract (here, the Swap

Agreements) at the time of execution.").  Deutsche Bank does not dispute that the CDS

Agreement was part of the "consideration" for Arco's investment in the Notes.  *See Luce*, 802

F.2d at 55.  Indeed, the CDS Agreement defined the risk Arco agreed to accept.  Thus, Deutsche

Bank's sale of the Notes (through the Issuer) with an undisclosed intention not to comply with

the CDS Agreement is a "deceptive act."

        The Complaint alleges that Deutsche Bank entered into the CDS Agreement for

the Upsize with the *present* intention *not* to comply with it.  At the time, it faced regulatory

pressure to reduce its exposure, and it had poor-quality derivative investments on its books.

Cplt. ¶ 76.  This has been confirmed by the number of counterparties challenging the legality and

enforceability of Deutsche Bank's derivative instruments, including three of the companies (the

"Reference Entities") on Reference Obligations that became Credit Events.  Cplt. ¶¶ 139-147.

Notably, the changes Deutsche Bank made in the Upsize were to double the size of the

Reference Portfolio and to add *derivatives* as permitted Reference Obligations.

        That Deutsche Bank had a present intention to abandon the CDS Agreement at the

time of the Upsize is also demonstrated by the Reference Obligations Deutsche Bank added

immediately after the Upsize: the "Egana" and "Peace Mark" as Reference Obligations.  Both of

these companies were engaged in accounting fraud, with obvious red flags in their financial

statements *before Deutsche Bank designated them*.  *Id*. ¶¶ 107-126.  Deutsche Bank declared a

Credit Event for Egana within months, and for Peace Mark the following year.  *Id.* ¶¶ 117, 125.

These Reference Obligations patently violated the Eligibility Criteria.  *Id.* ¶ 123.  The fact that

warning signs of accounting fraud were readily apparent when Deutsche Bank designated them,

and that Deutsche Bank did so in January 2007 immediately after the Upsize, are highly

suggestive that Deutsche Bank's motive in effecting the Upsize was to designate ineligible

Reference Obligations in violation of the CDS Agreement.

In addition, Deutsche Bank committed other deceptive acts throughout the

Transaction.  Deutsche Bank controlled information about whether it was complying with the

CDS Agreement and whether it was entitled to Credit Event Payments.  Cplt. ¶ 7.  Two of the

E&Y Certifications are attached to the Complaint.  Both are for the "Wockhardt" Credit Event.

In the first, E&Y stated that it could not certify compliance with "Eligibility Criteria 2, 3, 4, and

5 and Replenishment Conditions (a) and (b) as we were not provided with the necessary

information."  Cplt. Ex. B at 2.  In the second, E&Y issued another E&Y Certification for

Wockhardt.  Cplt. Ex. C.  This is already a violation of the E&Y Certification requirement,

which requires that E&Y Certification be "irrevocable."  The second Wockhardt E&Y

Certification states that E&Y "certified" compliance "using" the "Assumptions on Exhibit 2."

*Id.* at 3.  The Assumptions on Exhibit 2 recite verbatim most of the Eligibility Criteria and

Replenishment Conditions, and state that E&Y "performed no procedures to verify the accuracy

of the Assumptions provided to us by the Issuer Swap Counterparty [Deutsche Bank]."  Thus,

Deutsche Bank *knew* that E&Y could not give a valid E&Y Certification for Wockhardt, and

simply told E&Y to "assume" compliance.  Deutsche Bank received a Credit Default Payment

for the Wockhardt Credit Event.  Cplt. ¶¶ 149-150.

Deutsche Bank argues that Arco's "information and belief" allegations, which it

takes out of context, are insufficient.  However, it is well-established that allegations as to the

defendant's state of mind or matters within the defendant's knowledge may be alleged on

information and belief if supported by factual allegations demonstrating the basis for the

plaintiff's belief.  *See Goldin Assocs., L.L.C. ex rel. SmarTalk Teleservices, Inc. v. Donaldson,*

*Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688, 2003 U.S. Dist. LEXIS 16798 (S.D.N.Y. Sept. 24, 2003) ("allegations of fraud ordinarily cannot be based on information and belief" but "this pleading restriction may be relaxed where the matter is peculiarly within the knowledge of the defendant" if "accompanied by a statement of facts upon which the belief is founded") (citing *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988)).  Arco appropriately uses information and belief allegations as to matters of Deutsche Bank's state of mind (which may be "averred generally" under Rule 9(b)) and amply supports such allegations by explaining the basis for its belief.

