UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X

ARCO CAPITAL CORPORATIONS LTD.,        12 Civ. 7270


                    Plaintiff,           OPINION
    -against-

DEUTSCHE BANK AG,

                    Defendant.

-----------------------------------------------X

A P P E A R A N C E S:

      Attorneys for Plaintiffs

      MILLER & WRUBEL P.C.
      570 Lexington Avenue
      New York, NY 10022
      By:  John G. Moon, Esq.
           Claire L. Huene, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6|6|13

      Attorneys for Defendants

      JONES DAY
      222 East 41st Street
      New York, NY 10017
      By:  Jayant W. Tambe, Esq.
           Kelly A. Carrero, Esq.

**Sweet, D.J.,**

Defendant Deutsche Bank AG ("Deutsche Bank" or the "Defendant") has moved pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint (the "Complaint") of plaintiff Arco Capital Corporation Ltd. ("Arco" or the "Plaintiff").

Upon the conclusions set forth below, the motion of Deutsche Bank to dismiss the cause of action for securities fraud is granted with leave to replead within 20 days, and supplemental jurisdiction over Arco's state law claim is declined.

## I. **Prior Proceedings**

On September 27, 2012, Arco filed the Complaint setting forth two causes of action against Deutsche Bank for (1) securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and (2) for breach of contract.

1

On December 3, 2012, invoking Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Deutsche Bank moved to dismiss the Complaint.  The instant motion was heard and marked fully submitted on January 16, 2013.

## II.  **Background**

The following factual background is drawn from the Complaint and from documents referenced in or integral to the Complaint as submitted by the parties.  The allegations of the Complaint are accepted as true for the purposes of this motion, see Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002), and do not constitute findings of fact by the Court.

This action arises out of Deutsche Bank's allegedly intentional or reckless misconduct in connection with a June 2006 collateralized loan obligation ("CLO") transaction (the "Transaction"), known as CRAFT EM CLO 2006-1 (the "CRAFT EM CLO" or the "Issuer").  (Compl. ¶ 1).

Deutsche Bank is a financial institution organized and existing under the laws of Germany with its principal place of

2

business in the United States in New York, New York.  (Id. ¶ 15).

Arco is an exempted limited company organized and existing under the laws of the Cayman Islands and externally managed by a company with its principal place of business in Guaynabo, Puerto Rico.  (Id. ¶ 14).

The Transaction

In June 2006, Deutsche Bank offered investors the opportunity to acquire debt securities (the "Notes") tied to a portfolio (the "Reference Portfolio") of Deutsche Bank-originated emerging markets investments and derivative transactions (the "Reference Obligations").  (Id. ¶ 2).  The transactions were effected through CRAFT EM CLO, a Cayman Islands company created by Deutsche Bank.  (Id. ¶¶ 2-4, 30, 77). As a "synthetic" CLO, the Craft EM CLO did not go out and purchase outright whole loans or other direct exposures to the emerging market companies or derivatives counterparties; instead, it gained exposure synthetically through credit default swap transactions (the "CDS Agreements"), which the Issuer

3

entered into with Deutsche Bank.  (Id. ¶¶ 2-3, 31-43; Exs. 14-17 [Swap Confirmations]).

In exchange for the interest payments on the Notes, investors agreed to risk the principal due on the Notes based on the Reference Portfolio.  If a Reference Obligation defaulted in a way covered by the CDS Agreements (a "Credit Event"), Deutsche Bank received a payment (a "Credit Event Payment"), which directly reduced the principal due on the Notes at maturity. (Id. ¶ 3).

The Notes were issued in tranches with different levels of seniority: Class E, Class F and Class G Notes, with Class G as the most junior.  (Id. ¶ 4).  The Class E-1, F-1, and G-1 Notes were issued in June 2006 (the "First Offering"), and the Class E-2, F-2, and G-2 Notes were issued in January 2007 (the "Second Offering"). (Id. ¶¶ 1, 5, 31, 34, 77, 81).  All classes of Notes were scheduled to mature on July 15, 2012. (Id. ¶ 10).

According to Arco, Deutsche Bank caused the Issuer to enter into an Indenture, dated June 21, 2006 (the "Indenture") with HSBC Bank USA, N.A. ("HSBC"), located in New York, as

Trustee.  (Id. ¶ 5).  Arco alleges that Deutsche Bank controlled the transactions from its offices in New York, that all funds went to and from HSBC in New York, and that investors purchased the Notes by delivering funds to HSBC.  (Id.).

