UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCO CAPITAL CORPORATION LTD,

                Plaintiff,

    -against-

DEUTSCHE BANK AG,

                Defendant.

No. 12 CV 7270 (RWS)

ECF Case


RECEIVED
JUL 0 3 2013
U.S.D.C. S.D. N.Y.
CASHIERS

## FIRST AMENDED COMPLAINT

Plaintiff Arco Capital Corporation Ltd. ("Arco"), by its undersigned counsel, as and for its Complaint against defendant Deutsche Bank AG ("Deutsche Bank"), alleges as follows:

### Introduction

1.    This action arises out of a fraudulent scheme by Deutsche Bank to get toxic loans off its books. In 2006, Deutsche Bank structured and created a collateralized loan obligation ("CLO") transaction (the "Transaction"), known as CRAFT EM CLO 2006-1 (the "Issuer").

2.    As described in more detail herein, the Transaction involved Deutsche Bank creating and managing a portfolio (the "Reference Portfolio") of Deutsche Bank-originated lending transactions to companies in emerging markets (each, a "Reference Obligation"), to be securitized and sold to investors through the Issuer.

3.    Deutsche Bank represented to investors that each of the Reference Obligations was to be selected by Deutsche Bank subject to rigorous credit review, and that defaulted Reference Obligations were to be certified by independent accountants. In fact, during the life of the transaction, Deutsche Bank selected Reference Obligations for the purpose of

removing risky loans from its own books and transferring undisclosed risks to investors in violation of both the federal securities laws and New York common law. No independent review of defaulted Reference Obligations occurred. Deutsche Bank intentionally or recklessly sold investors an interest in assets that were significantly riskier than what they had bargained for, and what Deutsche Bank had represented. In fact, Deutsche Bank represented that CRAFT would have an estimated default rate of .085%, but CRAFT experienced a default rate of over 14%. Because Arco owned the lower tranches of CRAFT, Arco lost 100% of its investment.

4. As part of the Transaction, Deutsche Bank also caused the Issuer to enter into a credit default swap agreement (the "CDS Agreement") with Deutsche Bank with respect to the Reference Portfolio.

5. A credit default swap is similar to an insurance policy. Under the terms of the CDS Agreement, Deutsche Bank made premium-like payments to the Issuer ("CDS Fee Payments"). In exchange, if any Reference Obligation defaulted in certain specified ways (a "Credit Event"), the Issuer was required to pay Deutsche Bank sixty-five percent (65%) of the defaulted notional amount (a "Credit Event Payment") of such Reference Obligation.

6. The Issuer raised the capital required to make Credit Event Payments to Deutsche Bank by issuing Notes to investors ("Noteholders"). The Notes were issued in tranches with different levels of seniority: Class E, Class F, and Class G, with Class G as the most junior. The Notes are "securities" under the Securities and Exchange Act of 1934 (the "Exchange Act").

7. Deutsche Bank caused the Issuer to enter into an Indenture, dated June 21, 2006 (the "Indenture"), with HSBC Bank USA, N.A. ("HSBC"), located in New York, as Trustee. Pursuant to the Indenture, the Issuer granted to HSBC, *inter alia*, all its rights under the

CDS Agreement. All payments with respect to the Transaction were made to or by HSBC. The Notes expressly did not become valid and binding until the Noteholders delivered the purchase price to HSBC in New York. In addition, the Transaction was created, structured, and managed, in whole or in substantial part, by Deutsche Bank employees in New York.

8.  HSBC used Deutsche Bank's CDS Fee Payments to make interest payments on the Notes. It held the proceeds from the sale of the Notes to investors (the "Note Collateral"), and used such proceeds to make Credit Event Payments to Deutsche Bank, with the remainder to be used to repay the principal balance due on the Notes at the expiration of the Transaction. When Deutsche Bank declared a Credit Event and HSBC made a Credit Event Payment from the Note Collateral, the principal balance due on the most junior Notes was correspondingly reduced. If the principal balance due on the most junior Notes was reduced to zero, any additional Credit Events would begin to reduce the principal balance due on the second most junior tranche of Notes. Thus, each Credit Event Payment benefitted Deutsche Bank at the direct expense of the Noteholders.

9.  Deutsche Bank dominated and controlled the Transaction. It unilaterally selected which of its emerging markets lending transactions would be Reference Obligations included in the Reference Portfolio at any given time. Although the CDS Agreement contained requirements with which Deutsche Bank was supposed to comply, several such requirements were dependent on Deutsche Bank's discretion and good faith. Deutsche Bank also controlled the information provided to the parties to the Transaction concerning whether it was complying with the terms of the CDS Agreement.

10.  The stated purpose of the Transaction was to reduce Deutsche Bank's regulatory capital requirements with respect to the Reference Portfolio. Because the Reference

3

Portfolio was subject to the CDS Agreement, which was secured by the Note Collateral, Deutsche Bank reduced the amount it had to set aside to meet its capital requirements.

11.     The Transaction was patently not represented to be used by Deutsche Bank as a repository for poorly-underwritten, toxic or distressed lending assets. The CDS Agreement contains protections for the Noteholders that should have prevented Deutsche Bank from taking advantage of the Transaction in that way.

12.     In January 2007, Deutsche Bank doubled the original size of the Transaction from $500 million to $1 billion (the "Upsize") in the face of impending regulations requiring it to reduce the risk on its books. Deutsche Bank took advantage of the Upsize to dump ineligible lending transactions into the Reference Portfolio, and used its control over the Transaction to disguise its misconduct and frustrate the protections that existed for Noteholders. Deutsche Bank managed the Transaction in a way that operated as a fraud on the Noteholders. Between 2007 and the end of the Transaction on July 15, 2012, Deutsche Bank wrongfully obtained more than $86 million in Credit Event Payments to which it was not entitled.

13.     None of the Reference Obligations that Deutsche Bank included in the Reference Portfolio prior to the Upsize suffered a Credit Event. Seventeen of the Reference Obligations designated by Deutsche Bank ultimately suffered Credit Events. Prior to the Upsize, Deutsche Bank had estimated that the potential loss rate in the Reference Portfolio would be less than 1%. The loss rate after the Upsize was 14.28% of the maximum Reference Portfolio.

14.     Arco purchased Notes in the Upsize for approximately $56 million. As a result of Deutsche Bank's misconduct, Arco has incurred damages in excess of $37 million.

15.     On July 15, 2008, in furtherance of the Transaction, Deutsche Bank sold to Arco an additional $10 million in securities, called Earls Eight Series 469 Tranche B Pass

4

Though Notes ("Earls Eight Notes"). The Earls Eight Notes entitled Arco to subordinated

payments on the G Notes it had previously purchased in CRAFT and transferred to Earls Eight

on July 15, 2008. The Earls Eight Notes are "securities" under the Exchange Act.

16.     The sale of the Earls Eight Notes by Deutsche Bank to Arco also

constituted a sale of securities and an independent violation of Section 10(b) of the Exchange

Act and Rule 10b-5 thereunder.

17.     Arco's purchase of Earls Eight Notes from Deutsche Bank was effectuated

by means of the execution of documents by Arco Capital Management LLC, a Puerto Rico LLC

as attorney in fact for Arco, from its offices in Puerto Rico. Arco's beneficial interest in the

Earls Eight Notes was delivered to and recorded in Arco's prime brokerage account at Citigroup,

located in New York, NY.

18.     Arco asserts claims against Deutsche Bank for violation of Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder ("Rule

10b-5"), for common-law fraud, and for breach of the CDS Agreement as third-party beneficiary.

### The Parties

19.     Arco is an exempted limited company organized under the laws of the

Cayman Islands and externally managed by a company having its principal place of business in

Guaynabo, Puerto Rico.

20.     Deutsche Bank is a financial institution organized under the laws of

Germany. Deutsche Bank's principal place of business in the United States is 60 Wall Street,

New York, NY 10005.

### Jurisdiction and Venue

21.     This Court has subject matter jurisdiction pursuant to Section 27 of the

Exchange Act, 15 U.S.C. § 78aa, because Arco asserts a claim for violation of Section 10(b) of

the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, and pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

22.     This Court has personal jurisdiction over Deutsche Bank because it consented to such jurisdiction in the documents governing the Transaction. This Court also has jurisdiction over Deutsche Bank because it is located in this District and controlled the Transaction in whole or in significant part from its offices in this District.

23.     Venue is proper under 28 U.S.C. § 1391 because documents governing the Transaction provide for venue in this District, because Deutsche Bank resides in this District, and because a substantial part of the events giving rise to this action occurred in this District.

## Allegations

## Deutsche Bank's Emerging Markets Lending and Internal Credit Ratings

24.     Among its other lines of business, Deutsche Bank engages in lending to companies in emerging markets.

25.     Deutsche Bank holds itself out as a prudent, diligent lender. In an April 2006 investor presentation (the "Investor Presentation") for the Transaction, Deutsche Bank described itself as "an experienced loan originator," with "disciplined loan origination" practices, and described its underwriting standards as involving "in-depth credit research (both bottom-up and top-down), due diligence, and a rigorous approach to servicing and workout procedures." Investor Presentation, at 27, 32. According to Deutsche Bank, its "EM [emerging markets] loan losses have averaged 1.35% during 1999-2005," and the investments it selected for the original Reference Portfolio in June 2006 had "better credit quality than DB's global EM portfolio." It estimated that the Reference Portfolio, as originally constituted, would have a default rate on the order of ".085%." *Id.*, at 32.

26.     The CDS Agreement required that Deutsche Bank's borrower or other counterparty to a Reference Obligation have a minimum credit rating. If one of the rating agencies, such as Moody's or S&P, rated the counterparty, then that rating was used. However, many companies in emerging markets are not rated by the rating agencies. Where no other rating is available, the applicable rating is Deutsche Bank's own "internal" rating ("Internal DB Ratings") reflecting its assessment of the credit worthiness of its counterparties.

27.     The rating agencies periodically review Deutsche Bank's internal ratings process and provide "mapping tables" showing how Internal DB Ratings correlate to their ratings. For example, in the Moody's mapping table for Deutsche Bank in June 2006 (which was included in the CDS Agreement), an Internal DB Rating of "iA" (the "i" reflects an "internal" rating) is listed as being equivalent to a Moody's rating of "A2."

28.     In the Investor Presentation, Deutsche Bank stated that "Moody's and Fitch recently completed an update of their mapping of the DB internal rating scale to their ratings." *Id.* at 37. This process included a "review" by Moody's of "the DB rating process in emerging markets in general." *Id.*

## Deutsche Bank's Loan Exposure Management Group

29.     To the extent that Deutsche Bank's lending transactions remain on its balance sheet, they expose Deutsche Bank to credit risk (the risk that a borrower will default) and also increase the amount of capital Deutsche Bank must set aside to comply with applicable regulatory capital requirements.

30.     In 2003, Deutsche Bank created its Loan Exposure Management Group ("LEMG") to manage "the credit risk" within its commercial lending portfolio. Deutsche Bank

2004 Annual Report, at 137. One of LEMG's "primary initiatives" is to "manage credit exposures actively by utilizing techniques" such as CLOs, including the Transaction. *Id.*

31.     LEMG was responsible for creating and running the Transaction. The Investor Presentation stated that LEMG manages Deutsche Bank's "global lending portfolio" (*id.* at 27), and "bases decisions regarding inclusion of assets [in the Reference Portfolio] on external sources and internal ratings data." *Id.* at 26. When the Transaction closed in June 2006, Deutsche Bank issued a press release announcing "Deutsche Bank's Loan Exposure Management Group Issues Landmark Emerging Markets CLO."

32.     The LEMG employees responsible for the Transaction, including selecting Reference Obligations, are located in New York and London. Sourav Sinha, an LEMG employee located in London, was involved in marketing the Transaction, in conjunction with New York employees Mario Verna ("Verna"), David Burroughs ("Burroughs"), Peter Rose ("Rose"), and Sanjeev Punjabi ("Punjabi"). The individuals most directly responsible managing the Transaction were in New York, including without limitation Verna, Burroughs, Rose, Punjabi, Douglas Darman and others.

33.     Upon information and belief, Verna is a Managing Director with LEMG in New York, and was one of the senior Deutsche Bank employees responsible for the Transaction. He has been quoted in multiple news articles relating to the Transaction and LEMG. For example, a July 1, 2006 article on Risk.net quotes Verna as saying that LEMG will "manage" the Transaction, and that it "will effectively shift much of Deutsche's emerging markets risk off the books, allowing it to expand its lending activities." *See* http://www.risk.net/risk-magazine/news/1497927/deutsche-launches-emerging-market-clo (last visited Sept. 12, 2012).

## The Issuer

34.     For the Transaction, Deutsche Bank created a special-purpose entity ("SPE"), the Issuer, in or around late May 2006.

35.     The Issuer is a Cayman Islands exempted limited liability company. It has no employees or officers. Pursuant to an Administration Agreement, dated June 9, 2006, the Issuer is administered by Maples Finance Limited, a Cayman Islands company that specializes in providing corporate governance and administrative services for SPEs.