      For example, Deutsche Bank asserts that Arco's "information and belief" allegation that Deutsche Bank failed to obtain E&Y Certifications (not "assumptions," actual certifications) for *any* of the Credit Events (Cplt. ¶ 95) is "conclusory."  Br. 16. It claims that a "certification" does not require an "audit" (Br. 7), and that therefore the Complaint merely challenges the "quality" of the E&Y Certifications (*id.* 8), but not that Deutsche Bank failed to "deliver" E&Y Certifications.  *Id.* 8, 16.  According to Deutsche Bank, the delivery of an "assumption" is the same as delivery of a "certification."

      This argument fails.  Arco alleges that an "assumption" is *not* a certification at all, which is self-evident.  Cplt. ¶ 94.  Arco's allegation that Deutsche Bank failed to comply with the E&Y Certification for any of the Credit Events is based on the five fraudulent E&Y Certifications it has been able to obtain, in all of which E&Y admits that it cannot certify, or it was directed to "assume" compliance by Deutsche Bank.  *Id.* ¶¶ 90-94.  Arco attaches two examples to the Complaint.  *Id.* Exs. B-C.  This is more than sufficient to support Arco's "information and belief" allegation that all of the purported E&Y Certifications were the same (*id.* ¶ 95), and thus all fraudulent.

Similarly, Arco's allegations that Deutsche Bank must have delivered knowingly false instructions to HSBC directing it to make Credit Event Payments to Deutsche Bank (Cplt. ¶¶ 117, 125, 137, 150, 152, 154, 160), which Deutsche Bank refers to as "bald" (Br. 17) are expressly based on the false E&Y Certifications, which were a "condition precedent" to Deutsche Bank's entitlement to Credit Event Payments.  Cplt. ¶¶ 89-95.  Arco also explains its allegation that Deutsche Bank failed to use up-to-date Moody's mapping tables (Cplt. ¶ 98), which is based on a press release.  Deutsche Bank fails to explain its assertion that Arco's reading of the press release is "misguided."  Br. 17.

Deutsche Bank's remaining arguments, of "fraud by hindsight," or "fiduciary duty," are not based on anything in the Complaint, and Deutsche Bank makes no effort to explain on what such arguments are based.  Br. 18-19.  The Complaint plainly alleges that Deutsche Bank had *present* fraudulent intent and knowledge at the time of the wrongdoing.  *E.g.* Cplt. ¶¶ 113, 134.  *See Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (rejecting defendants' "fraud-by-hindsight" argument where the complaint alleged that that they "had present knowledge" at the time of the wrongdoing).  In addition, the Complaint is not based on allegations of fiduciary duty.

### 2.       The Complaint Alleges Scienter

Scienter is established by facts "that give rise to a strong inference of fraudulent intent."  *Tower Automotive*, 483 F. Supp. at 335-336.  This can be done "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* (citing *Kalnit v. Eichler*, 264 F.3d 131, 138-139 (2d Cir. 2001)).

The allegations in the Complaint are more than sufficient to allege scienter.  *See supra* at Point I(C)(1); *e.g.* Cplt. ¶¶ 76, 79, 88-96.  *See Tower Automotive*, 483 F. Supp. 2d at 338, citing *In re NYSE Specialists Sec. Litig*., 405 F. Supp. 2d 281, 313 (S.D.N.Y. 2005) ("plaintiffs need only plead circumstances that provide at least a minimal factual basis" for allegations of scienter).  Indeed, Deutsche Bank's use of sham E&Y Certifications, examples of which are attached to the Complaint, would be sufficient by itself.  Cplt. Exs. B-C.