In June 2006, during the First Offering, Gramercy Emerging Markets Fund ("Gramercy"), a company associated with Arco, purchased Class F and Class G Notes on Arco's behalf. (Id. ¶¶ 81-82).  During the Second Offering in January 2007, Gramercy purchased new Notes on behalf of Arco.  (Id. ¶ 83). Gramercy, as the alleged agent for Arco, purchased Class G-1 Notes with an original notional amount of $15 million, Class G-2 Notes with an original notional amount of $15 million, Class F-1 Notes with an original notional amount for $8.75 million, and Class F-2 Notes with an original notional amount for $17.5 million.  (Id.).  In total, Gramercy purchased a total of $56.25 million of the Class G and Class G Notes during the First Offering and Second Offering.  (Id.).  In May 2007, Gramercy transferred the Notes to Arco in a pass-through transaction, in which Arco reimbursed Gramercy at par for the amounts Gramercy had advanced to purchase the Notes.  (Id. ¶ 84).

The Representations and Warranties by Note Purchasers

5

In connection with the purchase of the Notes, Gramercy executed a separate note subscription agreement (the "Note Subscription Agreement") with the Issuer.  (Id. ¶ 61).  The Note Subscription Agreement became an irrevocable agreement between Gramercy and the CLO, stating that:

> This subscription by the Purchaser is irrevocable; provided, however, that the execution and delivery by the Purchaser of this Subscription Agreement will not constitute an agreement between the Company and the Purchaser until this Subscription Agreement is accepted on behalf of the Company and, if not so accepted (as described below), this subscription and the obligations of the Purchaser hereunder will terminate.

(Exs. 8-11 at § 1(b) [Note Subscription Agreements]).

On or before the closing date of each issuance, each Note Subscription Agreement was agreed to and accepted in the Cayman Islands by a director of the CLO employed by the CLO's "Administrator," Maples & Calder, a Cayman Islands law firm. (Exs. 8-11 at Signature Pages [Note Subscription Agreements]; Ex. 12 at § 2.4 [Administration Agreement]; Ex. 13 [Registers of Directors and Officers]).  The Administration Agreement required them to "perform all services and take all actions in connection with [the transaction] in or from within the Cayman Islands."

6

(Ex. 12 at § 2.9 [Administration Agreement]).   Deutsche Bank was
not a party to any of the Note Subscription Agreements, but was
expressly identified as a third party beneficiary. (Exs. 8-11 at
§ 17 [Note Subscription Agreements]).

In Section 4 of each Note Subscription Agreement,
Gramercy made several representations and warranties, including
that:

> • It "received the Indenture and the other Transaction
> Documents and has not relied on any information . . .
> other than information that is contained in, and the
> terms and provisions of, the Indenture and the other
> Transaction Documents or is otherwise available."
>
> • It "has made its own investment decisions based upon
> its review of the Indenture and the other Transaction
> Documents, its own judgment and upon any advice from
> such advisers as it has deemed necessary . . . ."
>
> • It acknowledged that the Notes had been sold
> pursuant to Regulation S ("Reg S") of the Securities
> Act of 1933 (the "1933 Act"), an exemption from the
> registration requirements of Section 5 of the 1933 Act
> for offshore securities offerings.

(Exs. 8-11 at § 4(e) - (i) [Note Subscription Agreements].)

The CDS Agreements

7

The CDS Agreements applied to the Reference Portfolio, which started at $500 million in size. (Compl. ¶ 1). In January 2007, the Swap Confirmations were amended and the Reference Portfolio's size doubled to $1 billion (the "Úpsize") (Id. ¶ 10). At that time, the definition of "Reference Obligation" was expanded to include "Specified Payment Obligations," which in turn was defined to include certain derivative transactions and "a senior secured or unsecured note of the Reference Entity issued pursuant to an indenture or equivalent instrument." (Id. ¶ 77; compare Exs. 14-15 at § 1 [2006 Swap Confirmations], with Exs. 16-17 at §§ 1 and 3 [2007 Amended Swap Confirmations]).