## The CDS Agreement

36.     The CDS Agreement is made up of three agreements between Deutsche Bank and the Issuer: (a) an ISDA Master Agreement, dated as of June 21, 2006 (the "ISDA Master Agreement"); (b) a Schedule, dated as of June 21, 2006 (the "Schedule"); and (c) a Confirmation (the "Confirmation"). Each of these agreements incorporates the others by reference. These documents were subsequently amended during the Upsize. Except where otherwise noted, references to the ISDA Master Agreement, the Confirmation and the Schedule include amendments.

37.     Pursuant to Paragraph 4(h) of the Schedule, the CDS Agreement "shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of law doctrine)."

38.     Pursuant to Paragraph 13(b) of the ISDA Master Agreement, the Issuer and Deutsche Bank each "irrevocably" submitted to the jurisdiction "of the court of the State of New York and the United States District Court located in the Borough of Manhattan."

39.     The maximum size of the Reference Portfolio when the Transaction closed in June 2006 (prior to the January 2007 Upsize) was $500 million.  Confirmation, ¶ 1 (definition of "Initial Portfolio Notional Amount").

40.     The obligor with respect to a lending transaction that Deutsche Bank designated as a Reference Obligation is defined as a "Reference Entity." *Id.* (definition of "Reference Entity").

41.     The initial Reference Obligations in the Reference Portfolio were listed in Schedule A to the Confirmation.  Subject to certain requirements (the "Replenishment Conditions"), Deutsche Bank could change ("Replenish") the Reference Portfolio at any time by (a) removing Reference Obligations; (b) adding new Reference Obligations (subject to the maximum amount of $500 million); and/or (c) increasing or decreasing the notional amount of a particular Reference Obligation without removing it from the Reference Portfolio.  *Id.* ¶ 5 & Schedule D.  The Replenishment Conditions are described *infra* at ¶¶ 62-65.

42.     Each Reference Obligation had to meet five eligibility criteria ("Eligibility Criteria"), both on the date it was first included in the Reference Portfolio, and on the date of any Replenishment that increased the notional amount of the Reference Obligation (each such date, a "Relevant Date").  Confirmation, ¶ 1 (definition of "Reference Obligation Eligibility Criteria) & Schedule C.  The Eligibility Criteria are described in detail *infra* at ¶¶ 49-61.

43.     The Confirmation defines two types of Credit Events relevant to this action: "Bankruptcy" Credit Events and "Failure to Pay" Credit Events.  *Id.* ¶ 3.

44.     Under the ISDA Master Agreement, a Bankruptcy Credit Event is broadly defined to include not only a voluntary or involuntary bankruptcy filing (or similar proceeding),

but also includes, among other things, a Reference Entity becoming "insolvent" or "unable to pay its debts" as they become due.

45.    A Failure to Pay Credit Event means "the failure of the Reference Entity . . . to make, when and where due, any payments in respect of interest, fees . . . or principal or other amount under or in respect of" a Reference Obligation.  Confirmation ¶ 3.

46.    For each Credit Event, the Confirmation requires that Ernst & Young ("E&Y"), as "Independent Accountant," provide a certification (an "E&Y Certification"): "(a) that such Defaulted Reference Obligation satisfied the Reference Obligation Criteria [the Eligibility Criteria] and, if added to the Reference Portfolio pursuant to a Replenishment, did not . . . contravene the Replenishment Conditions, in each case on the Relevant Date, (b) verifying that the Credit Event identified in the Credit Event Notice had occurred and (c) verifying the computation of the relevant Loss Determination Amount."  *Id.* ¶ 4.

47.    The E&Y Certification requirement was an express *"condition precedent"* to Deutsche Bank's entitlement to any Credit Event Payment.

48.    The E&Y Certification requirement was the only independent, external safeguard in the Transaction designed to ensure Deutsche Bank's compliance with the terms of the CDS Agreement.

### The Eligibility Criteria

49.    Each Reference Obligation had to meet *all* Eligibility Criteria, both when Deutsche Bank originally designated it as a Reference Obligation and on any subsequent Replenishment dates on which Deutsche Bank increased the dollar amount of such Reference Obligation.

## A.   Minimum Rating

50.    The first Eligibility Criterion was that the Reference Entity related to the Reference Obligation have "an S&P Equivalent Rating of 'B-' or better and a Moody's Equivalent Rating of 'B3' or better." *Id.*

51.    If S&P and/or Moody's rated the Reference Entity, then the actual S&P and/or Moody's rating was to be used for the "Equivalent Ratings." *Id.*, Schedule E.

52.    If, however, S&P and/or Moody's did *not* rate the Reference Entity, then the "Equivalent Ratings" meant the S&P and/or Moody's ratings that correlated to the *Internal DB Rating,* according to the applicable "mapping" table provided by S&P or Moody's. *Id.*

53.    Thus, if the Reference Entity was not rated by S&P or Moody's, Deutsche Bank's compliance with the first Eligibility Criterion depended entirely on its good faith in assigning an Internal DB Rating.  The Internal DB Rating was required to be the "credit rating assigned by [Deutsche Bank] to such Reference Entity for purposes of [Deutsche Bank's] generally applicable internal credit evaluation and monitoring processes." *Id.*

54.    In addition, the definition of "Moody's Equivalent Rating" required that Deutsche Bank apply the *current* Moody's mapping table. *Id.* A Moody's mapping table was shown in a table listed in Schedule E to the Confirmation, but it was to be applied "as such table may be updated from time to time by Moody's." *Id.*

## B.   Origination in Accordance with Credit Policies

55.    The second Eligibility Criterion is that the Reference Obligation "relates to a senior secured or unsecured obligation of the relevant Reference Entity that has been originated by [Deutsche Bank] in accordance with its standard credit policies and guidelines." Confirmation, Schedule C.

56.     Thus, *inter alia,* Deutsche Bank had to adhere to its standard credit policies and guidelines, and could not, for example, designate poorly-underwritten lending transactions as Reference Obligations.

## C.     Absence of Existing or Pending Credit Event

57.     The third Eligibility Criterion was that "[a] Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event shall not have occurred in relation to such Reference Obligation." Confirmation, Schedule C. Thus, Deutsche Bank could not designate a lending transaction as a Reference Obligation if either (a) a Credit Event had already occurred, or (b) some event had occurred that would cause a Credit Event to occur with the "giving of notice" or "the lapse of time."

58.     As one example, if either an event constituting a Failure to Pay Credit Event or an event that would become a Failure to Pay Credit Event with notice or the passage of time had occurred prior to Deutsche Bank's designation of the Reference Obligation, then Deutsche Bank's designation of the Reference Obligation violated the third Eligibility Criteria.

59.     As another example, if a Reference Entity were insolvent (which constitutes a Bankruptcy Credit Event) prior to Deutsche Bank's designation of the corresponding Reference Obligation, or if some event had occurred that would cause the Reference Entity to become insolvent with "the lapse of time," Deutsche Bank's designation of the Reference Obligation violated the third Eligibility Criterion.

## D.     Legality and Enforceability

60.     The fourth Eligibility Criterion was that the Reference Obligation "shall be legally valid and enforceable in accordance with its terms and applicable provisions of law." *Id.*

## E.    Nature of the Reference Obligation

61.    The fifth Eligibility Criterion was that the Reference Obligation meet the definition of Reference Obligation in the Confirmation.

## The Replenishment Conditions

62.    In order for Deutsche Bank to make changes to "Replenish" the Reference Portfolio, all of the Replenishment Conditions had to be satisfied.  Confirmation, Schedule D.  The Replenishment Conditions consisted of requirements as to the overall composition of the Reference Portfolio, and limited Deutsche Bank's ability to make further changes if the condition of the Reference Portfolio had deteriorated beyond a certain point.  *Id.*

63.    For purposes of this action, the most significant Replenishment Condition is that the "Moody's Rating Condition Test is satisfied."  This is the most important Replenishment Condition because it is the only one that Deutsche Bank could not avoid.  Even if the other Replenishment Conditions were not satisfied, Deutsche Bank could still Replenish the Reference Portfolio if in doing so it did not "cause the degree of compliance with any Replenishment Condition to worsen."  *Id.*  However, this exception did *not* apply to the Moody's Rating Condition Test: "no Replenishment shall be permitted if the Reference Portfolio does not comply with clause (b) of the Replenishment Conditions."  Clause (b) is the Moody's Rating Condition Test.  *Id.*

64.    The Moody's Rating Condition Test *incorporated the Moody's Equivalent Ratings.*  If the Moody's Equivalent Ratings across the entire Reference Portfolio declined past a certain point, the Moody's Rating Condition Test would fail.  If the Moody's Rating Condition Test failed, Deutsche Bank could no longer add new Reference Obligations or otherwise Replenish the Reference Portfolio.

65. As described *supra* at ¶¶ 26-27, for a Reference Entity that was unrated by Moody's, the Moody's Equivalent Rating was the rating shown on the Moody's "mapping table" as being equivalent to the Internal DB Rating for that Reference Entity. Thus, this Replenishment Condition, like the first Eligibility Criterion, depended on the good faith of Deutsche Bank in assigning Internal DB Ratings to the Reference Entities and in applying the Moody's "mapping table," which was required to be applied "as such table may be updated from time to time by Moody's." Confirmation, Schedule E.

### The Note Subscription Agreement

66. The Notes were sold pursuant to a Note Subscription Agreement between the Issuer and each purchaser. The Note Subscription Agreement provides that it is governed by New York law.

67. The Note Subscription Agreement provides that the "purchase price" shall be transmitted "to the account to be advised to the Purchaser by the Trustee [HSBC]."

68. The Note Subscription Agreement does not itself contain the material terms governing the Noteholders' investment. Instead, it refers to the Indenture as well as other "Transaction Documents," including the CDS Agreement. The Note Subscription Agreement required each purchaser to represent and warrant that it had "received the Indenture and the other Transaction Documents setting forth the terms and provisions of the Notes and the Transaction Documents and has not relied on any information relating to the Company [the Issuer], the Issuer Swap Counterparty [Deutsche Bank], . . . or any other person *other than* the information that is contained in, and the terms and provisions of, the Indenture and the other Transaction Documents." Note Subscription Agreement, ¶ 4(e) (emphasis added).

69.   Thus, Arco and the other Noteholders were expressly invited and intended to rely on the terms of the CDS Agreement and other Transaction Documents in purchasing Notes. The CDS Agreement contains the essential terms of the Noteholders' investment, including the Eligibility Criteria and the Replenishment Conditions. These provisions were intended for the Noteholders' benefit and protection, and to induce the Noteholders to purchase Notes.

70.   The Note Subscription Agreement provided that the Notes would become "valid and binding obligations" of the Issuer when they had been "paid for by the Purchaser pursuant to Section 2 hereof," which required the purchaser to deliver funds "to the account to be advised to the Purchaser by the Trustee [HSBC]." *Id.*, ¶¶ 2(a) and (i). The Notes also had to be "authenticated" by HSBC to become valid and binding. *Id.*, ¶ 2(i).

### The Indenture

71.   Pursuant to the Indenture, the Issuer broadly conveyed "all of its estate, right, title and interest (but not the obligations), whether now owned or hereafter acquired or arising, in, to and under all of the following property," which included, among other things, all the Issuer's "rights" under the CDS Agreement. Indenture, at 1.

72.   The Indenture required HSBC to open and maintain two accounts, the "Collection Account" and the "Custodial Account." *Id.* § 10.2.

73.   Deutsche Bank sent its CDS Fee Payments under the CDS Agreement to HSBC, for deposit into the Collection Account. HSBC used the Collection Account to pay administrative expenses of the Transaction (including of HSBC and the Issuer), and to pay Noteholders the interest due on their Notes. *Id.* § 11.1(b)(i).

74.     HSBC held the Note Collateral in the Custodial Account. HSBC used funds in the Custodial Account to make Credit Event Payments to Deutsche Bank. The rest of the time, HSBC invested the funds on deposit in the Custodial Account in "Eligible Investments," which were required to be held at Deutsche Bank in London and which were, upon information and belief, highly-liquid interest-bearing securities. The interest on the Note Collateral could be added to the Collection Account and used to pay administrative expenses if needed, but otherwise was added to the Note Collateral in the Custodial Account. *Id.* § 11.1.

75.     Deutsche Bank controlled all the information on which HSBC made Credit Event Payments from the Custodial Account. Deutsche Bank provided HSBC with "Information Reports," which included any amounts to be paid to Deutsche Bank as a result of any Credit Events, as well as the current list of Reference Obligations in the Reference Portfolio (known as a "Reference Registry"). *Id.* § 10.5. Under the Indenture, HSBC was entitled to rely on the Information Reports. *Id.* § 6.1.

76.     At the end of the Transaction, HSBC used "the remaining amount on deposit in the Custodial Account" (*id.* § 11.1(c)(ii)) to pay Noteholders the outstanding principal balances due on their Notes (the original principal balance less reductions for Credit Events claimed by Deutsche Bank).

77.     Attached hereto as Exhibit A is a chart showing the structure of the Transaction (taken from Deutsche Bank's Investor Presentation).