Deutsche Bank's arguments (Br. 20-21) on scienter are meritless.  Deutsche Bank's motive – divesting itself of its toxic derivative emerging markets investments in the face of new regulations (Cplt. ¶ 76) and seizing funds from Arco to which Deutsche Bank knew it was *not* entitled – is not an ordinary course "profit motive."  *See, e.g., Jacquemyns v. Spartan Mullen Et Cie, S.A.*, No. 10 Civ. 1586, 2011 U.S. Dist. LEXIS 136579, at *26 (S.D.N.Y. Nov. 23, 2011) ("While [g]eneral profit-making motive alone is generally disclaimed as a sign of fraudulent intent . . . *misappropriating* approximately $1 million is not the same as a desire for mere legal profits.") (internal citation omitted).  Deutsche Bank's assertions that Arco "has pleaded no facts to support any conscious misbehavior or recklessness," and there are "no allegations" that Deutsche Bank "knew specific information concerning" Reference Obligations when it designated them, simply ignore the allegations in the Complaint.  *E.g.*, Cplt. ¶¶ 89-138 & Exs. B and C.  More of Arco's "information and belief" include a description for the basis of Arco's belief, and the others are plausible in light of the facts alleged in the Complaint as a whole.  *See* Point I(C)(1).

Finally, Deutsche Bank asserts that it "did nothing more than it was supposed to do by contract," and recites simplistic features of the Transaction, such that it was the "swap counterparty."  Br. 21.  This argument, if it is an argument, is irrelevant.

### 3.      **The Complaint Alleges Reliance**

It is unclear whether "reliance" is an element of Rule 10b-5(a) and (c) claims.  *See In re Tower Automotive*, 483 F. Supp. 2d at 349 (not listing reliance as an element under Rule 10b-5(a) and (c)); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d at 492 (same).  Unlike Rule 10b-5(b), Rule 10b-5(a) and (c) do not require misleading statements.   Indeed, Rule 10b-5(a) and (c) broadly prohibit "any scheme, device or artifice to defraud" and "any act, practice or course of business which operates or would operate as a fraud or deceit on any person."  Here, Deutsche Bank misappropriated funds by obtaining Credit Event Payments to which it knew it was not entitled.  *Cf. Securities and Exchange Commission v. Zanford*, 535 U.S. 813 (2002) (broker's misappropriation of proceeds of sale of securities violated Rule 10b-5).

Even if reliance were an element, Arco has plainly alleged reliance.  Arco invested in the Notes in reliance on Deutsche Bank's commitments in the CDS Agreement.  *See Wharf (Holdings)*, 532 U.S. at 596 ("To sell an option while secretly intending not to permit the option's exercise is misleading, *because a buyer normally presumes good faith*") (emphasis added).  Arco was entitled to rely on Deutsche Bank's good faith, *i.e.* that it intended to comply with the CDS Agreement.  Arco would never have invested had Deutsche Bank disclosed that the CDS Agreement was a sham, that Deutsche Bank would instruct E&Y to merely "assume" compliance, and that it actually planned to use the Transaction to off-load toxic investments.  *See also Luce*, 802 F.2d at  55 ("making a specific promise to perform a particular act in the future while secretly intending not to perform that act may violated Section 10(b) where the promise is part of the consideration for the transfer of securities.").

21

Deutsche Bank's conclusory arguments that Arco's reliance on the CDS agreement is insufficient (Br. 22) are based on general propositions, do not address the law cited herein, and ignore the allegations in the Complaint.

Deutsche Bank's argument concerning the Investor Presentation (Br. 23) is irrelevant.  Deutsche Bank claimed in the Investor Presentation that its underwriting and originating standards were high (Cplt. ¶ 20), but even if it had not done so, Arco was entitled to rely on Deutsche Bank's underwriting and origination standards being commercially reasonable. The CDS Agreement required Deutsche Bank to underwrite to its standards and policies. Confirmation, Schedule C (Eligibility Criteria 2).  The allegations in the Complaint plausibly suggest that Deutsche Bank did not originate the derivative investments it designated as Reference Obligations to commercially reasonable standards.  *E.g.* Cplt. ¶¶ 107-124.

## II.

## ARCO HAS STATED A CLAIM FOR BREACH OF <u>CONTRACT AS THIRD-PARTY BENEFICIARY</u>

Under New York law, a "third party may enforce a contract when 'recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Bayerische Landesbank v. Aladdin Capital Management, LLC*, 692 F.3d 42, 52 (2d Cir. 2012).  In "determining whether the parties intended to benefit the third party, a court should consider the circumstances surrounding the transaction as well as the actual language of the contract." *Id.* (quotation omitted).