Deutsche Bank had sole discretion to select the Reference Obligations to add to the Reference Portfolio. (Compl. ¶¶ 7, 36, 178(d)). Each Reference Obligation was required to meet the following qualifications (the "Eligibility Criteria"), on the date it was first included in the Reference Portfolio, and on the date of any replenishment that increased the notional amount of the Reference Obligation (the "Relevant Date"): (1) the underlying company (the "Reference Entity") would satisfy the credit rating thresholds (e.g., Moody's Equivalent Rating of "B3" or better); (2) the Reference Obligation could meet

8

origination requirements (e.g., an eligible asset type and
originated by Deutsche Bank "in accordance with its standard
credit policies and guidelines"); (3) there was no known event
that with notice or lapse of time would become a Credit Event in
relation to the Reference Obligation; (4) the Reference
Obligation was legally valid and enforceable in accordance with
its terms and applicable provisions of law; and (5) the
Reference Obligation was held by or for the benefit of a
Deutsche Bank entity. (Compl. ¶¶ 37, 44-56; Exs. 14-17 at ¶ 1, C
[Swap Confirmations]).

Under the first Eligibility Criteria, a Reference
Entity had to meet certain minimum credit rating thresholds,
including holding a Moody's Equivalent Rating of "B3" or better.
(Exs. 14-17 at C [Swap Confirmations]).  For any unrated
Reference Entity, Deutsche Bank would ascribe an internal rating
to that Reference Entity. (Compl. ¶¶ 21, 47-48).  The rating
agencies provided "mapping tables" to determine the
corresponding Moody's or Standard & Poor's ("S&P") rating to
Deutsche Bank's internal ratings, which would be used to
determine the "Moody's Equivalent Rating" and "S&P Equivalent
Rating," as defined in the CDS Agreements. (Id.
¶¶ 22, 49, 60, 97; Exs. 14-17 at E [Swap Confirmations]).

9

As "Calculation Agent" under the Swap Confirmations, Deutsche Bank was required to engage an independent accountant, Ernst & Young LLP ("E&Y"), to deliver an irrevocable notice to the Issuer containing a certification, as a condition precedent to Deutsche Bank's entitlement to any claimed Credit Event Payment. (Id. ¶¶ 41-42, 89-96; Exs. 14-17 at ¶ 4 [Swap Confirmations]).  The certification was to include: (a) that the defaulted Reference Obligation satisfied the Eligibility Criteria and Replenishment Conditions; (b) verification that the related Credit Event occurred; and (c) verification that the computation of the relevant "Loss Determination Amount" (each, an "E&Y Certification"). (Exs. 14-17 at ¶ 4 [Swap Confirmations]).  The E&Y Certifications were drafted by E&Y in accordance with "agreed upon procedures" and provided that they were "in accordance with attestation standards established by the American Institute of Certified Public Accountants [("AICPA")]." (Compl. at Ex. B).

## III. **Arco's Allegations and Claims**

Arco brings a securities fraud claim under Section 10(b) and Rule 10b-5(a) and (c) for "scheme liability" arising

10

out of the same operative facts as the contract claim and seeks to recoup the losses it allegedly suffered. Arco's allegations are predicated on seventeen Reference Obligations that Deutsche Bank designated after the Second Offering in January 2007 and that later suffered Credit Events. (Id. ¶¶ 11, 80).

First, as a basis for its fraud and contract claim, Arco contends that the assets that suffered Credit Events were ineligible under the Eligibility Criteria. (Id. ¶¶ 106-62, 168-69, 178(c)). As discussed above, upon default of each Reference Obligation, as provided for under the CDS Agreements, the Issuer was required to make a Credit Event Payment to Deutsche Bank. (Id. ¶¶ 3-4, 69-70). Each Credit Event Payment correspondingly reduced the amount of funds available to repay the principal balance due on the Notes at maturity. (Id. ¶ 6). According to Arco, at the time of the Upsize, Deutsche Bank faced more stringent regulatory capital requirements and had poorly-written and toxic investments on its books, particularly its derivative investments. (Id. ¶¶ 76). Arco alleges that Deutsche Bank knew that such investments did not meet the Eligibility Criteria, and secretly intended to use the Upsize to rid itself of such assets and shift the losses to Arco. (Id.). Deutsche Bank allegedly took advantage of the Upsize to dump

11

ineligible lending transactions into the Reference Portfolio, and used its control over the Transaction to disguise its misconduct and frustrate the protections that existed for Noteholders.  (Id. ¶ 10).

Second, as a basis for its fraud and contract claim, Arco takes issue with the E&Y Certifications.  (Id. ¶¶ 89-96). The Complaint alleges that all of the E&Y Certifications obtained by Arco have patent deficiencies and fail to satisfy the condition precedent that E&Y, as an independent accountant, certify that the defaulted Reference Obligation complied with the Eligibility Criteria and Replenishment Conditions.  (Id. ¶¶ 94-95).