## The January 2007 Upsize and Deutsche Bank's Scheme

78.     In its June 2006 Investor Presentation, Deutsche Bank had claimed among other things that its interests were "aligned with" the investors in the Transaction, that LEMG "works closely with the loan origination and relationship function" in Deutsche Bank's Global

Banking Division, "to develop high value adding global customer relationships," and that the Reference Portfolio "has better credit quality than DB's global EM [emerging markets] portfolio." Deutsche Bank had also touted its "superior credit management" and "disciplined loan origination," and estimated that the default rate in the Transaction would be "0.85%." Investor Presentation, at 32.

79.     Upon information and belief, in late 2006, Deutsche Bank directed LEMG to decrease the amount of risk on Deutsche Bank's books as a result of regulatory changes soon to be applicable, known as "Basel II." Deutsche Bank decided to double the amount of the Reference Portfolio from $500 to $1 billion, so that it could reduce the amount of its regulatory capital.

80.     Upon information and belief, at the time of the Upsize, individuals with LEMG knew that some of the emerging markets lending transactions on Deutsche Bank's books were poorly underwritten and/or otherwise highly risky, particularly certain of Deutsche Bank's lending transactions that had been structured as swaps and other derivative products. Upon information and belief, such individuals realized that the Upsize provided an opportunity for LEMG to impose the risk of some of these poor quality lending transactions on the Noteholders. Moreover, they knew that because of Deutsche Bank's level of discretion and control over the Transaction and information relating to its compliance with the terms thereof, it would be difficult for the Noteholders to obtain information about the Reference Obligations. Such individuals, upon information and belief, determined to use the Upsize to designate some of Deutsche Bank's poor investments – knowing that they did not meet the requirements of the Transaction – as Reference Obligations and cause the Noteholders to incur 65% of any losses therefrom.

81.     In January 2007, Deutsche Bank effected the Upsize, doubling the Reference Portfolio, and caused the Issuer to double the amount of Notes sold to investors. In place of the original Class E, F and G Notes, the Issuer sold new Class E-1, E-2, F-1, F-2, G-1 and G-2 Notes to the Noteholders, including Arco. In addition, Deutsche Bank changed the definition of "Reference Obligations" in the CDS Swap Agreement to include not only loans and similar investments, but also (a) a broad range of derivatives, including "any rate swap transaction," "currency swap transaction," "credit derivative transaction or any other similar or other derivative transaction." First Amended and Restated Confirmation, dated January 26, 2007. It also added to the definition of Reference Obligation "a senior unsecured or unsecured note of the Reference Entity issued pursuant to an indenture or equivalent instrument." *Id.*

82.     The documents governing the Transaction, including the Indenture and the Confirmations, were amended and updated to reflect the Upsize and the issuance of the new Notes, but otherwise remained materially the same, including the Eligibility Criteria, the Replenishment Conditions, the E&Y Certification requirement, and the requirement that Deutsche Bank use up-to-date Moody's mapping tables in correlating its Internal DB Ratings.

83.     Immediately after the Upsize closed in January 2007, Deutsche Bank designated several of the Reference Obligations that would ultimately suffer Credit Events. Two of the Reference Obligations added in January 2007 involved Reference Entities that were, as Deutsche Bank knew or was reckless in not knowing, engaged in blatant accounting fraud.

84.     Ultimately, seventeen of the Reference Obligations that Deutsche Bank designated after the Upsize suffered Credit Events. The defaulted Reference Obligations had an aggregate notional balance of $142,782,023, a loss rate of 14.28%.

85.     None of the Reference Obligations designated by Deutsche Bank prior to the Upsize became Credit Events.

### Arco's Purchases and Sales of Notes

86.     In June 2006, a company associated with Arco, Gramercy Emerging Markets Fund ("Gramercy") purchased Class F and Class G Notes on Arco's behalf. Gramercy purchased the Notes by sending the purchase price to HSBC in New York.

87.     At the time, Arco was not yet operational. Deutsche Bank knew and agreed that Gramercy was not purchasing the Notes on its own behalf, but rather was purchasing the Notes to hold (or "warehouse") on behalf of Arco.

88.     In January 2007, Gramercy purchased new Notes in the Upsize on behalf of Arco. The funds it had paid to HSBC for the Class F and Class G Notes were applied to purchase the new Class F-1 and Class G-1 Notes (governed by the newly amended terms of the CDS Swap Agreement), and also sent additional funds to HSBC to purchase Class F-2 and Class G-2 Notes. Gramercy, as agent for Arco, purchased Class G-1 Notes with an original notional amount of $15 million, Class G-2 Notes with an original notional amount of $15 million, Class F-1 Notes with an original notional amount of $8.75 million, and Class F-2 Notes with an original notional amount of $17.5 million.

89.     In May 2007, Gramercy transferred the Notes to Arco in a pass-through transaction, in which Arco reimbursed Gramercy at par for the amounts Gramercy had advanced to purchase the Notes for Arco.

90.     The Credit Events caused the principal balances on the Class G-1 and Class G-2 Notes to be reduced by 100% (to zero). As a result of the Earls Eight transaction described below, Arco received Earls Eight Notes. Earls Eight Notes were backed by a

20

subordinated interest in the G-1 and G-2 Notes, and they also became worhtless. The principal balance on Arco's Class F-1 and Class F-2 Notes was reduced by approximately 94%.

91.     In all, Arco lost more than $37 million as a result of the Credit Events.

### Deutsche Bank's July 2008 Sale of Securities

92.     The International Swaps and Derivatives Association, Inc. ("ISDA") has the objective of making the global over-the-counter ("OTC") derivatives markets safe and efficient. ISDA has over 800 member institutions from 60 countries, which include a broad range of OTC derivatives market participants. As part of its mission, ISDA promulgates model transaction documentation for OTC derivatives transactions ("ISDA Transactions"). ISDA Transactions are considered by market participants to be generally safer from execution risk than non-ISDA transactions, because the model documentation is well-established and has clear provisions on contract enforcement and remedies.

93.     In or about March 2007, Deutsche Bank amended the CDS Agreement to permit the designation of non-ISDA Transactions as reference obligations without the consent of Arco.

94.     In or about early 2008, Arco discovered that Deutsche Bank was designating non-ISDA Transactions as Reference Obligations without Arco's consent. Two such Reference Obligations had defaulted, causing a loss to Arco of $3,035,839. Arco objected to Deutsche Bank and threatened to use Deutsche Bank's breach of the CDS Agreement as grounds to negotiate modification of its purchase of the Notes.

95.     Arco's threat to seek modification the Transaction caused significant problems for Deutsche Bank in carrying out its fraudulent scheme. If the Transaction was modified, Deutsche Bank might not have an unwitting investor upon which to foist problematic

loan risk. Moreover, if Arco modified, other investors might discover Deutsche Bank's breach of the CDS Agreement and also seek to do the same.

96.     As a result, Deutsche Bank made significant efforts to placate Arco. LEMG employees of Deutsche Bank in New York agreed to enter into a securities transaction to transfer Arco's G-1 and G-2 Notes, sell Arco new notes that passed through the interest that would be paid on the G-1 and G-2 Notes, provide Arco with additional financing, compensate Arco for the losses created by the non-ISDA Transaction defaults, promise not to designate any non-ISDA Transactions as CRAFT Reference Obligations, and *even* pay the legal fees of the plaintiff's counsel Arco had retained.

97.     On July 15, 2008, in furtherance of the fraudulent scheme, Deutsche Bank sold to Arco approximately $10 million in securities, called Earls Eight Series 469 Tranche B Pass Though Notes ("Earls Eight Notes"). The Earls Eight Notes entitled Arco to payments on the G Notes it had previously purchased in CRAFT and transferred to Earls Eight (an SPE created by Deutsche Bank for that purpose) on July 15, 2008.

98.     The Earls Eight Notes are "securities" under the Exchange Act, and Deutsche Bank's sale of Earls Eight Notes also constitutes an independent violation of Rule 10b-5.

99.     Arco's purchase of Earls Eight Notes from Deutsche Bank was effectuated by means of the execution of documents by Arco Capital Management LLC, a Puerto Rico LLC as attorney in fact for Arco, from its offices in Puerto Rico. Deutsche Bank's counsel, located in New York, held the signature pages for both Arco and Deutsche Bank. When the transaction was agreed, Deutsche Bank's counsel emailed the signature pages to Arco in Puerto Rico and Deutsche Bank in London, copying LEMG personnel in New York. The Earls Eight Notes were

sold into Arco's prime brokerage account at Citigroup, located in New York, NY. On July 17, 2008, Arco Capital Management LLC from its offices in Puerto Rico transmitted to the London Branch of Deutsche Bank a cross-receipt evidencing closing of the transaction. It was the understanding of the parties that the transaction closed when Arco received the Earls Eight Notes and funds in its accounts in New York, and Deutsche Bank received the G Notes in its account.

### Deutsche Bank's Misconduct

100.    After the Upsize, Deutsche Bank systematically violated the terms of the Transaction and engaged in other misconduct so pervasive that it demonstrates an intention to use the Transaction to commit fraud on the Noteholders, including Arco.

### A.    Frustration of the E&Y Certification Condition Precedent

101.    It was an express condition precedent to Deutsche Bank's entitlement to Credit Default Payments that E&Y, as *Independent Accountant*," provide a "*certification*" that the defaulted Reference Obligation "satisfied the Reference Obligation Criteria [the Eligibility Criteria] and, if added to the Reference Portfolio pursuant to a Replenishment, did not . . . contravene the Replenishment Conditions." Confirmation ¶ 4. The E&Y Certification requirement existed to protect the Noteholders.

102.    Arco has obtained purported E&Y Certifications for five Credit Events. E&Y Certifications are not provided to the Noteholders under the terms of the Transaction documents, and Arco has not been able to obtain any others.

103.    All of the E&Y Certifications obtained by Arco utterly fail to satisfy the requirement that E&Y certify Deutsche Bank's compliance with the Eligibility Criteria and the Replenishment Conditions. In two, E&Y expressly states that it was "not provided with the

necessary information" to certify compliance with "Eligibility Criteria 2, 3, 4 and 5." *See* Exhibit B.

104.    In the other E&Y Certifications obtained by Arco, E&Y *merely assumed* that Deutsche Bank had complied with the Eligibility Requirements and the Replenishment Conditions, based on Deutsche Bank's representations. These E&Y Certifications include a list of "Assumptions." The Assumptions track the precise language of Eligibility Criteria 2, 3, 4 and 5. When this "assumptions" formulation is used, E&Y states that it "performed no procedures to verify the accuracy of the Assumptions *provided to us by the Issuer Swap Counterparty*," i.e. Deutsche Bank (emphasis added). *See* Exhibit C.

105.    Upon information and belief, the Deutsche Bank employee(s) who provided the "Assumptions" to E&Y were one or more LEMG employees in New York, and they knew, or were reckless in not knowing, that the Assumptions were false.

106.    All of the E&Y Certifications obtained by Arco fail to satisfy the condition precedent that E&Y, as "Independent Accountant," certify that the defaulted Reference Obligation complied with the Eligibility Criteria and Replenishment Conditions. If unsubstantiated assertions of compliance by Deutsche Bank were all that was required, it would render the E&Y Certification requirement – the core protection for Noteholders (along with the Eligibility Criteria and Replenishment Conditions themselves) – a nullity.

107.    Upon information and belief, the E&Y Certifications for *all* of the Credit Events, including those that Arco has not been able to obtain, have the same patent deficiencies and fail to satisfy the condition precedent.

108.    Because none of the E&Y Certifications satisfy the condition precedent, Deutsche Bank was not entitled to any of the Credit Event Payments that it obtained. Deutsche

Bank nonetheless caused HSBC to make the Credit Event Payments by providing HSBC with Information Reports (prepared by Deutsche Bank) that listed Credit Event Payments as being due to Deutsche Bank. Upon information and belief, the Deutsche Bank employees who provided such reports to HSBC knew, or were reckless in not knowing, that they were false.

## B.    Manipulation of Moody's Equivalent Ratings

109.    The majority (approximately 75%-80%) of the Reference Obligations designated by Deutsche Bank for inclusion in the Reference Portfolio were not rated by Moody's. For such Reference Entities, the Moody's Equivalent Rating was the rating that correlated to the Internal DB Rating according to the Moody's mapping table. The Confirmation required that Deutsche Bank apply the Moody's map "as such table may be updated from time to time by Moody's." Confirmation, Schedule E.

110.    On April 6, 2009, Moody's issued a press release stating that it was downgrading some of the Notes. Moody's explained the reasons for the downgrade in the press release. One factor was that "for the majority of the underlying referenced assets, the equivalent Moody's ratings used in our analysis are obtained through a mapping process between the originator's [Deutsche Bank's] internal rating scale and Moody's public rating scale." To "compensate" for this, Moody's applied a "half notch stress to the mapping scale." In addition, "*[b]ecause this mapping was performed prior to 1st April 2007*, an additional stress was applied *to capture potential deviations from the established mapping.*" Moody's press release dated April 6, 2009 (emphasis added).

111.    Upon information and belief, based on this press release, Moody's updated its mapping table for Deutsche Bank in or around April 2007. In addition, because the Moody's press release refers to applying an "additional stress" due to Deutsche Bank's failure to use the

"established mapping," the updated Moody's mapping table lowered the Moody's ratings that correlated to Internal DB Ratings.