In *Bayerische Landesbank*, plaintiffs were investors in debt securities issued by an SPE in a collateralized debt obligation ("CDO").  The SPE entered into a credit default swap, on

which the value of the investors' notes depended, and a portfolio management agreement

("PMA") with the manager of the reference portfolio subject to the swap.  The noteholders

alleged that they were third-party beneficiaries of the PMA.  The PMA expressly named a third-

party beneficiary *other than* the noteholders, and the District Court had held that this precluded

any intention to benefit the noteholders.  The Second Circuit reversed after reviewing the

language of the transaction documents and the allegations in the complaint, finding that it was

plausible that the PMA was intended to benefit the noteholders notwithstanding that the PMA

did not name them in the third-party beneficiary provision.  *Id.* at 52-58.

      Here, the NSA makes clear that the CDS Agreement was intended to benefit the

Noteholders.  The NSA incorporates by reference the Transaction Documents,[7] including the

CDS Agreement, and provides that the Noteholders could rely on their terms.  NSA § 4(e)

(purchasers could not rely on anything *other than* the "terms and provisions" of the Transaction

Documents, and had not relied on any "representation and warranty made by" Deutsche Bank

*other than* "in its capacity as a party to a Transaction Document").

      Deutsche Bank argues that this is a "disclaimer" of reliance and does not indicate

that the Noteholders were intended beneficiaries of the CDS Swap.  To the contrary, the

disclaimer of reliance was as to documents "other than" the Transaction Documents such as the

CDS Agreement, which clearly indicates that reliance on the CDS Agreement was intended.  The

cases relied on by Deutsche Bank (Br. 24) are inapposite because they involve entirely different

provisions and circumstances.  *See Subaru Dists. Corp. v. Subaru of America, Inc.*, 425 F.3d 119

(2d Cir. 2005) (contract sought to be enforced by plaintiff was not the contract to which it

---

[7]  The NSA provides that defined terms have the same meaning as in the Indenture.  NSA at 1.  The
Indenture defines "Transaction Documents" to include the CDS Agreement.  Indenture, at Annex A.

claimed to be a third-party beneficiary, and agreement to which plaintiff did claim to be a third-party beneficiary contained clauses refuting any intent to benefit any third parties, and did not contain the right plaintiff sought to enforce); *Banco Espirito Santo de Investimento v. Citibank NA*, No. 03-1537, 2003 U.S. Dist. LEXIS 23062 (S.D.N.Y. Dec. 29, 2003) (expressly denied liability as to fund and shareholders and breach alleged was solely of oral representations, not the contract to which plaintiff claimed it was a third-party beneficiary).

In addition, the Issuer assigned "all" its "rights" under the CDS Agreement to the Trust in the Indenture "for the benefit and security" of the Noteholders.  Indenture, at 1 (First Granting Clause).  The remainder of the Trust was for the "benefit and security" of both the Noteholders and Deutsche Bank, but the rights under the CDS Agreement were solely for the benefit of the Noteholders.  *Id.*  The Noteholders were *express* third-party beneficiaries under the Indenture "to the extent of the rights" granted therein.  *Id.* § 13.8.

Notably, while other Transaction documents contain third-party beneficiary clauses, the Confirmation contains no such clause.  While it does not expressly name the Noteholders as third-party beneficiaries, it also does not purport to bar third-party beneficiaries.  Given that the other Transaction Documents barred or limited third-party beneficiaries when intended, it suggests that the omission of such a provision in the Confirmation was intentional.

The CDS Agreement defined the Noteholders' investment.  It was the entire purpose of the investment.  The Issuer was an SPE that had no meaningful economic interest in the Transaction, and could not "benefit" by the CDS Agreement.  Whether the Note Collateral was distributed to Deutsche Bank as Credit Event Payments or used to repay the Noteholders the principal due on their Notes made no difference to the Issuer.  Provisions in the CDS Agreement

such as the Eligibility Requirements, Replenishment Conditions and the E&Y Certification requirement, on their face, serve only to protect the *Noteholders*.

For all these reasons, Arco has alleged that it is a third-party beneficiary of the CDS Agreement.

### Conclusion

For all these reasons, the Court should deny Deutsche Bank's motion to dismiss.

Dated: New York, New York
       December 17, 2012

MILLER & WRUBEL P.C.


By: /s/ John G. Moon
    John G. Moon
    Claire L. Huene
    570 Lexington Avenue
    New York, New York 10022
    Tel:  (212) 336-3500
    Fax: (212) 336-3555

    *Attorneys for Plaintiff*
    *Arco Capital Corporation Ltd.*