Third, as a basis for its fraud and contract claim, Arco contends that Deutsche Bank falsely reported Moody's Equivalent Ratings based on its use of an outdated Moody's mapping table. (Id. ¶¶ 97-105, 171, 178(b)).  The Complaint refers to a Moody's issued April 6, 2009 press release, which stated that "[b]ecause this mapping was performed prior to 1st April 2007, an additional stress was applied to capture potential deviations from the established mapping."  (Id. ¶ 98). Arco alleges that the employees managing the Transaction knew,

12

or were reckless in not knowing, that Moody's had updated the mapping table in or around April 2007, and intentionally or recklessly continued to use the old Moody's mapping table in order to be able to falsely report higher Moody's Equivalent Ratings for the Reference Obligations in the Reference Portfolio. (Id. ¶¶ 103-104).

Fourth, as a basis for its fraud and contract claims, Arco contends Deutsche Bank took Credit Event Payments it should not have. (Id. ¶¶ 172, 178(e)). Deutsche Bank allegedly instructed HSBC to make Credit Event Payments to which Deutsche Bank knew it was not entitled, amounting to over $86 million in Credit Event Payments. (Id. ¶¶ 106-162). As a result of Deutsche Bank's alleged misconduct, Arco contends that it incurred damages in excess of $37 million.

## IV.   The Applicable Standards

Rule 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. Mills v. Polar Molecular

Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Cohen v. Stevanovich, 772 F. Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. (quoting Twombly, 550 U.S. at 555).

14

Section 10(b), Rule 10b-5 and the Rule 9(b) Pleading Standard

Section 10(b) imposes civil liability on any person who uses "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale" of any security.  15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful for "any person . . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that defendants "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'" Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).  Such claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

15

Rule 9(b) requires that the plaintiff "state with particularity the circumstances constituting the fraud." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Romach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks and citation omitted). While "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. Kalnit v. Eichler, 264 F.3d 131, 137-38 (2d Cir. 2001).

## V. **Discussion**

### A) **The Section 10(b) Claim Survives Under Morrison**

Deutsche Bank seeks dismissal of the Section 10(b) claim under the transactional test adopted by the Supreme Court in Morrison v. National Australia Bank Ltd., --- U.S. ---, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010). It contends that because Arco purchased the Notes offshore, and not on a domestic exchange or in a domestic transaction, Arco cannot avail itself

16

of the federal securities laws to bring a claim for alleged
securities violations in connection with its transactions.  Arco
maintains that the Complaint and the documents associated with
the Transaction give rise to the plausible inference that
irrevocable liability arose in New York and that therefore its
investment in the Notes was a domestic transaction for <u>Morrison</u>
purposes.

<u>Morrison</u> involved a "foreign-cubed" class action:  one
in which one in which "(1) <u>foreign</u> plaintiffs [were] suing (2) a
<u>foreign</u> issuer in an American court for violations of American
securities laws based on securities transactions in (3) <u>foreign</u>
countries.  <u>Id.</u> at 2894 n.11 (Breyer, J., concurring in part and
concurring in the judgment) (emphasis in the original).  Three
Australian plaintiffs sued an Australian bank, the National
Australian Bank, under Section 10(b) of the Exchange Act for
losses they allegedly suffered on stock purchases traded on
Australian exchanges.  <u>Id.</u> at 2875.  The Supreme Court held that
a private right of action under Section 10(b) and Rule 10b-5 of
the Exchange Act could be maintained by foreign plaintiffs only
if: (1) the security was listed on an American stock exchange or
(2) the purchase or sale took place in the U.S.  <u>Id.</u> at 2888.
("Section 10(b) reaches the use of a manipulative or deceptive

17

device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States.").

In reaching its decision, the Court directed its attention to the Exchange Act's regulatory center and adopted a "transactional" test, which focused "not upon the place where the deception originated, but upon the purchases and sales of securities in the United States." Id. at 2884. This new transactional test replaced the Second Circuit's conduct and effects test, which asked "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens" or "whether the wrongful conduct occurred in the United States." Id. at 2879 (quoting SEC v. Berger, 322 F.3d 187, 192-93 (2d. Cir 2003)). The Court explained that the conduct and effects test lacked textual support in the Exchange Act and contravened the longstanding presumption against extraterritorial application of U.S. legislation in the absence of contrary Congressional intent. Morrison, 130 S. Ct. at 2878. Applying the transactional test to the case before it, the Court concluded that "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," Id. at 2883, and dismissed the action because it "involve[d] no

18

securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside of the United States."   Id. at 2888.