112.   The Reference Registries show that Deutsche Bank did not apply an updated Moody's mapping table in or after April 2007.

113.   The Moody's Rating Condition Test failed in or around October 2008. Thereafter, Deutsche Bank could no longer Replenish the Reference Portfolio.

114.   Upon information and belief, the Moody's Rating Condition Test would have failed earlier had Deutsche Bank applied the April 2007 updated Moody's mapping table. The high percentage of Reference Obligations (75%-80%) that were not rated by Moody's and were therefore given Moody's Equivalent Ratings based on the mapping table meant that any shift downwards in the correlation between Internal DB Ratings and Moody's Equivalent Ratings would have had a significant impact on the Moody's Rating Condition Test.

115.   Had the Moody's Rating Condition Test failed in April 2007 (when Moody's updated the mapping table), Deutsche Bank would have been unable to add 11 of the 17 defaulted Credit Events to the Reference Portfolio. The 11 defaulted Reference Obligations added by Deutsche Bank after Moody's updated the mapping table had an aggregate notional balance of more than $100 million, which represents 70% of the total losses.

116.   Upon information and belief, the LEMG employees managing the Transaction knew, or were reckless in not knowing, that Moody's had updated the mapping table in or around April 2007, and intentionally or recklessly continued to use the old Moody's mapping table in order to be able to falsely report higher Moody's Equivalent Ratings for the Reference Obligations in the Reference Portfolio. Upon information and belief, such employees

26

did this in order to preserve their ability to Replenish the Reference Portfolio, and thereby add Reference Obligations that were likely to default, as long as possible.

117. In addition, upon information and belief, one or more of the defaulted Reference Obligations would not have met the first Eligibility Criteria (requiring a minimum Moody's Equivalent Rating) had Deutsche Bank applied the Moody's mapping table as updated by Moody's.

### Deutsche Bank's Continuing Scheme Slowly Emerges

118. The limited amount of information furnished by Deutsche Bank with respect to the Reference Portfolio and the defaulted Reference Obligations made it impossible for Arco to discern Deutsche Bank's fraudulent scheme until shortly before it commenced suit, despite efforts at investigation that were frustrated by Deutsche Bank. In fact, it was not until 2012 that the pattern of Credit Events, coupled with Arco's own investigation into the financial statements of defaulted Reference Obligations that Arco discovered that Deutsche Bank had not merely breached its contractual obligations, but had recklessly or intentionally schemed to transfer risky debts from its books to unsuspecting investors.

119. Pursuant to the terms of the Transaction, only Deutsche Bank had authority to select Reference Obligations for the Reference Portfolio. Arco had no input or visibility into this process, and could only rely on the terms of the Transaction, by which Deutsche Bank had promised both rigorous internal credit review and independent accountant review, as described above.

120. Arco was not entitled to - and did not - know the identities of the companies that were designated as Reference Obligations prior to a Credit Event, and Arco's efforts at diligent investigation were frustrated by Deutsche Bank. On the basis of the

Transaction documents, Deutsche Bank consistently declined to provide Arco with requested information. Arco could only rely on Deutsche Bank's false representations as to its diligence in selecting Reference Obligations.

121.    In particular, the identity of the Reference Obligation was only disclosed to Arco upon occurrence of a Credit Event. The remaining Reference Obligations remained undisclosed. This meant that Arco was unable to perform any due diligence on the Reference Obligations that remained part of the Reference Portfolio, and could only research a Reference Obligation after it had defaulted.

122.    It was therefore only as a pattern of defaults emerged among the Reference Obligations that Arco could reasonably be expected to gather enough information to suspect that the failures were not the result of the financial crisis or mere contractual breaches (as with Deutsche Bank's earlier inclusion of ineligible non-ISDA derivatives), but were instead part of Deutsche Bank's fraudulent scheme to sell poorly underwritten debts to investors.

123.    As the Transaction continued to mature, the rate of Credit Events increased. In 2007 there was a single Credit Event. In 2008 there were three, and in 2009 there were two more.

124.    Throughout mid-2009, concerned about possible contractual breaches, but still unaware of Deutsche Bank's scheme, Arco sought information from Deutsche Bank regarding the Credit Events that had so far occurred. Deutsche Bank, on the basis of the Transaction documents, declined to provide much of the requested information, including the identities of performing Reference Obligations, or even their industries or risk profiles. Deutsche Bank provided only minimal and incomplete information about certain derivative Reference Obligations. Deutsche Bank also declined to disclose its credit rating methodology.

125.    In August 2009, Deutsche Bank assured Arco—falsely—that it had satisfied all its obligations under the Transaction documents, and declined to provide further information about the Reference Obligations.

126.    Following the second credit event in November 2009, in December 2009, Arco retained counsel to investigate the facts regarding the Credit Events.

127.    Throughout 2010, Arco and Arco's counsel sought information regarding the Reference Obligations and the Credit Events from Deutsche Bank and from HSBC, the Trustee.

128.    In 2010, Deutsche Bank agreed to re-issue the E&Y Certifications for certain past Credit Events.

129.    Thereafter, Deutsche Bank referred Arco to the Trustee for further information.  Arco (through counsel) asked the Trustee to investigate, noting that the E&Y Certifications did not satisfy the terms of the Transaction.  Counsel for the Trustee demanded indemnification before commencing an investigation.  Counsel for Arco and counsel for the Trustee negotiated the terms of the indemnity, but came to an impasse in September 2011.  As a result, no investigation was undertaken by the Trustee.

130.    In 2010, there were two further Credit Events.  In each case, Arco sought copies of the E&Y Certifications for these Credit Events, which Deutsche Bank had previously provided.  Deutsche Bank declined to provide this information based upon the Transaction documents.

131.    Further inquiries by Arco to Deutsche Bank during 2010 resulted in Deutsche Bank declining to provide further information, and referring Arco to the Transaction documents.

132.   By the end of 2010, Arco believed that Deutsche Bank may have breached its contractual obligations, at least in respect of the obligation to provide Independent Accountant certifications of Credit Events.

133.   In 2011 there was a significant increase in the number of Credit Events, with five separate Credit Events, and by March of 2012 there had been two additional Credit Events.

134.   By the summer of 2011, knowing the identities of a significant number of defaulted Reference Entities, Arco commenced a systematic review of the defaulted Reference Entities. This review was difficult because the majority of the Reference Obligations operated in emerging markets, which generally have less financial transparency than more developed financial markets, and certain of the Reference Entities were not publicly reporting companies in their home jurisdiction.

135.   In the fall of 2011, having experienced considerable difficulty in ascertaining the relevant information, Arco's general counsel retained litigation consultants to help examine the facts and circumstances of the Credit Events.

136.   In or about December of 2011, in telephone conversations between Verna at Deutsche Bank and Arco, Verna continued to represent falsely that Deutsche Bank had complied with all of its obligations regarding selection of Reference Obligations, and that the Credit Events were all the result of bad luck, rather than Deutsche Bank's reckless or intentional conduct.

137.   It was not until this investigation was completed in mid 2012 that Arco discovered that the pattern of Credit Events was not the result of a poor investment or noncompliance with the terms of the Transaction, but was the result of a fraudulent effort by

Deutsche Bank to transfer its bad debts to investors. In retrospect, and with the benefit of expert inquiry into the Reference Obligations, the investigation showed a clear pattern: the Reference Obligations associated with the Credit Events were significantly riskier than represented by Deutsche Bank. Only then, Arco discovered that Deutsche Bank's selection of the Reference Obligations had not only failed to satisfy the contractual requirements of the Transaction, but constituted a scheme to transfer poorly underwritten credit from Deutsche Bank's books to investors.

138. The Transaction came to an end in 2012, having experienced fifteen credit events (plus two additional credit events in non-ISDA Reference Obligations), of which a majority took place after August 2010.

### Specific Credit Events

139. As noted above, Arco had very limited information about the Reference Obligations and the Credit Events, because such information was generally non-public and within Deutsche Bank's control.

140. In contrast, Deutsche Bank, as a lender to each Reference Obligation counterparty, on information and belief, had extensive information as to each Reference Obligation, including non-public information Deutsche Bank had gathered as part of its credit review process.

141. The facts surrounding each of the Credit Events described below are highly suggestive of Deutsche Bank's scienter when taken in the aggregate. However, in each case, only the identity of the defaulted Reference Obligation was learned at the time of the Credit Event. The remaining information was discovered only later, as a result of Arco's diligent investigations.

## Egana International (Holdings) Limited

142. One of the first Credit Events declared by Deutsche Bank was with respect to a Reference Obligation involving Egana International (Holdings) Limited ("Egana"), in the amount of $7.8 million. Deutsche Bank designated it as a Reference Obligation right after the Upsize in late January 2007. Less than nine months later, Egana collapsed when its fraudulent accounting practices were publicly revealed, and Deutsche Bank declared a Credit Event in September 2007.

143. Subsequent investigation revealed that Egana, a Hong Kong company, was not rated by either Moody's or S&P, so the Internal DB Rating was the rating used to determine the Moody's Equivalent Rating. Deutsche Bank gave Egana an Internal DB Rating of iBB when it added the Reference Obligation to the Reference Portfolio in January 2007. Viewed in retrospect, this could not have been a good faith rating. To the contrary, that Deutsche Bank would rate it at all demonstrates intentional fraud or recklessness. Any reasonable due diligence, and certainly the diligent credit review touted by Deutsche Bank in the Investor Presentation, would have put Deutsche Bank on notice that Egana was engaging in wholly fictitious accounting.

144. Shortly before the end of Egana's 2004 fiscal year, it changed auditors, from one of the "big four" accounting firms to a smaller firm. The second auditor completed the financials for the 2004 fiscal year, but then Egana changed auditors *again* shortly before the end of its 2005 fiscal year. Both times, Egana claimed in public notices that it was changing auditors purely for "cost competitiveness" reasons.

145. The largest "asset" identified on Egana's financial statements was an entry for unexplained, unsecured "promissory notes," which the company listed as "cash equivalents."

Although the "promissory notes" were listed as short-term, Egana's financials also indicated that they were being continuously rolled over.

146. When Egana collapsed and filed for liquidation in 2007, a new auditor was appointed and quickly determined that the "promissory notes" were fraudulent. Egana's liquidation petition describes just how obvious the fraud was: all the "promissory notes," though purportedly issued by different debtors at different times, bore the same interest rate of 7% and were "identical in terms of layout, style and font size. Similar spelling mistakes appeared in the purchase orders, delivery notes, etc. of the Debtors. These documents were also of the same format, suggesting that the documents of the supposedly unrelated debtors might have come from a single source instead." In addition, "there were not any board minutes or documents detailing the commercial reasons and rationale behind the transactions," nor was there "any record . . . evidencing actual physical delivery of goods concerned."

147. Any reasonable due diligence would have included a review of the largest asset the company claimed to hold, particularly where the largest asset was "promissory notes."

148. Upon information and belief, in January 2007 Deutsche Bank, including LEMG employees in New York, knew or suspected the problems at Egana, and designated the Reference Obligation knowing that it would become a Credit Event. To do so, upon information and belief, one or more such individuals intentionally or recklessly gave Egana an inflated Internal DB Rating.

149. The E&Y Certification for the Egana Credit Default, one of the few E&Y Certifications Arco has been able to obtain, further demonstrates Deutsche Bank's intentional misconduct. E&Y did not certify anything. Instead, it listed "Assumptions" including, *inter alia*: (a) that Deutsche Bank's lending transaction with Egana met the definition of "Reference

33

Obligation" and was in the amount of $7.8 million; (b) that the Reference Obligation "relates to a senior or unsecured obligation of the relevant Reference Entity that has been originated by [Deutsche Bank] in accordance with its standard credit policies and guidelines and represents an obligation where the primary risk is the credit risk of a corporate entity or a Sovereign;" (c) that the Reference Obligation was legally valid and enforceable; and (d) that a "Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event" had not previously occurred.

150. These "Assumptions" *precisely track* Eligibility Criteria 2, 3, 4 and 5. Thus, E&Y merely "assumed" what it was supposed to certify. Moreover, the E&Y Certification makes clear that this was what Deutsche Bank told E&Y to do. The E&Y Certification recites that E&Y had performed such procedures as "were agreed to by" Deutsche Bank and the Issuer. Upon information and belief, the Issuer was not in fact involved, and the only people who communicated with E&Y were LEMG employees. E&Y also makes clear that the "Assumptions" came from Deutsche Bank ("We performed no procedures to verify the accuracy of the Assumptions provided to us by the Issuer Swap Counterparty," *i.e.* Deutsche Bank). The only Eligibility Criterion that E&Y did not merely "assume" was that Deutsche Bank had given Egana an Internal DB Rating of iBB, a matter wholly within Deutsche Bank's control.

151. The Egana E&Y Certification fails to satisfy the condition precedent in the Confirmation, which requires that E&Y, as "Independent Accountant," deliver an "irrevocable notice . . . containing a certification" of, among other things, compliance with the Eligibility Criteria and the Replenishment Conditions.