In addition, under Morrison, deceptive conduct is punished only "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered" but transacted in the United States. Id. at 2884.   The Second Circuit recently addressed this second prong of Morrison's transactional test and clarified what constitutes a domestic transaction.   In Absolute Activist Value Master Fund Ltd. v. Ficeto, the Second Circuit endorsed both an "irrevocable liability" and "transfer of title" standard, holding that "to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States."   677 F.3d 60, 68 (2d Cir. 2012).

Thus, under Morrison, a plaintiff must demonstrate that its purchase or sale of a security was domestic by alleging that (1) the transaction involved securities traded on a domestic exchange, (2) irrevocable liability was incurred in the

19

United States, or (3) title was passed in the United States.

See Morrison, 130 S. Ct. at 2884; see also Absolute Activist,

677 F.3d at 66-67.  At the pleading stage, it is sufficient for

the plaintiff "to allege facts leading to the plausible

inference" of a domestic transaction.  Id. at 68.  As the

instant transaction does not fall in the first category, Arco

must adequately allege fact demonstrating that the Notes that it

purchased fall in the latter two categories.


To support its claim, Arco contends that (i) the

"Issuer granted its interest in the Transaction . . . to the New

York Trust;" (ii) the Trustee "HSBC maintained the bank accounts

for the Transactions, and all funds in the Transaction went to

and from HSBC in New York;" (iii) "Deutsche Bank controlled the

Transaction from its offices in New York;" (iv) the "[relevant

agreements] are all governed by New York law;" and (v) "it is

plausible that decisions concerning the Transaction, including

the decision to sell Notes to Arco, were made by Deutsche Bank

in New York." (Opp. Br. at 6-8).


To the extent that Arco seeks to establish some nexus

to the United States because the Deutsche Bank employees

involved in the transactions were located in New York or that

20

the contracts were governed by New York law, (Compl. ¶ 166),
such assertions are irrelevant as to whether Arco's purchase of
its Notes was a domestic transaction as contemplated by
Morrison's transactional approach.  See Morrison, 130 S. Ct. at
2884 (noting that "the presumption against extraterritorial
application would be a craven watchdog if it retreated to its
kennel whenever some domestic activity is involved in the
case.") (emphasis in the original).  While potentially relevant
under conduct and effects test, courts have found such pleadings
that "some acts that ultimately result in the execution of the
transaction abroad [took] place in the United States amounts to
nothing more than the reinstatement of the conducts test."  Pope
Invs. II LLC v. Deheng Law Firm, No. 10 Civ. 6608, 2012 WL
3526621, at *8 (S.D.N.Y. Aug. 15, 2012); Cornwell v. Credit
Suisse Grp., 729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010) (finding
that read as a whole, the Morrison opinions indicate that the
Court considered that under its new test § 10(b) would not
extend to foreign securities trades executed on foreign
exchanges even if purchased or sold by American investors, and
even if some aspects of the transaction occurred in the United
States . . . .").  Examples of factual allegations that would be
sufficient under Morrison include "facts concerning the
formation of the contracts, the placements of purchase orders,

21

the passing of title, or the exchange of money, [but] the mere
assertion that transactions 'took place in the United States' is
insufficient to adequately plead the existence of domestic
transactions." Absolute Activist, 677 F.3d at 70.

In addition, "the point of irrevocable liability can
be used to determine the locus of a securities purchase or
sale." Id. at 68. In this Circuit, parties incur irrevocable
liability within the United States when the purchaser agrees "to
take and pay for a security" in the United States or when the
seller agrees "to deliver a security" in the United States. Id.
Specifically, the Second Circuit highlighted "the time when the
parties to the transaction are committed to one another . . . in
the classic contractual sense, [where] there was a meeting of
the minds of the parties; it marks the point at which the
parties obligated themselves to perform what they had agreed to
perform even if the formal performance of their agreement is to
be after a lapse of time." Id. at 67-68 (citing Radiation
Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir. 1972)).

Deutsche Bank contends that, under the terms of the
Note Subscription Agreements between Gramercy and the Issuer,
irrevocable liability attached to the transaction when the

22

Issuer accepted each of the executed the agreements in the
Cayman Islands.  According to Deutsche Bank, the transaction
cannot be domestic because the purchase involved a Cayman
Islands' purchaser and a Cayman Islands' issuer, which was
completed only upon acceptance by the Issuer in the Cayman
Islands.