152. Upon information and belief, on or around September 2007, one or more LEMG employees, knowing that the E&Y Certification condition precedent had not been

satisfied and that Deutsche Bank was not entitled to a Credit Event Payment, delivered an Information Report to HSBC showing a Credit Event Payment of $5,070,000 due to Deutsche Bank for the Egana Credit Event. HSBC paid this amount to Deutsche Bank for the Egana Credit Event.

153.    The outstanding principal balances of the Class G-1and Class G-2 Notes were each reduced by $2,535,000 as a result of the Egana Credit Event.

### Peace Mark (Holdings) Limited

154.    Another Reference Obligation that Deutsche Bank added to the Reference Portfolio immediately after the Upsize in January 2007 was Peace Mark (Holdings) Limited ("Peace Mark"), another Hong Kong company that was not rated by either Moody's or S&P. As it did with Egana, Deutsche Bank gave Peace Mark an Internal DB Rating of "iBB."

155.    Through subsequent investigation, Arco learned that Peace Mark was a holding company with a huge number (more than 200) of subsidiaries. Several red flags are apparent on the face of Peace Mark's financial statements for 2005 and 2006. Peace Mark's huge network of subsidiaries was unexplained and unaccounted for: the financials state that only about 35 subsidiaries "principally affected the results of the year or formed a substantial portion of the net assets of the Group." The remaining subsidiaries were not included in the consolidated financials. The financials are vague as to inter-subsidiary dealings. Peace Mark was repeatedly both raising capital through sales of stock and increasing its borrowing from banks. At the same time, Peace Mark was stockpiling cash in "cash and bank balances" held by unidentified subsidiaries. The subsidiaries included in the consolidated financials were reportedly generating significant sales, but the group as a whole was only generating a relatively small profit.

156.    Peace Mark's extremely complicated subsidiary structure, repeated

borrowing and raising of capital purportedly to hold in cash, and small profits compared to its

size and claimed sales volume, were all warning signs of fraud, and were apparent well prior to

January 2007, when Deutsche Bank designated the Reference Obligation.

157.    Peace Mark collapsed in the middle of 2008.  Its liquidators "quickly

identified that the [company and its more than 200 affiliates] had engaged in substantial fictitious

transactions and that over half of its revenue and all of its profit did not actually exist."

According to a November 2008 Hong Kong court decision: "Since taking over the Group, the

Provisional Liquidators have serious doubt about the integrity of senior management . . . They

became concerned over the legitimacy of both sales and trade receivables relating to the Group's

wholesale and distribution business.  They thought the Group had partially financed its

acquisitions and loss making businesses via a trade finance 'money go-round' utilizing sales of

non-existent goods to corporate entities controlled by parties with close ties to the management

of the Group that actually carry on little, if any, legitimate business.  It appears that the Group's

operations are substantially smaller and less profitable than reported in its reports."  This is

precisely the type of fraud suggested by the red flags in Peace Mark's financial statements.

158.    As with Egana, Deutsche Bank could not have legitimately "rated" Peace

Mark, nor could it have adhered to its purportedly "rigorous" standards in originating this

investment.  Therefore, the Peace Mark Reference Obligation did not satisfy the first and second

Eligibility Criteria.

159.    Arco has not been able to obtain an E&Y Certification for the Peace Mark

Reference Obligation, if one exists.  Upon information and belief, if such an E&Y Certification

exists, it is the same as the E&Y Certifications that Arco does have, and therefore fails to satisfy the condition precedent in the Confirmation.

160.    Upon information and belief, in or about September 2008, one or more LEMG employees caused HSBC to transfer $6,175,000 from the Custodial Account to Deutsche Bank based on the Peace Mark Credit Event, knowing that it was not entitled to such funds.

161.    The outstanding principal balances of the Class G-1 and G-2 Notes were each reduced by $3,087,500 as a result of the Peace Mark Credit Event.

**The Grande Holdings Limited**

162.    Yet another Hong Kong Reference Obligation not rated by Moody's was The Grande Holdings Limited ("Grande Holdings"). Arco subsequently discovered that Grande Holdings had a history of acquiring companies in order to fraudulently transfer their assets to Grande Holdings (and its owners). In 1999, Grande Holdings was accused of seizing the assets of one of its subsidiaries, Akai, shortly before Akai collapsed in what remains, upon information and belief, Hong Kong's largest bankruptcy. Next was a Canadian company, MTC, which collapsed following Grande Holdings' alleged seizure of its assets, followed by Emerson Radio. In each case, there were allegations of self-dealing transactions, fraudulent transfers, accounting irregularities, and other misconduct.

163.    Deutsche Bank designated a Reference Obligation for which Grande Holdings was the Reference Entity in February 2008, with an Internal DB Rating of iBB-. The events leading up to February 2008 indicate that the Grande Holdings Reference Obligation violated the Eligibility Criteria.

164. In 2005, MTC shareholders obtained an approximately $40 million judgment against MTC and its insiders arising out of MTC's collapse at the hands of Grande Holdings.

165. In December 2006, the MTC shareholders filed a action in California to enforce the $40 million judgment against Grande Holdings, on an alter ego theory.

166. In November 2007, the California court denied Grande Holdings' motion to dismiss for lack of jurisdiction. Also in November 2007, an Emerson Radio director resigned and accused Grande Holdings of wrongdoing at Emerson Radio.

167. In December 2007, the first shareholder lawsuit was filed in connection with Grande Holdings' alleged appropriation of the assets of Emerson Radio.

168. With these lawsuits pending, in 2007-2008 Grande Holdings announced sales of its interests in certain subsidiary companies, suggesting that it was either moving assets to avoiding forthcoming judgments against it, or was in need of funds. One such sale occurred in January 2008, just before Deutsche Bank designated the Grande Holdings Reference Obligation.

169. Upon information and belief, these events, all of which were publicly reported, were known to Deutsche Bank at the time that it designated the Grande Holdings Reference Obligation in February 2008. In addition, upon information and belief, Deutsche Bank knew or should have known that the Akai investigation was ongoing. The fact that Grande Holdings was a Reference Obligation could not have been learned by Arco until after the Credit Even had occurred.

170. As with Egana and Peace Mark, Deutsche Bank could not have legitimately "rated" Grande Holdings, nor could it have adhered to its purportedly "rigorous"

standards in originating this investment. Therefore, the Grande Holdings Reference Obligation did not satisfy the first and second Eligibility Criterion.

171. Arco has not been able to obtain an E&Y Certification for the Grande Holdings Reference Obligation, if one exists. Upon information and belief, if such an E&Y Certification exists, it is the same as the E&Y Certifications that Arco does have, and therefore fails to satisfy the condition precedent in the Confirmation.

172. Upon information and belief, in or around July 2011, one or more LEMG employees caused HSBC to transfer $5,850,000 from the Custodial Account to Deutsche Bank based on the Grande Holdings Credit Event, knowing that it was not entitled to such funds.

173. The outstanding principal balances of the Class G-1 and G-2 Notes were each reduced by $2,925,000 as a result of the Grande Holdings Credit Event.

### Companies Alleging Misconduct by Deutsche Bank In the Sale of Derivative Lending Products: Unitech, Wockhardt, First Natural

174. On or around March 30, 2012, Deutsche Bank declared a Credit Event with respect to Unitech Limited, an Indian property developer. According to published news reports, Deutsche Bank commenced a lawsuit against Unitech, alleging that it had failed to make payments pursuant to an interest-rate swap agreement (presumably, the Reference Obligation). The amount of the Reference Obligation was $7,000,000, due July 15, 2012—the same date as the expiration of the Transaction.

175. In May 2012, Unitech filed counterclaims against Deutsche Bank. According to reports, Unitech claims that the interest-rate swap was unsuitable, that Deutsche Bank did not explain the risks, and that the amount of profit Deutsche Bank collected from the swap was excessive. Unitech reportedly paid Deutsche Bank more than $23 million under the

swap in less than four years. The case is *Deutsche Bank AG v. Unitech Limited*, High Court of Justice, Queen's Bench Division, 12-464.

176. The Unitech Reference Obligation thus potentially violates the fourth Eligibility Criterion, that the Reference Obligation be "valid and enforceable."

177. Other Reference Entities connected to defaulted Reference Obligations have also challenged Deutsche Bank's lending practices. In November 2008, First Natural Foods ("First Natural"), a Hong Kong company to which Deutsche Bank reportedly sold "toxic derivatives," issued a statement that due to false representations made by Deutsche Bank, First Natural "remains of the view that the Swap is not enforceable."

178. Another Credit Event claimed by Deutsche Bank concerned an Indian pharmaceutical company, Wockhardt Limited ("Wockhardt"). Wockhardt's 2008 Annual Report states that Wockhardt contests "certain derivative/hedging contracts" with banks and is "discussing with lawyers for various options." Upon information and belief, Deutsche Bank's Reference Obligation for Wockhardt is among the lending products Wockhardt challenged.

179. Moreover, these companies are not alone in challenging Deutsche Bank's practices with respect to its derivative lending products. An October 2010 Bloomberg article describes a decision by a German appellate court that Deutsche Bank failed to disclose risks of a lending derivative product to a municipal company in Germany. The article quotes the decision as saying that Deutsche Bank "exploited the customer's ignorance about the market value and was able to clandestinely help itself to his assets." Karin Matussek, *Deutsche Bank Ordered to Pay $980,000 in Swap Suit*, Bloomberg, Oct. 27, 2010. In March 2011, the judgment against Deutsche Bank was affirmed by the Federal Court of Justice, Germany's highest court. Karin Matussek and Elisa Martinuzzi, *Deutsche Bank Loses First German High Court Case Over*

*Swaps*, Bloomberg, Mar. 22, 2011 (also noting that the ruling could impact "dozens of disputes Deutsche Bank has" with local governments, utilities and companies "that claim the lender sold swaps without adequately disclosing risks and fees for the products").

180.    In 2010, the city of Milan, Italy asserted claims against Deutsche Bank and three other banks for misrepresentation in connection with debt swaps arranged for Milan between 2005 and 2007. Earlier this year, Deutsche Bank reportedly settled with Milan, rescinded the swaps and paid Milan "almost 500 million euros." *See* Joe Lynam, *UK-based banks accused of massive mis-selling in Italy*, BBC Business News, September 11, 2012.

181.    Although it settled with Milan, the Italian criminal case against Deutsche Bank for fraud in connection with the selling of derivatives is ongoing.

182.    To the extent any Reference Obligations are susceptible to challenge because Deutsche Bank engaged in fraudulent or misleading practices in its sale of such Reference Obligations to its customers, they do not meet the fourth Eligibility Criteria's requirement that Reference Obligations be "legally valid and enforceable." Deutsche Bank may not recover its losses on such products from the Noteholders.

183.    Arco has not been able to obtain E&Y Certifications for the Unitech or First Natural Reference Obligations, if they exist. Upon information and belief, if such E&Y Certifications exist, they are the same as the E&Y Certifications that Arco does have, and therefore fail to satisfy the condition precedent in the Confirmation.

184.    Arco has obtained two purported E&Y Certifications for the Wockhardt Credit Event, one dated October 8, 2009 (Ex. B) and the other dated March 8, 2010 (Ex. C). In the October 2009 version, E&Y stated that it had not been "provided with the necessary information" to determine "Eligibility Criteria 2, 3, 4 and 5 and Replenishment Conditions (a)

and (b)." In the March 2010 version, this language was removed, and instead these items were included in the list of "Assumptions" from Deutsche Bank as to which E&Y "performed no procedures to verify the accuracy" thereof. Neither of these E&Y Certifications for the Wockhardt Credit Event satisfy the condition precedent.

185.    Upon information and belief, on or around March 2012, one or more LEMG employees caused HSBC to transfer $4,550,000 from the Custodial Account to Deutsche Bank based on the Unitech Credit Event, knowing that it was not entitled to such funds.

186.    The outstanding principal balances of the Class F-1 and F-2 Notes were each reduced by $2,275,000 as a result of the Unitech Credit Event.

187.    Upon information and belief, in or around July 2009, one or more LEMG employees caused HSBC to transfer $5,918,841.50 from the Custodial Account to Deutsche Bank based on the Wockhardt Credit Event, knowing that it was not entitled to such funds.

188.    The outstanding principal balances of the Class G-1 and G-2 Notes were each reduced by $2,959,420.75 as a result of the Wockhardt Credit Event, which flowed through to Arco as owners of the Earls Eight Notes.

189.    Upon information and belief, in or around January 2011, one or more LEMG employees caused HSBC to transfer $1,588,073.50 from the Custodial Account to Deutsche Bank based on the First Natural Credit Event, knowing that it was not entitled to such funds.

190.    The outstanding principal balances of the Class G-1 and G-2 Notes were each reduced by $794,036.75 as a result of the First Natural Credit Event, which flowed through to Arco as owners of the Earls Eight Notes.

**Arcapita**

191.    The largest single defaulted Reference Obligation was an approximately $30 million Reference Obligation relating to Arcapita Bank ("Arcapita"), a Bahrain financial institution that filed for bankruptcy in or around March 2012.

192.    Upon information and belief, the Arcapita Reference Obligation arises from a "murabaha" transaction between Deutsche Bank (among others) and Arcapita in or around May 2007.