Arco, on the other hand, maintains that, under the
Note Subscription Agreements, the sale of the Notes was
expressly non-binding until the purchase price was received by
HSBC in New York.  Specifically, Arco asserts that the Notes
Subscription Agreements, (1) required Arco to deliver the
purchase price to HSBC in New York on the Closing Date, (Note
Subscription Agreements § 2) (delivery of payment to be by
"immediately available funds on the Closing Date to the account
to be advised to the Purchaser by the Trustee [HSBC]"); (2) the
Notes were not "valid and binding" until "paid for by the
Purchaser pursuant to Section 2 hereof," (Note Subscription
Agreements § 3(i)); (3) receipt of payment "in accordance with
Section 2" (i.e. delivery to HSBC) was a condition precedent to
the Issuer's obligation to "sell" the Notes, (Id. § 7(c)); (4)
the Issuer could revoke the Note Subscription Agreements in "its
sole discretion at any time prior to the Closing Date," i.e.

23

prior to Arco's delivery of payment; (Id. § 9(a)); and (5)
Arco's delivery of funds to HSBC completed the Note Subscription
Agreement, which automatically terminated with "the payment of
the [purchase price] in accordance with Section 2 hereof." (Id.
§ 9(b)).

Courts have repeatedly held that allegations "that
investors subscribed to the Funds by wiring money to a bank
located in New York . . . or that the Funds were heavily
marketed in the United States and that United States investors
were harmed by the defendant's actions," without more, do not
satisfy the transactional test announced in Morrison. Absolute
Activist, 677 F.3d at 70; see MVP Asset Mgmt. (USA) LLC v.
Vestbirk, No. 2:10-cv-02483-GEB-CKD, 2012 WL 2873371, at *7
(E.D. Cal. July 12, 2012) ("Plaintiff's allegations concerning
the transactions, that certain funds were transferred in between
New York-based banking institutions, are insufficient to
establish the existence of a domestic transaction, as required
under Section 10(b)."). In Cascade Fund, LLP v. Absolute
Capital Mgmt. Holdings Ltd., for example, the Court found that a
transaction was not "completed" in New York where the investor's
delivery of money was "one step" in the process of "applying to
invest in the funds." No. 08-cv-01381-MSK-CBS, 2011 WL 1211511,

24

at *7 (D. Colo. Mar. 31, 2011).  The agreement in that case also made "clear that simply sending money to New York was not sufficient to complete the transaction" and that the fund manager reserved the right to reject an application, "even if the purchase money had properly been wired to New York."  Id.

Here, in contrast, the Note Subscription Agreements provide that the delivery of funds to HSBC automatically terminated or "consummate[d]" the transaction because that act made the contract irrevocably binding.  (Note Subscription Agreements § 7) (receipt of funds a "condition" of "obligation" to "sell" Notes); see also 1 WILLISTON ON CONTRACTS, 1936 Ed., § 116 ("The subscription agreement is not a contract, but an offer to contract, which, when acted upon by incurring liability, becomes a binding obligation.").  As outlined in Section 9, the date beyond which the Issuer no longer had the discretion to revoke acceptance was the Closing Date, when the purchaser was to transmit the funds to HSBC in New York.  Thus, the irrevocable sale of the Notes occurred with the parties' performance on the Closing Date, when Gramercy delivered the funds to HSBC in New York and the Issuer assigned the interest to the Trust in New York.

25

Accordingly, for the reasons stated above, Arco has alleged facts leading to the plausible inference that irrevocable liability was incurred when the funds were delivered to HSBC in New York, and thus, its Section 10(b) claim survives under Morrison.

## B) Arco's Section 10(b) Claim, However, is Time-Barred

A district court may consider timeliness on a motion to dismiss when the circumstances are "sufficiently clear on the face of the complaint and related documents as to make the time-bar ruling appropriate on a motion to dismiss." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 157 (2d Cir. 2003). Even if irrevocable liability arose in New York and Arco's Section 10(b) claim survives under Morrison, the claim is time-bared under the applicable statute of repose.

An action under Section 10(b) of the Exchange Act or Rule 10b-5 is subject to a five-year statute of repose or may be brought within "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b).[1] Thus, in

---

[1] The temporal limitations governing Arco's § 10(b) claims are set forth in 28 U.S.C. § 1658(b), which states:

26

order to determine whether Arco's § 10(b) claim is timely, it must be determined (1) when the violation occurred, and (2) when Arco can be said to have discovered the facts constituting the violation.

The five-year statute of repose period is a fixed statutory cutoff, which is independent of a plaintiff's awareness of the violation and is not subject to equitable tolling.  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363, 111 S. Ct. 2773, 115 L. Ed. 2d 321 (1991) (stating that "the purpose of the [statute of repose] . . . is clearly to serve as a cutoff . . . [and equitable] tolling principles do not apply to that period."); P. Stolz Family P'ship, L.P. v. Daum, 355 F.3d 92, 102-03 (2d Cir. 2004) ("[A] statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling . . . .").