193.    According to Arcapita's bankruptcy counsel at a hearing on March 21, 2012, a "murabaha" is "effectively a purchase and sale contract for a commodity." Upon information and belief, a murabaha is not a loan, and indeed cannot be a loan, because, according to Arcapita's counsel, Islamic law prohibits the payment or receipt of interest.

194.    A "purchase and sale contract for a commodity" does not meet the definition of "Reference Obligation" in the Confirmation. Therefore, the Arcapita Reference Obligation violated the fifth Eligibility Criterion (requiring that each Reference Obligation be "of a type described in the definition of 'Reference Obligation'"). Confirmation, Schedule C.

195.    Arco has not been able to obtain an E&Y Certification for the Arcapita Credit Event, if one exists. If such an E&Y Certification exists, it is likely the same as the E&Y Certifications that Arco does have, and therefore fail to satisfy the condition precedent in the Confirmation.

196.    Upon information and belief, on or about March 2012 one or more LEMG employees caused HSBC to transfer $19,529,708.25 from the Custodial Account to Deutsche Bank based on the Arcapita Credit Event, knowing that it was not entitled to such funds.

197.    The outstanding principal balances of the Class F-1 and F-2 Notes were each reduced by $9,764,584.13 as a result of the First Natural Credit Event.

## FIRST CAUSE OF ACTION

### (NOTES and EARLS EIGHT NOTES - Violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a), (c), 17 C.F.R. § 240.10b-5(a), (c))

198.    Arco incorporates by reference the foregoing allegations.

199.    Rule 10b-5 (promulgated under 15 U.S.C. § 78(b)) provides that it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of national securities exchange, (a) To employ any device, scheme, or artifice to defraud, . . . or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

200.    The Notes are securities.

201.    Arco purchased (through Gramercy) Class F-1, F-2, G-1 and G-2 Notes in the January 2007 Upsize. This purchase was completed in the United States because Gramercy was required to transmit its funds to HSBC in New York to complete the purchase, and the Note Purchase Agreement provided that the Notes would not be valid or binding until HSBC received the funds and authenticated the Notes.

202.    Arco purchased Earls Eight Notes in July 2008. This transaction occurred in the United States because Arco executed the transactional documents in Puerto Rico, signature pages were exchanged by a law firm in New York and the Earls Eight Notes were sold into Arco's prime brokerage account in New York.

203.    Deutsche Bank's sale of Earls Eight Notes was in furtherance of the fraudulent Transaction, and it also constituted independent violations of the federal securities

laws (Second Cause of Action) and the common law of New York (Third and Fourth Causes of Action).

204.     Arco purchased its Notes and Earls Eight Notes in reliance on Deutsche Bank's agreements to honor the E&Y Certification requirement, the Eligibility Criteria, and the Replenishment Conditions, as well as Deutsche Bank's representations as to its high origination standards, and thorough due diligence. In addition, as Deutsche Bank knew and intended in structuring the Transaction and Earls Eight transaction, Arco relied on Deutsche Bank to exercise its discretion and control over the Transaction in good faith.

205.     At the time of and in connection with Arco's January 2007 and July 2008 purchases, Deutsche Bank planned to manage the Transaction as part of a scheme to defraud, and/or to engage in acts, practices or a course of business that operated as a deceit on Arco, in violation of Rule 10b-5. Only a few days after Arco's initial purchase, Deutsche Bank knowingly or recklessly designated the ineligible Egana and Peace Mark Reference Obligations. Deutsche Bank thereafter knowingly or recklessly designated the other ineligible Reference Obligations that ultimately defaulted.

206.     Upon information and belief, the Deutsche Bank employees who designated the ineligible Reference Obligations knew at the time that they were ineligible because they had been recklessly originated to borrowers engaging in accounting fraud, were subject to legal challenge due to Deutsche Bank's misleading or fraudulent lending practices, and/or were ineligible for other reasons.

207.     Deutsche Bank used its control over the Transaction to frustrate the E&Y Certification condition precedent. It directed E&Y to provide E&Y Certifications that failed to satisfy the condition precedent and were instead incomplete and/or were based on false

45

Assumptions provided by Deutsche Bank.

208. In addition, Deutsche Bank intentionally or recklessly failed to use updated Moody's mapping tables, and instead falsely reported Moody's Equivalent Ratings based on outdated tables.

209. To obtain Credit Event Payments, Deutsche Bank intentionally or recklessly provided Information Reports to HSBC requesting Credit Event Payments to which Deutsche Bank knew, or was reckless in not knowing, it was not entitled.

210. Deutsche Bank's misconduct employed the means and instrumentalities of interstate commerce, including transmissions of funds by wire transfer.

211. Deutsche Bank's misconduct in its management of the Transaction commencing in and after January 2007, and after July 2008 with respect to Earls Eight Notes, and continuing through 2012, constituted a scheme or artifice to defraud Arco, and a course of business that operated as a fraud and deceit upon Arco, in violation of Rule 10b-5(a) and (c).

212. Arco has been damaged as a result of Deutsche Bank's violation of Rule 10b-5 in an amount to be determined at trial, but not less than $37 million.

## SECOND CAUSE OF ACTION

### (EARLS EIGHT NOTES - Violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b)

213. Arco incorporates by reference the foregoing allegations.

214. Rule 10b-5 (promulgated under 15 U.S.C. § 78(b)) provides that it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of national securities exchange, ... (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make statements made, in right of the circumstances in which they were made, not misleading,

... in connection with the purchase or sale of any security."

215.    The Earls Eight Notes are securities.

216.    Arco purchased Earls Eight Notes in July 2008. This transaction occurred in the United States because Arco executed the transactional documents in Puerto Rico, signature pages were exchanged by a law firm in New York, and the Earls Eight Notes were sold into Arco's prime brokerage account in New York. Deutsche Bank acted through its counsel in New York in connection with the execution of the sale of Earls Eight Notes.

217.    Arco purchased Earls Eight Notes in reliance on Deutsche Bank's agreements to honor the E&Y Certification requirement, the Eligibility Criteria, and the Replenishment Conditions, as well as Deutsche Bank's representations as to its high origination standards, and thorough due diligence. In addition, as Deutsche Bank knew and intended in structuring the Transaction, Arco relied on Deutsche Bank to exercise its discretion and control over the Transaction in good faith.

218.    Shortly before Arco's purchase of Earls Eight Notes, Deutsche Bank designated the ineligible Egana and Peace Mark Reference Obligations, and Deutsche Bank intentionally or knowingly omitted to disclose that it was taking poorly underwritten loans off its books and transferring that undisclosed risk to Arco. Thereafter, Deutsche Bank knowingly or recklessly omitted to disclose that it designated the other ineligible Reference Obligations that ultimately defaulted.

219.    Deutsche Bank, in the sales of Earls Eight Notes made material misrepresentations of fact to Arco, including: Deutsche Bank's agreements to honor the E&Y Certification requirement, the Eligibility Criteria, and the Replenishment Conditions, as well as Deutsche Bank's representations as to its high origination standards, and thorough due diligence.

In addition, as Deutsche Bank knew and intended in structuring the Transaction, Arco relied on Deutsche Bank to exercise its discretion and control over the Transaction in good faith.

220.    In all, Deutsche Bank knowingly misrepresented the nature of risk presented to investors by the Notes and Earls Eight Notes. Arco understood that it was buying securities with a specified degree of risk, but Deutsche Bank sold Arco a product with an entirely different kind of risk and without the benefit of meaningful Independent Accountant certifications, Eligibility Criteria, and Replenishment Conditions, as well as high origination standards, and thorough due diligence. In fact, Deutsche Bank represented that the estimated default rate would be .085%, but it actually was over 14%, causing Arco's investment to be lost in its entirety.

221.    Deutsche Bank's misconduct employed the means and instrumentalities of interstate commerce, including transmissions of funds by wire transfer.

222.    Deutsche Bank's misstatements and omissions in and after July 2008 with respect to Earls Eight Notes constituted a violation of Rule 10b-5(b).

223.    Arco has been damaged as a result of Deutsche Bank's violation of Rule 10b-5 in an amount to be determined at trial, but not less than $10 million.

## THIRD CAUSE OF ACTION

## (NOTES and EARL EIGHT NOTES Common-Law Fraud)

224.    Arco incorporates by reference the foregoing allegations.

225.    Deutsche Bank's sale of the Notes constituted fraud under the common law of New York.

226.    Deutsche Bank's sale of the Earls Eight Notes also constituted a fraud under the common law of New York.

227.    Deutsche Bank, in the sales of Notes and Earls Eight Notes made material

48

misrepresentations of fact to Arco, including: Deutsche Bank's agreements to honor the E&Y Certification requirement, the Eligibility Criteria, and the Replenishment Conditions, as well as Deutsche Bank's representations as to its high origination standards, and thorough due diligence. In addition, as Deutsche Bank knew and intended in structuring the Transaction, Arco relied on Deutsche Bank to exercise its discretion and control over the Transaction in good faith.

228.     In all, Deutsche Bank knowingly misrepresented the nature of risk presented to investors by the Notes and Earls Eight Notes. Arco understood that it was buying securities with a specified degree of risk, but Deutsche Bank sold Arco a product with an entirely different kind of risk and without the benefit of meaningful accountant certifications, Eligibility Criteria, and Replenishment Conditions, as well as high origination standards, and thorough due diligence. In fact, Deutsche Bank represented that the estimated default rate would be .085%, but it actually was over 14%, causing Arco's investment to be lost in its entirety.

229.     Deutsche Bank knew the falsity of its misrepresentations.

230.     Deutsche Bank intended to induce Arco to rely upon its misrepresentations by purchasing Notes and Earls Eight Notes.

231.     Arco justifiably relied on the misrepresentations by Deutsche Bank. Arco purchased Notes and Earls Eight Notes in reliance on Deutsche Bank's agreements to honor the E&Y Certification requirement, the Eligibility Criteria, and the Replenishment Conditions, as well as Deutsche Bank's representations as to its high origination standards, and thorough due diligence. In addition, as Deutsche Bank knew and intended in structuring the Transaction, Arco relied on Deutsche Bank to exercise its discretion and control over the Transaction in good faith.

232.     Arco has been damaged as a result of Deutsche Bank's fraud in an amount to be determined at trial, but not less than $37 million.

## FOURTH CAUSE OF ACTION

## (NOTES and EARLS EIGHT NOTES Breach of Contract – Third Party Beneficiary)

233.   Arco incorporates by reference the foregoing allegations.

234.   Arco is a third-party beneficiary under the CDS Agreement.  The Note Purchase Agreement incorporates the Indenture and other "Transaction Documents" by reference, and invites Noteholders to rely on them.  Note Purchase Agreement ¶ 4(e).  The CDS Agreement is the Transaction Document most important to owners of Notes and Earls Eight Notes, because it provides the Eligibility Criteria, the Replenishment Conditions, and the E&Y Certification condition precedent, all of which are vital to the protection of owners of Notes and Earls Eight Notes.

235.   Deutsche Bank breached the CDS Agreement by:

(a)   Failing to comply with the E&Y Certification requirement, an express condition precedent to Deutsche Bank's receipt of Credit Default Payments.  Confirmation ¶ 4.  Due to the failure of an express condition precedent, Deutsche Bank was not entitled to any of the Credit Event Payments it took.

(b)   Failing to apply updated Moody's mapping tables in determining Moody's Equivalent Ratings.  Upon information and belief, had Deutsche Bank applied the updated Moody's mapping table: (i) the Moody's Rating Condition Test would have failed much sooner than it did, and thereby prevented Deutsche Bank from including one or more of the defaulted Reference Obligations in the Reference Portfolio; and (ii) one or more the defaulted Reference Obligations would have breached the first Eligibility Criteria (the minimum rating).

50

(c)    Including Reference Obligations in the Reference Portfolio that violated one or more of the Eligibility Criteria, including without limitation Egana, Peace Mark, Grande Holdings, Unitech, Wockhardt, First Natural and Arcapita.

(d)    Violating the implied covenant of good faith and fair dealing by exercising its discretion and control over the Transaction, including its discretion with respect to selecting the Reference Obligations, rating the Reference Entities (giving them Internal DB Ratings), updating the Moody's mapping table, and obtaining E&Y Certifications, to defeat the protections in the Transaction for owners of Notes and Earls Eight Notes and seize funds to which it was not entitled; and

(e)    Taking Credit Default Payments from the Note Collateral (i) despite the failure of the E&Y Certification condition precedent and (ii) for Credit Events that involved ineligible Reference Obligations.

236.    Arco has fully complied with its obligations under the Transaction Documents.

237.    Arco has been damaged as a result of Deutsche Bank's breaches of the CDS Agreement in an amount to be determined at trial, but not less than $37 million.

## Demand for Jury Trial

238.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Arco hereby demands a jury trial.

WHEREFORE, Arco respectfully requests that judgment be entered in its favor against Deutsche Bank in an amount to be proven at trial but not less than $37 million, plus interest, costs, attorneys' fees and such other relief as the Court may deem just and proper.

Dated:  June 27, 2012

MILLER & WRUBEL P.C.