The statute of repose begins to run "on the dates the parties have committed themselves to complete the purchase or

---

[A] private right of action that involved a claim of fraud, deceit, manipulation, or contrivance in contravention of regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation.

sale of transaction." Arnold v. KPMG LLP, 334 Fed. App'x 349, 351 (2d Cir. 2009) (stating that "Plaintiff's contention that the period of repose begins to run at the time of the last alleged misrepresentation (even when made after the final purchase or sale of the securities) ignores the applicable limitations period, and thus is devoid of merit."); Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 428 (S.D.N.Y. 2010) (dismissing Section 10(b) claims as time-barred because the investments were made more than five years before the complaint was filed.).

In the Complaint, Arco alleges that Gramercy purchased the Notes, on its behalf, in June 2006 and January 2007. (Compl. ¶¶ 81-83).  At the very latest, Arco acquired its securities in May 2007 when Gramercy allegedly transferred the Notes to Arco.  (Id. ¶ 84).  The Complaint was filed on September 27, 2012, more than five years after the latest purchase day.

Arco, however, contends that Deutsche Bank's allegedly deceptive conduct in furtherance of its scheme continued from January 2007 through 2012, which directly reduced the outstanding principal value of Arco's Notes throughout that

28

period.  (Opp. Br. at 12).  According to Arco, the plain
language of the statute . . . measures the repose period from
the 'violation,' which is not the same things as the date of
'purchase or sale.'"  (Id.).  Arco therefore maintains that,
because it commenced this action within a few months of the end
of the Transaction in June 2012, its claim is timely.  (Id.).

    Arco cites to certain cases that it claims supports
its position that the statute of repose runs from the date of
the last misrepresentation.  (Id.).  Several of these cases pre-
date Arnold, are factually inopposite, or are from outside of
this Circuit.  For example, Arco relies on In re Beacon Assocs.
Litig., 282 F.R.D. 315 (S.D.N.Y. 2012) and Plymouth County Ret.
Ass'n v. Schroeder, 576 F. Supp. 2d 360 (E.D.N.Y. 2008) for the
proposition that "where a series of fraudulent
misrepresentations is alleged, this 'period of repose beings
when the last alleged misrepresentation was made.'"  Both cases
cite to In re Dynex Capital, Inc. Secs. Litig., which pre-dates
Arnold and which limited the date of the last misrepresentation
to circumstances where "plaintiff purchased the bonds at issue
less than five years before filing suit."  No. 05 Civ. 1897(HB),
2006 WL 314524, at *5 n.4 (S.D.N.Y. Feb. 10, 2006).

29

Indeed, district courts that have employed Arco's formulation have done so in the context of claims by plaintiffs who, unlike Arco, purchased their securities within five years prior to the commencement of their action. See e.g., In re Tower Automotive Sec. Litig,, 483 F. Supp. 2d 327, 331 (S.D.N.Y. 2007). Alternatively, this and other courts in this Circuit have held that the repose period runs from the date of last misrepresentation when the last alleged misrepresentation pre-dates the purchase. See e.g., Intesa Sanpolo, S.p.A v. Credit Agricole, --- F. Supp. 2d ---, 2013 WL 525000, at *7 (S.D.N.Y. Feb. 13, 2013) (distinguishing Arnold's holding from a situation where the last alleged misrepresentation pre-dated purchase); Isanaka v. Spectrum Tech. USA Inc., 131 F. Supp. 2d 353, 358 (N.D.N.Y. 2001) (stating that "a violation of section 10(b) and Rule 10b-5 can take place before and up to the time when the sale of securities take place, but not after the investment is made.") (citation omitted). Thus, where post-purchase violations are alleged, having a repose period triggered on the date of purchase is consistent with the well-established rule that a statute of repose cannot be equitably tolled. See Lampf, 501 U.S. at 363.

30

In a supplemental letter to the Court, Arco suggests that decisions such as Arnold, which refer to a transaction date, "do so conclusorily, and without addressing the statutory term 'violation'" in 28 U.S.C. § 1658(b).  While the Second Circuit in Arnold did not engage in statutory construction, it instead relied on a prior decision, which held that "the statute of repose in federal securities law claims 'starts to run on the date the parties have committed themselves to complete the purchase or sale transaction.'"  Arnold, 334 Fed. App'x at 351 (quoting Grondahl v. Merritt & Harris, Inc., 964 F.2d 1290, 1294 (2d Cir. 1992)).  In addition, the Arnold Court was expressly invited to consider several of the cases now cited by Arco, but declined to do so.  (See Tambe Supp. Decl. Exs. A and B) (highlighting the relevant excerpts of appellant's briefs in Arnold making the same argument advanced here by Arco).