By: _____

John G. Moon
S. Christopher Provenzano
570 Lexington Avenue
New York, New York 10022
(212) 336-3500

*Attorneys for*
*Arco Capital Corporation Ltd.*

# EXHIBIT A



# Transaction Structure



**Deutsche Bank AG**
(AA-/Aa3)
("Protection Buyer")

Reference
Portfolio

Credit Protection

CDS Fixed Payment

*Issuer Swap*

**CRAFT
CLO EM 2006-1**
("Issuer")

Note Proceeds

Note Collateral

Interest from
Note Collateral

(DB AG Deposit rated AA-/Aa3)

Note Issuance

Note Proceeds

Note Coupon

**Senior**
EUR [440.0] million
[Not Rated]

**Class F Notes**
EUR [25.0] million
[Rated [BB]]

**Class G Notes**
EUR [35.0] million
[Not Rated]

*not offered*

# EXHIBIT B



CRAFT EM CLO 2006-1, Ltd.

Report to:
CRAFT EM CLO 2006-1, Ltd.
and
Deutsche Bank AG, Frankfurt

8 October 2009



**ERNST & YOUNG**

Ernst & Young LLP
5 Houston Center
Suite 1200
Houston, Texas 77010-2007

Tel: +1 (713) 750-1500
Fax: +1 (713) 750-1501
www.ey.com

INDEPENDENT ACCOUNTANTS' REPORT
ON APPLYING AGREED-UPON PROCEDURES

CRAFT EM CLO 2006-1, Ltd.                                8 October 2009
Queensgate House, South Church Street
P.O. Box 1093GT
George Town, Grand Cayman
Cayman Islands

Deutsche Bank AG, Frankfurt
Taunusanlage 12
60325 Frankfurt am Main
Germany

**Notice of Credit Event for Wockhardt Limited**

Ladies and Gentlemen:

We have performed the procedures enumerated below, which were agreed to by the
addressees of this report as shown above (the "Addresses"), solely to assist Deutsche Bank
AG, Frankfurt (the "Issuer Swap Counterparty") in complying with the first amended and
restated confirmations dated 26 January 2007 for CRAFT EM CLO 2006-1, Ltd.'s
(the "Issuer") Class G Notes and 30 January 2007 for the Issuer's Class E Notes and Class F
Notes (together, the "Amended Credit Swaps") relating to the credit derivative transactions
between the Issuer and the Issuer Swap Counterparty. The Amended Credit Swaps indicated
that the Issuer issued the Class E Notes and Class F Notes pursuant to an indenture between
the Issuer and HSBC Bank USA, National Association (the "Trustee") and issued the Class G
Notes pursuant to a separate indenture between the Issuer and the Trustee.

This engagement to apply agreed-upon procedures was performed in accordance with
attestation standards established by the American Institute of Certified Public Accountants.
The sufficiency of the procedures we performed is solely the responsibility of the Addressees
of this report. Consequently, we make no representation regarding the sufficiency of the
procedures we performed, as described below, either for the purpose for which this report has
been requested or for any other purpose. Furthermore, we make no representations and
express no opinion as to: (a) questions of legal interpretation, (b) the sufficiency of the
requirements of the Amended Credit Swaps, (c) the accuracy, completeness or
reasonableness of the assumptions and methodologies set forth in the Amended Credit
Swaps and (d) the accuracy, completeness or reasonableness of the information provided to
us by Issuer Swap Counterparty, on behalf of the Issuer. This report does not constitute a
legal determination as to the Issuer Swap Counterparty's compliance with the Amended Credit
Swaps' specified requirements or the Issuer's compliance with either indenture.

 **ERNST & YOUNG**

We are independent with respect to the Issuer within Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Credit Swaps.

The Issuer Swap Counterparty provided us with:

a)  Two forms of documentation (the "Source Documentation") relating to its determination of a Credit Event in connection with the Reference Obligation identified as Wockhardt Limited on the Reference Registry held by the Issuer. The Issuer Swap Counterparty indicated that the Source Documentation comprises the documentation of Wockhardt Limited's failed debt payment that is relevant to such determination of a Credit Event by the Issuer Swap Counterparty.

b)  The monthly Reference Registries as of 16 October 2007 and 18 January 2008 (the "Relevant Dates") which correspond to the date of inclusion into the Reference Registry and subsequent replenishment of the Reference Obligation, respectively, and the Reference Registry as of 17 July 2009 (the "Credit Event Notice Reference Registry").

Except as identified below, we performed no procedures on the Source Documentation, any information provided to us by the Issuer Swap Counterparty, or on any other information related to the Reference Obligations held by the Issuer or on the Issuer's Class E Notes, Class F Notes and Class G Notes.

The procedures we performed and our associated findings were as follows:

(1)  We read the information on the Source Documentation and compared the terms described therein to the definition of a Credit Event in the Amended Credit Swaps and found to be in agreement with the Issuer Swap Counterparty that such terms correspond to a Credit Event within such definition for the Reference Obligation identified as Wockhardt Limited on the Reference Registry.

(2)  We obtained the Reference Obligation Eligibility Criteria and Replenishment Conditions for the Reference Portfolio as of each Relevant Date. Using the assumptions provided by the Issuer Swap Counterparty listed on Exhibit 1 (the "Assumptions"), we recalculated such items on the 16 October 2007 and 18 January 2008 Reference Registries using the terms described in the Amended Credit Swaps and found them to be in agreement with the Issuer Swap Counterparty (except for Eligibility Criteria 2, 3, 4 and 5 and Replenishment Conditions (a) and (b) as we were not provided with the necessary information to recalculate these tests), and redetermined that the Reference Obligation identified as Wockhardt Limited satisfied the Reference Obligation Eligibility Criteria and Replenishment Conditions on the Relevant Dates.


**ERNST & YOUNG**

(3)    Using:

    a.    Information in the Amended Credit Swaps,

    b.    The Credit Event Notice Reference Registry and

    c.    Assumptions on Exhibit 1,

we recomputed, compared and agreed our results with the Issuer Swap Counterparty that the Loss Determination Amount of Wockhardt Limited is $5,918,841.50. We performed no procedures with regards to the allocation of the Loss Determination Amounts to the Issuer's Notes.

We were not engaged to, and did not perform, an examination, the objective of which would be the expression of an opinion on the items specified above. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you. Unless otherwise specified in this report, the foregoing procedures were limited to a comparison of information or a recomputation of the specified calculation.

This report is intended solely for the use of the Addressees of this report and should not be used by those who have not agreed to the procedures we performed and taken responsibility for the sufficiency of those procedures for their purposes.

We undertake no responsibility to update this report for events and circumstances occurring after the date hereof.

Sincerely yours,

*Ernst + Young LLP*

Exhibit 1

## Assumptions

(refer to Items 2. and 3.)

1.  Wockhardt Limited relates to the Reference Obligation Identifier "CCT-FX-6" in the October 2007 Reference Registry and "CLOCCT-FX-6" in the January 2008 Reference Registry and the Credit Event Notice Reference Registry. Additionally Wockhardt Limited relates to the Reference Entity Identifier "5112892" on the Relevant Dates Reference Registry and Credit Event Notice Reference Registry.

2.  Wockhardt Limited is a Specified Payment Obligation.

3.  A Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event has not occurred in relation to Wockhardt Limited prior to the Relevant Dates.

4.  Wockhardt Limited has a DBAG Group Amount of $29,327,633.97.

5.  The Source Documentation relates to an Obligation of Wockhardt Limited that is Borrowed Money.

6.  The date of the Credit Event is 9 July 2009.

Note:  We performed no procedures to verify the accuracy of the Assumptions provided to us by the Issuer Swap Counterparty.

# EXHIBIT C



CRAFT EM CLO 2006-1, Ltd.

Report to:
CRAFT EM CLO 2006-1, Ltd.
and
Deutsche Bank AG, Frankfurt

8 March 2010



Ernst & Young LLP
5 Houston Center
Suite 1200
Houston, Texas 77010-2007

Tel: +1 (713) 750-1500
Fax: +1 (713) 750-1501
www.ey.com

## INDEPENDENT ACCOUNTANTS' REPORT
## ON APPLYING AGREED-UPON PROCEDURES

CRAFT EM CLO 2006-1, Ltd.                                     8 March 2010
Queensgate House, South Church Street
P.O. Box 1093GT
George Town, Grand Cayman
Cayman Islands

Deutsche Bank AG, Frankfurt
Taunusanlage 12
60325 Frankfurt am Main
Germany

**Notice of Credit Event for Wockhardt Limited**

Ladies and Gentlemen:

We have performed the procedures enumerated below, which were agreed to by the
addressees of this report as shown above (the "Addresses"), solely to assist Deutsche Bank
AG, Frankfurt (the "Issuer Swap Counterparty") in complying with the first amended and
restated confirmations dated 26 January 2007 for CRAFT EM CLO 2006-1, Ltd.'s
(the "Issuer") Class G Notes and 30 January 2007 for the Issuer's Class E Notes and Class F
Notes (together, the "Amended Credit Swaps") relating to the credit derivative transactions
between the Issuer and the Issuer Swap Counterparty. The Amended Credit Swaps indicated
that the Issuer issued the Class E Notes and Class F Notes pursuant to an indenture between
the Issuer and HSBC Bank USA, National Association (the "Trustee") and issued the Class G
Notes pursuant to a separate indenture between the Issuer and the Trustee.

This engagement to apply agreed-upon procedures was performed in accordance with
attestation standards established by the American Institute of Certified Public Accountants.
The sufficiency of the procedures we performed is solely the responsibility of the Addressees
of this report. Consequently, we make no representation regarding the sufficiency of the
procedures we performed, as described below, either for the purpose for which this report has
been requested or for any other purpose. Furthermore, we make no representations and
express no opinion as to: (a) questions of legal interpretation, (b) the sufficiency of the
requirements of the Amended Credit Swaps, (c) the accuracy, completeness or
reasonableness of the assumptions and methodologies set forth in the Amended Credit
Swaps and (d) the accuracy, completeness or reasonableness of the information provided to
us by Issuer Swap Counterparty, on behalf of the Issuer. This report does not constitute a
legal determination as to the Issuer Swap Counterparty's compliance with the Amended Credit
Swaps' specified requirements or the Issuer's compliance with either indenture.


**ERNST&YOUNG**

We are independent with respect to the Issuer within Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants.

Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Amended Credit Swaps.

The Issuer Swap Counterparty provided us with:
a)  Two forms of documentation (the "Source Documentation") relating to its determination of a Credit Event in connection with the Reference Obligation identified as Wockhardt Limited on the Reference Registry held by the Issuer. The Issuer Swap Counterparty indicated that the Source Documentation comprises the documentation of Wockhardt Limited's failed debt payment that is relevant to such determination of a Credit Event by the Issuer Swap Counterparty.
b)  A copy of the Credit Event Notice and Notice of Publically Available Information related to Wockhardt Limited (together, the "Notices").
c)  The monthly Reference Registries as of 16 October 2007 and 18 January 2008 (the "Relevant Dates") which correspond to the date of inclusion into the Reference Registry and subsequent replenishment of the Wockhardt Limited Reference Obligation, respectively.
d)  The Reference Registry as of 17 September 2009 (the "Credit Event Notice Reference Registry").
e)  A copy of the ISDA agreement dated 18 October 2005 and swap confirmation dated 7 August 2008 (together, the "Swap Confirmation") between Deutsche Bank AG and Wockhardt Limited.
f)  Their calculations of the Reference Obligation Eligibility Criteria and Replenishment Conditions (the "Test Results") as of the Relevant Dates, which we attached as Exhibit 1.
g)  Copies of the Issuer Swap Counterparty's results (the "Model Results") as of the Relevant Dates for their calculation of the S&P SROC Condition and Moody's Rating Condition Test.
h)  Certain assumptions (the "Assumptions") listed on Exhibit 2.

The Issuer Swap Counterparty indicated that the information on the Reference Obligations used to prepare the Test Results was the same information on the related Reference Registries and the appropriate inputs for determination of the S&P SROC Condition and Moody's Rating Condition Test.

Except as identified below, we performed no procedures on the Source Documentation, the Model Results, any information provided to us by the Issuer Swap Counterparty, or on any other information related to the Reference Obligations held by the Issuer or on the Issuer's Class E Notes, Class F Notes and Class G Notes.


The procedures we performed and our associated findings were as follows:

(1)     We read the information on the Source Documentation and compared the terms
described therein to the definition of a Credit Event in the Amended Credit Swaps and
found to be in agreement with the Issuer Swap Counterparty that such terms
correspond to a Credit Event within such definition for the Reference Obligation
identified as Wockhardt Limited on the Credit Event Notice Reference Registry.

(2)     We read the information in the Swap Confirmation and compared the documentation
type to the types described in the definition of Specified Payment Obligation in the
Amended Credit Swaps and found to be in agreement with the Issuer Swap
Counterparty that such documentation type corresponds to the one of the items referred
to under clause (ii)(a) or (ii)(b) within such definition for the Reference Obligation
identified as Wockhardt Limited on the Credit Event Notice Reference Registry.