Taken together, the allegedly fraudulent conduct here occurred after the date of purchase and Arco has not meaningfully distinguished itself from Arnold to align itself with the line of cases that have allowed for the statute of repose to run from the date of the last misrepresentations. Without any dispositive distinguishing facts from Arnold, there

31

is no reason to disturb the long-line of cases in this district
upholding Arnold's holding.

    In addition, pursuant to § 1658(b), Arco was required
to have asserted its § 10(b) claims within two years of the date
upon which "a reasonably diligent plaintiff would have
sufficient information about that fact to adequately plead it in
a complaint." City of Pontiac Gen. Employees' Ret. Sys. v.
MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011). Thus, with
respect to the facts showing scienter, which are "among those
facts that 'constitut[e] the violation" under 1658(b), Merck &
Co., Inc. v. Reynolds, 130 S.Ct. 1784, 1796 (2010), they are
deemed "discovered" for § 1658(b) purposes when the plaintiff
has uncovered (or when a reasonably diligent plaintiff *would
have* uncovered) enough information about the defendant's
knowledge or intent "to state with particularity facts giving
rise to a strong inference that the defendant acted with the
required state of mind such that it is at least as likely as not
that the defendant acted with the relevant knowledge or intent."
Pontiac, 637 F.3d at 175.

    A plaintiff may establish the requisite strong
inference of fraud if the Complaint (1) demonstrates 'that

defendants had both motive and opportunity to commit fraud,' or
(2) alleges 'facts that constitute strong circumstantial
evidence of conscious misbehavior or recklessness.'" Campo v.
Sears Holding Corp., 635 F. Supp. 2d 323, 332-33 (S.D.N.Y. 2009)
(citation omitted).


      Citing to paragraphs 76, 79, 88 through 96 of the
Complaint, Arco contends that its allegations are more than
sufficient to allege scienter.  These paragraphs refer to the
Upsize in January 2007, the E&Y Certifications issued after the
five Credit Events, and a conclusory statement of Deutsche
Bank's misconduct.  (See Compl. ¶ 88) (alleging that "[a]fter
the Upsize, Deutsche Bank systematically violated the terms of
the Transaction and engaged in other misconduct so pervasive
that it demonstrates an intention to use the Transaction to
commit fraud on the Noteholders, including Arco.").  Because the
allegations in the Complaint relevant to scienter, as pled,
demonstrate that Arco could have discovered "the facts
constituting the violation" within two years of the date upon
which "a reasonably diligent plaintiff would have sufficient
information about that fact to adequately plead it in a
complaint[,]"  Arco's Section 10(b) claims have expired.
Pontiac, 637 F.3d at 175.  Accordingly, Arco's Section 10(b)

claim are untimely with respect to § 1658(b)'s five-year statute of repose and two-year post-discovery deadline.

### C) The Supplemental Jurisdiction Over Arco's Breach of Contract Claim is Declined

Because Arco's Section 10(b) claim is dismissed as time-barred pursuant to 28 U.S.C. § 1658(b), there is no need to reach on the sufficiency of the allegations in the Complaint as to that claim.  The Complaint also alleges as breach of contract claim under New York law.  Arco contends that it is a third-party beneficiary under the CDS Agreement, which Deutsche Bank allegedly breached.

"[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" Kolari v. N.Y. Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill,

34

484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988);

Klein & Co. Futures, Inc. v. Bd. of Trade, 464 F.3d 255, 262 (2d

Cir. 2006) ("[W]here, as here, the federal claims are eliminated

in the early stages of litigation, courts should generally

decline to exercise pendent jurisdiction over remaining state

law claims.")  Because Arco's federal claim is dismissed, the

Court declines to exercise supplemental jurisdiction over its

breach of contract claim.


## VI.  Conclusion


Based on the conclusions set forth above, Defendant's

motion to dismiss Plaintiff's federal securities law claim is

granted with leave to replead within 20 days.  Supplemental

jurisdiction over Plaintiff's state law cause of action is

declined, without prejudice.


It is so ordered.


New York, NY
June 6 , 2013

ROBERT W. SWEET
U.S.D.J.