(3)     For each Relevant Date, we compared and agreed the following information
(the "Attributes") provided by the Issuer Swap Counterparty for the Reference
Obligation identified as Wockhardt Limited on the Credit Event Notice Reference
Registry to the corresponding information we obtained or derived using the
Assumptions, Amended Credit Swaps and information from the Notices,
Source Documentation or Swap Confirmation (collectively, the "Data Sources").

| Attribute | Data Sources |
|---|---|
| Event Determination Date | Notices and Source Documentation |
| Obligation location | Swap Confirmation |
| Reference Obligation type | Swap Confirmation |

(4)     Using:
a. Information on the Reference Registry as of each Relevant Date,
b. Information in the Amended Credit Swaps and
c. Assumptions on Exhibit 2,
we recalculated, and found to be in agreement, with the corresponding information on
Exhibit 1, the information indicated by the letter A on Exhibit 1. In performing this
procedure, we were instructed by the Issuer Swap Counterparty, on behalf of the
Issuer, to ignore differences of +/- 0.01% or less

(5)     For each Relevant Date, we assessed whether the output on the Model Results
exceeded the corresponding threshold requirement for Replenishment Conditions (a)
and (b) and compared such result to the Issuer Swap Counterparty's result of "TRUE"
as shown on the Test Results and found such items to be in agreement as indicated by
the letter B on Exhibit 1.



(6)    For the Reference Obligation Eligibility Criteria and Replenishment Conditions indicated by the letter A on Exhibit 1, we compared such values resulting from the inclusion of the Reference Obligation identified as Wockhardt Limited on the Relevant Dates to the corresponding threshold amounts and found such values to be at or within such threshold amounts.

(7)    Using:
a. Information in the Amended Credit Swaps,
b. The Credit Event Notice Reference Registry and
c. Assumptions on Exhibit 2,
we recomputed, compared and agreed our results with the Issuer Swap Counterparty that the Loss Determination Amount of Wockhardt Limited is $5,918,841.50. We performed no procedures with regards to the allocation of the Loss Determination Amounts to the Issuer's Notes.

We were not engaged to, and did not perform, an examination, the objective of which would be the expression of an opinion on the items specified above. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you. Unless otherwise specified in this report, the foregoing procedures were limited to a comparison of information or a recomputation of the specified calculation.

This report is intended solely for the use of the Addressees of this report and should not be used by those who have not agreed to the procedures we performed and taken responsibility for the sufficiency of those procedures for their purposes.

We undertake no responsibility to update this report for events and circumstances occurring after the date hereof.

Sincerely yours,

Ernst + Young LLP

Exhibit 1

## Reference Obligation Eligibility Criteria and Replenishment Conditions

(refer to Items 4., 5. and 6.)

CRAFT EM CLO 2006-1 Ltd.
16-Oct-07
Strictly Private and Confidential
Preliminary and Subject to Change
Replenishment Conditions
Reference Obligation Eligibility Criteria

| | | Calculated | | Criteria | Result |
|---|---|---|---|---|---|
| **Reference Obligation Eligibility Criteria** | | | | | |
| | | Calculated | | Criteria | Result |
| | Aggregate Outstanding Notional Amount of all Reference Claims | 593,240,000.00 | | 398,310,000.00 | Pass |
| (1) | Such Reference Entity has an S&P Equivalent Rating of B- and a Moody's Equivalent Rating of B3 or above | 100.00% | | 100.00% | Pass |
| (2) | Such Reference Obligation relates to a senior secured or unsecured obligation of the relevant Reference entity that has been originated by the Originator in accordance with its standard credit policies and guidelines | 100.00% | A | 100.00% | Pass |
| (3) | A Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event shall not have occurred in relation to such Reference Obligation | 100.00% | | 100.00% | Pass |
| (4) | Such Reference Obligation shall be legally and enforceable in accordance with its terms and applicable provisions of law | 100.00% | | 100.00% | Pass |
| (5) | Such Reference Obligation shall not be a bond but shall be a loan, guarantee, letter of credit or revolving credit facility (or combination of the foregoing) as defined in the definition of "Reference Obligation" held by or for the benefit of an entity w | 100.00% | | 100.00% | Pass |
| **Replenishment Conditions** | | | | | |
| (a) | S&P SROC Condition is satisfied | TRUE | B | TRUE | Pass |
| (b) | Moody's Rating Condition Test is satisfied. | TRUE | | TRUE | Pass |
| (c) | The aggregate of the Reference Obligation Notional amounts of Reference Entities with a Moody's Equivalent Rating of "Ba1" or below or an S&P Equivalent Ratings of "BB+" or below does not exceed 65% of the initial Portfolio Notional Amount | 30.40% | | 65% | Pass |
| (d) | The aggregate of the Reference Obligation Notional amounts of Reference Entities with a Moody's Equivalent Rating of "Ba3" or below or an S&P Equivalent Ratings of "BB-" or below does not exceed 25% of the initial Portfolio Notional Amount | 19.62% | | 25% | Pass |
| (e) | No individual Reference Entity Group has an aggregate Reference Obligation Notional amount that exceeds the percentage shown in the table below (based on the lowest of its Moody's Equivalent Rating and its S&P Equivalent Rating as the highest rated Referenc | | | | |
| | **S&P Equivalent Rating** / **Moody's Equivalent Rating** | | | | |
| | BBB- and above / Baa3/Ba1 and above | 4.00% | | 4.00% | Pass |
| | BB+ to B+ / Ba1 to B1 | 0.14% | A | 2.00% | Pass |
| | B or B- / B2 or B3 | 0.00% | | 1.00% | Pass |
| | provided that if the Moody's Equivalent Rating or S&P Equivalent Rating of any one or more Reference Entities within the Reference Entity Group is the same or lower than the Moody's Equivalent Rating or S&P Equivalent Rating or any other Reference Entity | | | | |
| | (1) All such Reference Entities with the same such rating may not have an aggregate Reference Obligation Notional amount that exceeds the amount shown in the preceding table (based on the Moody's Equivalent Rating or S&P Equivalent Rating); | | | | |
| | **S&P Equivalent Rating** / **Moody's Equivalent Rating** | | | | |
| | BBB- and above / Baa3/Ba1 and above | 1.78% | | 4.00% | Pass |
| | BB+ to B+ / Ba1 to B1 | 0.00% | | 2.00% | Pass |
| | B or B- / B2 or B3 | 0.00% | | 1.00% | Pass |
| | (2) All such lower-rated Reference Entities may not have an aggregate Reference Obligation Notional amount that exceeds an amount shown in the preceding table (based on their own Moody's Equivalent Rating or S&P Equivalent Rating). | | | | |
| | **S&P Equivalent Rating** / **Moody's Equivalent Rating** | | | | |
| | BBB- and above / Baa3/Ba1 and above | 0.00% | | 4.00% | Pass |
| | BB+ to B+ / Ba1 to B1 | 0.00% | | 2.00% | Pass |
| | B or B- / B2 or B3 | 0.00% | | 1.00% | Pass |
| | (3) All such higher-rated Reference Entities may not have an aggregate Reference Obligation Notional amount that exceeds an amount equal to (i) the amount shown in the preceding table (based on their own Moody's Equivalent Rating or S&P Equivalent Rating) | N/A | | | N/A |

CRAFT EM CLO 2006-1 Ltd.
18-Jan-08
Strictly Private and Confidential
Preliminary and Subject to Change
Replenishment Conditions
Reference Obligation Eligibility Criteria

|  | Calculated | Criteria | Result |
|---|---|---|---|

## Reference Obligation Eligibility Criteria

|  |  | Calculated | Criteria | Result |
|---|---|---|---|---|
|  | Aggregate Outstanding Nominal Amount of all Reference Obams | 838,915,000.00 | 999,915,000.00 | Pass |
| (1) | Such Reference Entity has an S&P Equivalent Rating of B- and a Moody's Equivalent Rating of B3 or above | 100.00% | 100.00% | Pass |
| (2) | Such Reference Obligation relates to a senior secured or unsecured obligation of the relevant Reference entity that has been originated by the Originator in accordance with its standard credit policies and guidelines | 100.00% | 100.00% | Pass |
| (3) | A Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event shall not have occurred in relation to such Reference Obligation. | 100.00% | 100.00% | Pass |
| (4) | Such Reference Obligation shall be legally and enforceable in accordance with its terms and applicable provisions of law | 100.00% | 100.00% | Pass |
| (5) | Such Reference Obligation shall not be a bond but shall be a loan, guarantee, letter of credit or revolving credit facility (or combination of the foregoing) as defined in the definition of "Reference Obligation" held by or for the benefit of an entity within the OBAG Group | 100.00% | 100.00% | Pass |

## Replenishment Conditions

|  |  | Calculated | Criteria | Result |
|---|---|---|---|---|
| (a) | S&P SROC Condition is satisfied. | TRUE | TRUE | Pass |
| (b) | Moody's Rating Condition Test is satisfied | TRUE | TRUE | Pass |
| (c) | The aggregate of the Reference Obligation Notional amounts of Reference Entities with a Moody's Equivalent Rating of "Ba1" or below or an S&P Equivalent Rating of "BB+" or below does not exceed 65% of the Initial Portfolio Notional Amount. | 31.02% | 65% | Pass |
| (d) | The aggregate of the Reference Obligation Notional amounts of Reference Entities with a Moody's Equivalent Rating of "Ba3" or below or an S&P Equivalent Rating of "BB-" or below does not exceed 25% of the Initial Portfolio Notional Amount | 17.82% | 25% | Pass |
| (e) | No Individual Reference Entity Group has an aggregate Reference Obligation Notional amount that exceeds the percentage shown in the table below (based on the lowest of its Moody's Equivalent Rating and its S&P Equivalent Rating as the highest rated Reference Entity within the Reference Entity Group) | | | |

| S&P Equivalent Rating | Moody's Equivalent Rating | | | |
|---|---|---|---|---|
| BBB- and above | Baa3/Ba1 and above | 2.01% | 4.00% | Pass |
| BB+ to B+ | Ba1 to B1 | 1.30% | 2.00% | Pass |
| B or B- | B2 or B3 | 0.00% | 1.00% | Pass |

provided that if the Moody's Equivalent Rating or S&P Equivalent Rating of any one or more Reference Entities within the Reference Entity Group is the same or lower than the Moody's Equivalent Rating or S&P Equivalent Rating or any other Reference Entity within the same Reference Entity Group, then:

(1) All such Reference Entities with the same such rating may not have an aggregate Reference Obligation Notional amount that exceeds the amount shown in the preceding table (based on the Moody's Equivalent Rating or S&P Equivalent Rating);

| S&P Equivalent Rating | Moody's Equivalent Rating | | | |
|---|---|---|---|---|
| BBB- and above | Baa3/Ba1 and above | 0.00% | 4.00% | Pass |
| BB+ to B+ | Ba1 to B1 | 0.00% | 2.00% | Pass |
| B or B- | B2 or B3 | 0.00% | 1.00% | Pass |

(2) All such lower-rated Reference Entities may not have an aggregate Reference Obligation Notional amount that exceeds an amount shown in the preceding table (based on their own Moody's Equivalent Rating or S&P Equivalent Rating);

| S&P Equivalent Rating | Moody's Equivalent Rating | | | |
|---|---|---|---|---|
| BBB- and above | Baa3/Ba1 and above | 0.00% | 4.00% | Pass |
| BB+ to B+ | Ba1 to B1 | 0.00% | 2.00% | Pass |
| B or B- | B2 or B3 | 0.00% | 1.00% | Pass |

(3) All such higher-rated Reference Entities may not have an aggregate Reference Obligation Notional amount that exceeds an amount equal to (i) the amount shown in the preceding table (based on their own Moody's Equivalent Rating or S&P Equivalent Rating)

|  |  | N/A |  | N/A |

Exhibit 2

## Assumptions

(refer to Items 3., 4. and 7.)

1.  Wockhardt Limited relates to the Reference Obligation Identifier "CCT-FX-6" in the October 2007 Reference Registry and "CLOCCT-FX-6" in the January 2008 Reference Registry and the Credit Event Notice Reference Registry. Additionally Wockhardt Limited relates to the Reference Entity Identifier "5112892" on the Relevant Dates Reference Registry and Credit Event Notice Reference Registry.

2.  A Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event has not occurred in relation to Wockhardt Limited prior to the Relevant Dates.

3.  The Swap Confirmation referencing Wockhardt Limited is legally valid and enforceable in accordance with its terms and applicable provisions of law.

4.  The Source Documentation relates to an Obligation of Wockhardt Limited that is Borrowed Money.

5.  Wockhardt Limited is a Reference Obligation in the Obligation Category of "Payment" and represents a full recourse obligation of a Reference Entity.

6.  The DBAG Group Amount for Wockhardt Limited is $29,327,633.97.

7.  For the purpose of recalculating Reference Obligation Eligibility Criteria item 2, the definition of Specified Payment Obligation in the Amended Credit Swaps supersedes the description of item 2 in the Amended Credit Swaps.

8.  Wockhardt Limited was originated by the Originator in accordance with its standard credit policies and guidelines and represents an obligation where the primary risk is the credit risk of a corporate entity or a Sovereign (excluding asset financing).

Note:  We performed no procedures to verify the accuracy of the Assumptions provided to us by the Issuer Swap Counterparty.